## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**COREY MILLER**                                     **CIVIL ACTION**

**VERSUS**                                               **NO. 21-1413**

**TIMOTHY HOOPER, WARDEN**                    **SECTION "R" (4)**

### RESPONSE IN OPPOSITION TO
### <u>GRANTING WRIT OF HABEAS CORPUS</u>

### CUSTODY

The petitioner, Corey Miller, is a state court prisoner incarcerated in the Louisiana State

Penitentiary, Angola, Louisiana.  Miller is serving a sentence of life imprisonment at hard labor

without benefit of probation, parole, or suspension of sentence, imposed relative to his conviction

for Second Degree Murder (a violation of LSA-R.S. 14:30.1) in Case No. 02-0404 "N" of the 24th

Judicial District Court for the Parish of Jefferson.  Miller is in custody for purposes of 28 U.S.C.

2254

### STATEMENT OF THE CASE

On February 28, 2002, Corey "C-Murder" Miller was indicted by a Jefferson Parish grand

jury for a violation of LSA-R.S. 14:30.1 relative to the second  de gree murder of Steve Thomas in

1

a nightclub in Kenner, Louisiana. (St. R., p. 129).  On March 6, 2002, the defendant pled not guilty. (St. R., p. 4597).

A jury trial commenced on August 3, 2009, and a 12-person jury found petitioner guilty as charged on August 11, 2009.[1]  (St. R., pp. 114, 126).  The Louisiana Fifth Circuit Court of Appeal affirmed his conviction and sentence on December 28, 2011.  *State v. Miller*, 10-KA-718 (La. 12/28/11), 83 So.3d 178. (St .R., p. 21362).  The Louisiana Supreme Court denied Petitioner's timely petition for writ of certiorari on May 18, 2012.  *State v. Miller*, 12-K-0282 (La. 5/18/12), 89 So.3d 1191.  (St. R., p. 21266). Thereafter, on February 19, 2013, the United States Supreme Court denied Petitioner's timely petition for writ of certiorari.  *Miller v. Louisiana*, 568 U.S. 1157, 133 S.Ct. 1238, 185 L.Ed.2d 177 (2013).

On February 19, 2014, in the state district court, Petitioner, through counsel, filed an *Initial Application for Post-Conviction Relief* (St. R., p. 19135) and a *Notice of Intent to Amend Initial Application for Post Conviction Relief* (St. R., p.19130), wherein Petitioner requested that the state district court stay the proceedings until February 19, 2015 to allow him to amend the initial application for post conviction relief, stating that noted that he had filed his application "well within the two year statutory limit [set forth in LSA-C.Cr.P. art 922(D)] in order to preserve his right to federal review" with the intention of amending it at a later date. (St. R., p. 19131).  On April 7, 2014,

---

[1] This was Petitioner's second trial in this matter.  After petitioner's first trial he was convicted of second degree murder on September 30, 2003. However, he filed a motion for new trial, which was granted by the state district court after extensive litigation.  The State sought review and, on March 10, 2005, the Louisiana Fifth Circuit Court of Appeal granted writs and set aside the state district court's ruling in a two to one decision. *State v. Miller*, 04-KH-682 (La. App. 5 Cir. 3/10/05), (unpublished writ decision).  (St. R., p. 21151).  Thereafter, the Louisiana Supreme Court granted writs, reversed the Louisiana Fifth Circuit Court of Appeal's ruling, and reinstated the state district court's grant of Petitioner's new trial.  *See*, *State v. Miller*, 05-1111 (La. 3/10/06), 923 So.2d 625 (per curiam).  (St. R., pp. 21229, 21260).

2

the state district court granted Petitioner 60 days from the issuance of its order to amend his initial application for post conviction relief.  Without opposition, the deadline to supplement the initial application was subsequently extended until September 8, 2014, until December 8, 2014, and until February 19, 2015.

On December 8, 2014, Petitioner filed a counseled *First Amended Application for Post-Conviction Relief.*  On February 20, 2015, Petitioner filed another counseled *First Amended Application for Post-Conviction Relief* which appears to be a several pages longer and to contain a few more pages of exhibits than the version filed on December 8, 2014. (St. R, p. 22355).  On June 19, 2015, the State filed procedural objections to eight of petitioner's ten claims, arguing that all but claims VII and VIII, both of which alleged ineffective assistance of counsel, were procedural barred. (St. R., p. 22562).   In an *Order* dated August 26, 2015, the state district court sustained the State's objections to Claims I, II, III, IV, V, VI, IX, and X, and ordered the State to file a response on the merits to claims VII and VIII.  (St. R., p. 22582).

On September 10, 2015, the defendant filed a notice of intent to seek supervisory writs following the state district court's ruling of August 26, 2015, and was granted until October 16, 2015 in which to do so.  That date was thereafter extended until November 2, 2015.  On December 29, 2015, the Louisiana Fifth Circuit Court of Appeal denied Petitioner's timely filed writ application with reasons. *Miller v. Cain*, 15-KH-679 (La. App. 5 Cir. 12/29/15) (unpublished writ decision). (St. R. 90, p. 22585).  According to the Louisiana Supreme Court's letter of January 29, 2016 (St. R., p.22618), Miller on that date electronically filed a writ application seeking review of the Fifth Circuit's decision denying Writ No. 15-KH-679 under Louisiana Supreme Court Writ No. 16-KP-

0207 (St. R., p. 22588).  On October 28, 2016, the Louisiana Supreme Court issued an order stating

that Writ No. 16-KP-0207 was not considered and not timely filed. (St. R., pp. 22623, 22624).

Meanwhile postmarked May 16, 2016 and stamped as filed on May 19, 2016, Petitioner filed

a *pro se Supplement to Application for Post-Conviction Relief*.  (St. R., p. 18582).  By written *Order*

dated May 31, 2016, the trial court dismissed Petitioner's *pro se Supplement to Application for Post*

*Conviction Relief*. (St. R., p. 18576).

On June 26, 2018. Petitioner filed a counseled *Supplemental and Amended Memorandum in*

*Support of Initial Application for Post Conviction Relief* setting forth Claim XI (alleging the failure

to disclose exculpatory evidence in violation of Petitioner's rights under *Brady* and *Napue* - Kevin

Jordan affidavit) and Claim XII (reurged claim of Actual Innocence based upon the allegations set

forth in Claim XI).  (St. R., p. 18565).

On July 2, 2018, Petitioner filed a counseled *Second Supplemental and Amended*

*Memorandum* in Support of Initial Application for Post Conviction Relief setting forth Claim  XII

(alleging failure to disclose exculpatory evidence inviolation of Brady and Napue - Darnell Jordan

affidavit) and Claim XIII (reurged claim of Actual innocence based upon the allegations in Claim

XII).  (St. R., p. 21653).

On July 3, 2018, the state district court ordered the State to file a response raising whatever

procedural objections it may have, or if not procedural objections, an answer on the merits of Claims

VII, VIII of Petitioner's *Initial Application for Post-Conviction Relief* and *First Amended*

*Application for Post Conviction Relief*, and to claims raised in Petitioner's *Supplemental and*

*Amended Memorandum in Support of Initial Application for Post Conviction Relief* and *Second*

*Supplemental and Amended Memorandum in Support of Initial Application for Post Conviction*

4

*Relief.* (St. R., p. 18560). On September 21, 2018, the State filed its *Memorandum in Opposition* with supporting exhibits. (St. R., pp. 18439, 18381-18535). On December 5, 2018, Petitioner filed his *Rebuttal to State's Opposition to Defendant's Application for Post-Conviction Relief.* (St. R., p. 18180).

On January 23, 2019, the state district court denied claims VII and VIII of Petitioner's *Initial Application for Post-Conviction Relief* and *First Amended Application for Post Conviction Relief*, and denied claims raised in Petitioner's *Supplemental and Amended Memorandum in Support of Initial Application for Post Conviction Relief* and *Second Supplemental and Amended Memorandum in Support of Initial Application for Post Conviction Relief.* (St. R., p. 17993). Miller filed a notice of intent to seek writs and was granted a return date of March 21, 2019, which date was extended multiple times following the enrollment of new counsel for Miller on April 18, 2019 (St. R., pp. 17992, 17951). On September 16, 2020, Miller timely filed Writ No. 20-KH-322, which was denied by the Louisiana Fifth Circuit Court of Appeal on December 11, 2020. *State ex rel. Corey Miller v. State*, 20-KH-322 (La. App. 5 Cir. 12/11/20) (unpublished writ decision). (St. R., p. 21611). Miller then timely filed Writ No. 21-KP-00305 (St. R., pp. 21577), which was denied by the Louisiana Supreme Court on October 5, 2021. *State ex rel. Miller v. State*, 21-KP-00305, 2021 WL 4551252 (La. 10/5/21), — So.3d — .

Meanwhile, on September 24, 2020, Petitioner filed a *Initial Application for Post-Conviction Relief Application and Motion to Amend and Supplement a Timely Filed Petition for Post-Conviction Relief* contesting the non-unanimous jury and the State's alleged failure to disclose exculpatory evidence. (St. R., pp. 17820, 17832). Although the state district judge granted Petitioner's request

for thirty days to amend and/or supplement this application, he failed to amend or supplement, and it was denied by the state district judge on March 26, 2021. (St. R., pp. 17808, 17819).

On April 1, 2021, new counsel filed a motion to enroll and filed yet another application for post conviction relief, this one styled as a "Supplemental Application" and also challenging his non-unanimous jury verdict, claiming that said verdict is unconstitutional in light of the United States Supreme Court's decision in *Ramos v. Louisiana*, ____ U.S. ____, 140 S.Ct. 1390 (2020). (St. R. Vol.   , pp. 17769, 17770). The application for post conviction relief was denied by the state district court as repetitive and successive on April 8, 2021. (St. R., p.  17752). Petitioner sought review of the Court's ruling by filing an application for supervisory writ that was denied by the Louisiana Fifth Circuit Court of Appeal on May 13, 2021. *State v. Miller*, 21-KH-221 (La. App. 5 Cir. 5/13/21) (unpublished writ decision).

On July 25, 2021, Miller filed with this Honorable Court a petition for writ of habeas corpus and a supporting memorandum.   (*See* R., Docs. 1, 1-1).  The petition appears to have been timely filed by the calculations of the undersigned.   The claims appear to be exhausted with the exception The respondent has produced the state court record to the Court in 91 paginated volumes and respectfully submits that Miller is not entitled to an evidentiary hearing.

### FACTS

The following facts are derived from the opinion issued in regard to the petitioner's appeal:

Deputy Brian Singleton of the Jefferson Parish Sheriff's Office was patrolling in the early morning hours of January 12, 2002, when he received a call that shots had been fired inside of the Platinum Club, which was located on Manhattan Boulevard. When he arrived, he observed a large crowd of between 75 and 150 people who were screaming and exiting the club in a "hectic state."

Deputy Singleton made his way through the crowd and observed approximately 100 or 200 patrons inside the club. He also saw the victim, 16–year old Steve Thomas, who was lying on his back after suffering a single gunshot wound to his chest. Although Deputy Singleton tried to speak to him, the victim was unable to communicate. Deputy Singleton called for medical assistance.

The doors to the club were locked. Deputy Singleton and other deputies obtained the names, telephone numbers, and addresses of the remaining patrons and asked if they had any information concerning the incident or the shooter. Deputy Singleton testified that all of the people he spoke to advised him that they did not see anything. He believed that the incident happened around 1:30 a.m.

Darnell Jordan testified that he worked in security at the Platinum Club and was on duty at the time of the shooting. He recalled that defendant was at the club. Darnell testified that a fight broke out between the pool table and the dance floor and that 15 or 20 people were beating one person. The victim was lying on his back, trying to cover himself while he was getting kicked and punched. Darnell said that he ran to try to break up the fight. He said that he grabbed defendant and told him to "chill out." He said that defendant responded "alright," but then tried to make his way through. Thereafter, one gunshot was heard. He did not see defendant strike the victim with his foot or his fist, but believed he was trying to get into the fight. Darnell testified that he was about one yard away when he saw defendant reach his hand into the pile of people. He saw the gun flash from the end of defendant's arm. He testified that although he never saw defendant with a gun, he assumed that whatever flashed was in his hand. He believed that there were between 250 and 300 people in the club, but some had run out of the club after the shooting, including defendant and the individuals involved in the fight. Darnell called 9–1–1, but he did not identify the shooter.

Darnell testified that a few minutes after the shooting, he told Detective Kevin Nichols of the Jefferson Parish Sheriff's Office that the shooter was C–Murder. He explained that he knew and trusted Detective Nichols, who worked as a detail officer for the club. He further testified that he had no doubt that defendant shot the victim. However, he admitted that at times during the investigation, he denied knowing who the shooter was. He explained that he was scared because he feared retaliation from defendant and his "clique."

Darnell testified that he later received a phone call from one of the club owners and was told something that caused him to be concerned for his life. Because he was afraid of defendant, he called Detective Nichols. On January 17, 2002, Darnell met with Detective Nichols, Detective Donald Clogher and Lieutenant Thurman and told them that defendant was the shooter. He identified defendant in a photographic

lineup as the person who killed Steve Thomas. Darnell explained that he was testifying because the victim's father lost his son, and it was the right thing to do.

Detective Nichols testified that he was working a detail in the parking lot of the Platinum Club at the time of the shooting.  He observed people leaving in a hurried manner, so he thought there must have been a fight. However, when he got to the entry doors, he was told there had been a shooting. Detective Nichols entered the club and observed the victim lying on his back. Detective Nichols testified that he talked to Darnell, who worked in security at the club, and he told the detective that he saw C–Murder shoot the victim. Detective Nichols said that he collected 25 to 30 names on the scene, but no one admitted seeing anything.

Detective Donald Clogher of the Jefferson Parish Sheriff's Office was notified of the shooting at the Platinum Club, and he was ultimately given the primary responsibility for the investigation. He believed that between 100 and 150  people were still in the club when he arrived. During the investigation, Detective Clogher approached Darnell and asked him about what he had seen. Darnell placed defendant in the immediate vicinity of the murder, but did not name defendant as the shooter. Darnell was transported to the Detective Bureau and was interviewed further, but he said the same thing.

Other witnesses were taken to the Bureau that night as well. According to Detective Clogher, Denise Williams said she witnessed the murder and identified the shooter as Derrick Taylor. Denise was concerned that she had been pointed out as a witness and was upset when Detective Clogher met with her. Detective Clogher believed Denise was being untruthful, and she later admitted that she lied about her identification of the shooter. However, she was not arrested, because Detective Clogher believed she was untruthful due to concerns for her own safety, not to mislead the investigation.

Detective Clogher testified that on January 17, 2002, he took a statement from Darnell, and Darnell identified defendant as the shooter in a photographic lineup. An arrest warrant was obtained on January 18, 2002, and defendant was arrested. Defendant was read his rights and agreed to make a statement, but was not willing to give a recorded statement. He admitted that he was at the Platinum Club and stated that at the time of the incident he was speaking with the D.J. Defendant told Detective Clogher that he heard the gunshot and was immediately pushed out of the club by an unknown individual. Defendant asked the detective about the investigation, the level of cooperation the police was receiving from witnesses, and who had identified the shooter. He believed defendant was fishing for the identification of the witnesses to see if they had been "threatened out of cooperating." Defendant proclaimed his innocence to Detective Clogher. Detective Clogher testified that defendant gave statements that were contradicted on numerous

occasions throughout the investigation. Detective Clogher did not feel defendant was cooperating and felt defendant was lying.

Kenneth Jordan testified that he was at the Platinum Club on January 12, 2002, and that defendant was at the club with 10 to 15 people. He explained that the club let celebrities in first and allowed them to go past the line. He recalled that a metal detector wand was used on him that night, but defendant and his group went through without being checked. He recalled that there was a rap contest that night and the victim exited the stage after he rapped. He said that a person wearing a "CP3" hoodie ran into the victim and then attacked him. Kenneth explained that CP3 stands for the Calliope Project and identified the gang sign in a photograph of defendant. Kenneth testified that the victim was fighting for his life when the CP3 group of six or seven people attacked him. He stated that defendant did not throw any punches, but was watching the fight.

Kenneth testified that after the fight was over, he was about five or six feet from defendant when defendant stood over the victim and shot him once. He said the shot rung his ears, and he saw the fire come from the gun. Kenneth said he ran out of the club behind the group and defendant. Kenneth did not talk to the police at the time or contact the police, because he was scared for his life. He had heard what defendant's "people" could do and what was happening to people in jail.

About a year after the murder, the case was mentioned when Kenneth was at the Detective Bureau as a material witness regarding the death of his baby. It was learned that Kenneth was at the Platinum Club at the time of the shooting. On January 27, 2003, Detective Clogher interviewed Kenneth, took his statement, and showed him a photographic lineup. Kenneth identified defendant as the shooter. He explained that at that point he wanted to tell the truth because he knew how it felt to lose a child. Kenneth identified defendant in court and testified he was positive that defendant shot Steve Thomas.

The victim's father, George Thomas, testified that the victim liked rap music and had posters all over his room of different rappers, mostly of the Miller brothers—Master P, C–Murder, and Silk. The victim wanted to be a rapper. His father did not know his son was going to the Platinum Club, but instead believed he had gone to a movie. However, around 1:00 a.m., he received a call from a bouncer at the Platinum Club who said his son had been shot. At the hospital, a doctor eventually told him that they could not save his son.

The taped testimony of Kirk Edwards was presented. Kirk was the DJ at the Platinum Club at the time of the shooting. He had seen defendant a couple of times before, and identified him in court, but he denied seeing defendant in the Platinum Club on the night of the incident. After seeing a disturbance across the dance floor, Kirk turned

on the lights and then the gunshot went off. Kirk testified that he could not say if defendant was involved in the fight, but at no time during the night did defendant come up to the DJ booth to talk to him.

Defendant presented the taped testimony of Keshawn Scott. Keshawn testified that she was in the club when the victim was shot. She said she was close to the fight and recalled that a lot of people were kicking and stomping on the victim. She said after the "pang" from the gun, everyone ran and she left prior to when the club was locked. It was not until after the gunshot that the lights were turned on. She said she had no idea where defendant was at the time of the fight, but he was not one of the people involved in the fight. She testified that she did not see the shooter, but she knew defendant was not the shooter.

Defendant also presented the taped testimony of Vance LaFrance, who stated that he was at the Platinum Club at the time of the shooting. He saw defendant at the club before and during the fight. He said defendant was tall and was a celebrity, so he really could not be missed, even though there were 500 to 600 people in the club. Vance testified that he saw 12 to 15 men in hip hop clothes punching, kicking, and stomping one man on the dance floor. He said the men did not have CP3 on their clothing. He said he did not recognize the people fighting, but knew that defendant was not fighting. Vance said he heard when the gunshot was fired, but did not see who fired it. After the shot was fired, people rushed out of the club, but he was not able to get out. He told the police that he was in the bathroom, even though he was not in the bathroom, because he did not see the shooter. He testified that he had no doubt that defendant did not shoot the victim.

Defendant also presented the taped testimony of Vanessa Henry, who said she was at the Platinum Club at the time of the shooting. She knew defendant, and he was at the club that night. She testified that the victim got into a fight with a group a couple of feet away from her. When the fight started, she backed up and defendant was right behind her. Defendant grabbed her by her waist to move her to the side and that is when the shot went off. She testified that defendant was not involved in the fight, but she believed the people who were fighting were with defendant. She testified that the people in the fight were yelling out "Calliope," which referred to the Calliope Housing Project, where defendant was from. They also yelled "CP–3" which meant Calliope Project, Third Ward. She also showed the sign that some of them made. She identified defendant in a photograph with someone whom she could not identify, and said they were making the Third Ward signs in the photograph.

After the shot was fired, Vanessa saw defendant and the group that had been fighting run out of the door. Vanessa tried to leave, but security locked her in the club. She told the police that she did not see anything because she was nervous. She testified that she had no doubt that defendant did not shoot the victim.

10

Defendant also played the tape of Hashim Smith, who was at the Platinum Club on the night of the incident. Hashim testified that defendant was inside the DJ booth and that the DJ was announcing C–Murder and talking about his album. Hashim observed the fight, but did not hear anyone yelling CP–3 or Calliope. Hashim explained that the victim had been dancing close with a female, and he thought this must have been what the fight was over. Hashim stated that the victim was on the ground and was getting stomped on by a group, and then someone in the middle leaned in and shot the victim. Hashim did not see the shooter's face, but he did see the shooter's profile, and he was 100 percent certain that defendant was not the shooter. Hashim did not know where defendant was during the shooting, but knew where he was not.

*State v. Miller*, 10-718 (La. App. 5 Cir. 12/28/11), 83 So.3d 178, 182-186. (St. R., pp. 21364-21371).

## TIMELINESS

The respondent respectfully submits that it appears that Miller's federal habeas petition is timely.  The Antiterrorism and Effective Death Penalty Act of 1996 imposes a one-year period of limitations on petitions for a writ of habeas corpus filed by persons in custody persuant to a judgment of a state court.  Specifically, 28 U.S.C.A. § 2244(d) provides as follows:

(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.   The limitation period shall run from the latest of - -

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or

other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C.A § 2244(d).

The AEDPA provides that if a properly filed post-conviction relief application or other collateral review is pending during the grace period, the time to file a federal habeas corpus application is tolled. 28 U.S.C. § 2244 (d)(2); *see also Flanagan v. Johnson*, 154 F.3d 196, 198 (5th Cir. 1998). An application is "properly filed" when it "conforms with a state's applicable procedural filing requirements," defined as "those prerequisites that must be satisfied before a state court will allow a petition to be filed and accorded some level of judicial review." *Williams v. Cain*, 217 F.3d 303, 306 (5th Cir. 2000). A case is no longer deemed "pending," however, when further appellate review is unavailable, and an application seeking post-conviction relief ceases to be "pending" within the meaning of section 2244(d)(2) when a petitioner fails to timely file an application for supervisory writs. *See Williams*, 217 F.3d at 309-310.

In this case, the one-year limitation period for Miller to file his federal habeas petition began to run from the "date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review . . ." 28 U.S.C. § 2244(d)(1)(A). "Direct review" includes a petition for writ of certiorari to the Supreme Court of the United States after pursuing a relief on direct review through the Louisiana Supreme Court. Therefore, Miller's conviction did not become final for purposes of the AEDPA until the United States Supreme Court denied his timely filed petition of certiorari on February 19, 2013. *Miller v. Louisiana*, 568 U.S. 1157, 133 S.Ct. 1238, 185 L.Ed.2d 177 (2013).

At that point, the limitations period commenced to run with 364 untolled days then elapsing before Miller filed his *Initial Application for Post-Conviction Relief* stamped as filed on February 19, 2014. Because Miller's *Initial Application for Post-Conviction Relief* was supplemented and amended several times before all of the claims were ruled upon, it remained pending until October 5, 2021, when the Louisiana Supreme Court denied petitioner's writ application filed in that court under Writ No. 21-KP-00305. As such, the AEDPA limitations period expired on October 6, 2021. However, as the instant habeas petition was filed on July 25, 2021, while Louisiana Supreme Court Writ No. 21-KP-0305 was still pending and eligible to toll the running of the AEDPA limitations period, it appears that the instant petition is timely filed.

## EXHAUSTION

Pursuant to 28 U.S.C. §2244(b) and (c), a state inmate is required to exhaust the available state court remedies before proceeding to federal court. As recognized by the United States Supreme Court, the exhaustion requirement of § 2254(b) "ensures that the state courts have the opportunity fully to consider federal-law challenges to a state custodial judgment before the lower federal courts may entertain a collateral attack upon that judgment." *Duncan v. Walker*, 533 U.S. 167, 178-179, 121 S.Ct. 2120, 2127-2128, 150 L.Ed.2d 251 (2001). The Supreme Court has further determined that "[i]n order to provide the State with the necessary 'opportunity,' the prisoner must 'fairly present' his claim *in each appropriate state court* (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim." *Baldwin v. Reese*, 541 U.S. 27, 29, 124 S.Ct. 1347, 1349, 158 L.Ed.2d 64 (2004) (emphasis added).

Additionally, a habeas petitioner generally "must present his claims before the state courts in a procedurally proper manner according to the rules of the state courts." *Dupuy v. Butler*, 837

F.2d 699, 702 (5th Cir. 1988) (quotation marks omitted); see also *Carty v. Thaler*, 583 F.3d 244, 254 (5th Cir. 2009) ("Fair presentation does not entertain presenting claims for the first and only time in a procedural context in which its merits will not be considered unless there are special and important reasons therefor. The purposes of the exhaustion requirement would be no less frustrated were we to allow federal review to a prisoner who had presented his claim to the state court, but in such a manner that the state court could not, consistent with its own procedural rules, have entertained it." (citation and quotation marks omitted)).

To exhaust his state remedies, a habeas petitioner must fairly present the substance of his claim to the state courts. *Finley v. Johnson*, 243 F.3d 215 (5th Cir. 2001), citing *Picard v. Connor*, 404 U.S. 270, 275-76, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971). For purposes of exhaustion, the federal claim must have been presented to the highest court of the state, either on direct review of the conviction or in a post-conviction attack. *Bufalino v. Reno*, 613 F.2d 568, 570 (5th Cir. 1980). The Supreme Court has held that "ordinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material." *Baldwin*, 541 U.S. at 32, 124 S.Ct. at 1351.

Where a petitioner no longer has the opportunity to present his unexhausted claims in the state courts, such claims are considered to meet the technical requirements for exhaustion. *See Gray v. Netherland*, 518 U.S. 152, 162, 116 S.Ct. 2074, 2080, 135 L.Ed.2d 457 (1996) (recognizing that because the exhaustion requirement "refers only to remedies still available at the time of the federal petition, it is satisfied if it is clear that [the habeas petitioner's] claims are not procedurally barred under [state] law") (internal quotation marks and citations omitted). Where "the court to which the

petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred," the technically exhausted claims are subject to the doctrine of procedural default. *Nobles v. Johnson*, 127 F.3d 409, 420 (5th Cir. 1997), quoting *Coleman v. Thompson*, 501 U.S. 722, 731-732, 111 S.Ct. 2546, 2555, 115 L.Ed.2d 640 (1991).

Of significance, Miller's third and fourth claims appear to be exhausted following the Louisiana Supreme Court's decision in *State ex rel. Miller v. State*, 21-KP-00305, 2021 WL 4551252 (La. 10/5/21), — So.3d — .

However, Miller appears to be mistaken in contending that the first and second claims in the instant petition "were fully exhausted by former post-conviction counsel."[2]  (Rec. Doc. 1-1, p. 12). In fact, Miller's writ application filed in the Louisiana Supreme Court under Writ No. 16-KP-0207 did not present Miller's first and second claims to the Louisiana Supreme Court in a procedurally proper manner as it was not timely filed. In fact the Louisiana Supreme Court denied Writ No. 16-KP-0207 in a *per curiam* decision that explicitly stated: "Not considered; untimely filed.  La. S.Ct.R. X, § 5(a).  (St. R., pp. 22623, 22624).

"It is clear that a claim presented in an untimely writ application has not been 'fairly presented' for exhaustion purposes." *Jackson v. Vannoy*, Civ. Action 17-00265, 2018 WL 1441154,

---

[2]  It should be noted that, in Writ No. 12-K-282, Miller raised claims that his "Sixth Amendment rights were violated when the trial court refused to declare a mistrial after the jury could not reach a verdict and the deliberations process plainly had broken down" and that his "Sixth and Fourteenth Amendment rights were violated based on the presence of a Bible (and the reading of Scripture) in the jury room." (St. R., p. 21341).  However, to the extent that now Miller seeks to rely upon allegations regarding Juror Mary Jacob that were reported in the Times-Picayune article dated August 26, 2009 and upon the purported affidavit of Mary Jacob dated February 12, 2014 in support of his second claim, including the allegation of "racial animus"  his second claim is unexhausted.  This is because allegations based on the Times Picayune article and the purported affidavit of Mary Jacob were not fairly presented to the Louisiana Supreme Court in Writ No. 12-K-282.

15

at *6-7 (E.D. La. Feb. 27, 2018); citing *Murphy v. Cooper*, Civ. Action No. 12-1339, 2012 WL 5463864, at *5 (E.D. La. Oct. 1, 2012), *adopted*, 2012 WL (5463857 (E.D. La. Nov. 8, 2012 (citing *Depuy v. Butler*, 837 F.2d 699, 702 (5th Cir. 1988)(noting that a state court has a fair opportunity to pass upon a claim only if it is presented to the court in a "procedurally proper manner according to the rules of the state courts")); *Bias v. Wendom*, Civ. Action No.6:15-cv-0630, 2015 WL 454512, at *6 (W.D. La. July 27, 2015) (petitioner failed to exhaust claims where his sole writ application to the Louisiana Supreme Court was untimely and not properly filed), *certificate of appealability denied*, 15-30719 (5th Cir. June 14, 2016).

The lack of proper exhaustion has resulted in technical exhaustion and procedural default. Where a petitioner no longer has the opportunity to present his unexhausted claims in the state courts, such claims are considered to meet the technical requirements for exhaustion. *See Gray v. Netherland*, 518 U.S. 152, 162, 116 S.Ct. 2074, 2080, 135 L.Ed.2d 457 (1996) (recognizing that because the exhaustion requirement "refers only to remedies still available at the time of the federal petition, it is satisfied if it clear that [the habeas petitioner's] claims are now procedurally barred under [state] law")(internal quotation marks and citations omitted). Where "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred," the technically exhausted claims are subject to the doctrine of procedural default. *Nobles v. Johnson*, 127 F.3d 409, 420 (5th Cir. 1997), quoting *Coleman v. Thompson*, 501 U.S. 722, 731-732, 111 S.Ct. 2546, 2555, 115 .Ed.2d 640 (1991). In this case, the Louisiana Supreme Court has already advised that:

> Applicant has not fully litigated two applications for post-conviction relief in state court. Similar to federal habeas relief, see 28 U.S.C. § 2244, Louisiana post-conviction procedure envisions the filing of a second or successive application only

16

under the narrow circumstances provided in La. C.Cr.P. art. 930.4 and within the limitations period as set out in La. C.Cr.P. art. 930.8. Notably, the Legislature in 2013 La. Acts 251 amended that article to make the procedural bars against successive filings mandatory. Applicant's claims have now been fully litigated in accord with La. C.Cr.P. art. 930.6 and this denial is final. Hereafter, unless he can show that one of the narrow exceptions authorize the filing of a successive application applies, applicant has exhausted his right to state collateral review. The district court is ordered to record a minute entry consistent with this per curiam.

*State ex rel. Miller v. State*, 21-KP-00305, 2001 WL 4551253 (La. 10/5/21), — So.3d — . As directed, the minute entry was prepared by the state district court on October 6, 2021.

Any attempt by Miller to file additional claims on collateral review in the state courts at this point would be procedurally barred.[3]  *See* LSA-C.Cr.P. art. 930.4 ( barring successive post-conviction applications); *see also* LSA-C.r.P. art. 930.8 (providing in relevant part that "[n]o application for post conviction relief, including applications which seek an out-of-time appeal, shall be considered if it is filed more than two years after the judgment of conviction and sentence has become final under the provisions of Article 914 or 922 . . .").  Accordingly, the respondent maintains that the petitioner has procedurally defaulted the first and second claims he has presented to this Court due to his failure to properly exhaust these claims in the state courts.

The respondent acknowledges that the procedural default of a claim may be overcome by a petitioner demonstrating both cause and prejudice for the default or that a fundamental miscarriage of justice would result from the refusal to consider the claim. *See Coleman v. Thompson*, 501 u.S.

---

[3]  Even assuming *arguendo*, that Petitioner would not be procedurally barred from filing a petition asserting factual innocence pursuant to the provisions of LSA-C.Cr.P. art. 926.2 (added by Acts 2021, No. 104 § 1, effective August 1, 2021), the respondent would argue that there would be no point in requiring Miller to return to the state district to seek review of his first claim as it appears that the denial of relief pursuant to the provisions of LSA-C.r.P. art. 926.2 may present a matter of state law claim not cognizable on federal review.  Moreover, actual innocence

722, 750, 111 S.Ct. 2546, 2565, 115 L.Ed.2d 640 (1991); *Bagwell v. Dretke*, 372 F.3d 748, 755 (5th

Cir. 2004); *Amos v. Scott*, 61 F.3d 333, 338-339 (5th Cir. 1995).  To demonstrate cause, the petitioner

must prove that some condition external to the defense impeded his efforts to comply with the

procedural rules, that the factual or legal basis of a claim was not available to counsel, or that

governmental interference rendered procedural compliance impractical. *Murray v. Carrier*, 477 U.S.

478, 488, 106 S.Ct. 2639, 2645, 91 L.Ed.2d 397 (1986).  Additionally, a habeas petitioner must

demonstrate "actual prejudice as a result of the alleged constitutional violations." *Barrientes v.

Johnson*, 221 F.3d 741, 769 (5th Cir. 2000), quoting *Coleman*, 501 U.S. at 745-750.

The fundamental miscarriage of justice exception seeks to balance the societal interests in

finality, comity, and conservation of scarce judicial resources with the individual interest in justice

that arises in the extraordinary case."  *Schlup v. Delo*, 513 U.S. 298, 324, 115 S.Ct. 851, 865, 130

L.Ed.2d 808 (1995).  The exception is "limited to cases where the petitioner can make a persuasive

showing that he is actually innocent of the charges against him," and he must essentially show "as

a factual matter, he did not commit the crime for which he was convicted." *Finley*, 243 F.3d at 220.

A petitioner must provide the court with evidence that would support a colorable showing of factual

innocence." *Kuhlmann v. Wilson*, 477 U.S. 436, 454, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986).  As

the Supreme Court has long cautioned:

> To be credible, such a claim [of actual innocence] requires petitioner to support his
> allegations of constitutional error with new reliable evidence – whether it be
> exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical
> evidence – that ws not presented at trial.  Because such evidence is obviously
> unavailable in the vast majority of cases, claims of actual innocence are rarely
> successful.

*Schlup*, 513 U.S. at 324.

In the instant case, Petitioner has failed to establish either cause and prejudice for the default or that a fundamental miscarriage of justice would result from the refusal to consider his claim. First, the record does not support a finding that any factor external to the defense prevented Miller from asserting his claims in a procedurally proper manner, nor that any action or inaction by the state prevented Miller from presenting his claims in the state courts. Furthermore, Miller has not made a colorable showing of factual innocence. In fact, petitioner largely relies upon conclusory assertions concerning matters which do not constitute "new" evidence. For example, he asserts that "[t]here was no video surveillance which incriminated" him nor any "tangible evidence." (Rec. Doc. 1-1, p. 15). Although he concedes he was at the club when Thomas was shot, he asserts that "there was no DNA match" to him on some bottles, a CD case, or a chain near the victim's body. (Rec. Doc. 1-1, p. 12). Petitioner notes the introduction, at his second trial of audio recordings of witnesses who testified in his first trial that "they saw Mr. Miller at the Platinum Club, but he was not involved in the fight, and did not shoot Steve Thomas. (Rec. Doc. 1-1, p. 15). To the extent that petitioner relies upon affidavits given by trial witnesses Kenneth Jordan and Darnell Jordan subsequent to the trial, the State submits that, when considered in light of their other statements and testimony and all the evidence presented at trial, they are insufficient to show that it is more likely than not that no reasonable juror would have convicted Miller. Simply put, these affidavits do not constitute "new reliable evidence" for the reasons set forth in the discussion of petitioner's fourth claim (allegation of *Brady/Napue* violations).

Therefore, the State submits that Miller's defaulted claims are procedurally barred from review by this federal habeas corpus and should be dismissed with prejudice.

Even if a freestanding claim of actual innocence was recognized, petitioner did not satisfy the standard to prove his actual innocence. In order to establish an actual innocence claim, the applicant must "support his allegations of constitutional error with new reliable evidence whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." Schlup v. Delo, 513 U.S. 298, 324, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). Additionally, "[e]vidence does not qualify as 'new' under the Schlup actual-innocence standard if it was always within the reach of petitioner's personal knowledge or reasonable investigation." Tyler v. Davis, 768 Fed. Appx. 264, 265 (5th Cir. 2019)(internal quotes omitted). Furthermore, the applicant must show "that in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." Id. (citing McQuiggin v. Perkins, 569 U.S. 383, 386, 133 S.Ct. 1924, 185 L.Ed.2d 1019 (2013)).

To date, the United States Supreme Court has not recognized a freestanding claim of actual innocence to be an independently cognizable federal habeas claim. *McQuiggin v. Perkins*, 569 U.S. __, 392 , 133 S.Ct. 1924, 1931 (2013); *see also Merryman v. Davis,* 17-50914, 2019 WL 3071992 at *3 (5th Cir. July 12, 2019), — Fed. Appx. — .[4]   The Court has held that "actual innocence" may be used as a gateway through which a petitioner may pass to overcome a procedural bar to the consideration of the merits of their constitutional claims, or the expiration of the statute of limitations, the petitioner in the instant case is not seeking to avoid a procedural bar or the expiration of the statute of limitations. *McQuiggin v. Perkins*, ___ U.S. __, 133 S.Ct. 1924 (2013).

_____

[4]  The Court has held that "actual innocence" may be used as a gateway through which a petitioner may pass to overcome a procedural bar to the consideration of the merits of their constitutional claims, or the expiration of the statute of limitations. *McQuiggin v. Perkins*, ___ U.S. __, 133 S.Ct. 1924 (2013).

## STANDARD OF REVIEW

This case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. 104-132, 110 Stat. 1214.  As recognized by the Supreme Court in *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389 (2000),  "§ 2254 (d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court."   The AEDPA mandates that such claims are subject to the following standard of review:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. 2254(d).

The Supreme Court has clarified that a decision is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts.  *Williams v. Taylor*, 120 S.Ct. at 1523.  With regard to the "unreasonable application" clause, the Court has held that a federal habeas court may grant the writ only if the state court unreasonably applies the correct governing legal principle to the facts of the prisoner's case.  *Williams*, 120 S.Ct. At 1523.  "[A] federal habeas court making the 'unreasonable

application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Williams*, 120 S.Ct. at 1521.

The Supreme Court has consistently recognized that "the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254, imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt." *Hardy v. Cross*, 565 U.S. 65, 66, 132 S.Ct. 490, 491, 181 L.Ed.2d 468 (2011), quoting *Felkner v. Jackson*, 562 U.S. 594, 131 S.Ct. 1305, 1307, 179 L.Ed.2d 374 (2011) (internal quotation marks omitted). The Court has also found that the "standard of contrary to, or involv[ing] an unreasonable application of, clearly established Federal law is difficult to meet, because the purpsoe of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction." *Greene v. Fisher*, 565 U.S. 34, 38, 132 S.Ct. 38, 43, 181 L.Ed.2d 336 (2011) (internal quotations marks omitted). In fact, the Supreme Court has emphasized that "[i]t bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 102, 131 S.Ct. 770, 785, 178 L.Ed.2d 624 (2011).

As noted by the United States Fifth Circuit, because the standard of review is one of objective reasonableness, "mere disagreement" with the state court is not enough to warrant relief. *Orman v. Cain*, 228 F.3d 616, 619 (5th Cir. 2000). As the Fifth Circuit Court of Appeals has further recognized:

> Even if a state court errs in applying Supreme Court precedent, the court may still not have acted unreasonably for AEDPA purposes. *See Harrington v. Richter*, — U.S. —, 131 S.Ct. 770, 786, 178 L.Ed.2d 624 (2011). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Id.* "[E]valuating

whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Yarborough v. Alvarado*, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004). "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by th[e] [Supreme] Court." *Knowles v. Mirzayance*, 556 U.S. 111, 112, 129 S.Ct. 1411, 173 L.Ed.2d 251 (2009).

*Sprouse v. Stephens*, 748 F.3d 609, 616 (5ᵗʰ Cir. 2014).

Under 28 U.S.C. §2254(e)(1), the state court's findings are entitled to a presumption of correctness. Furthermore, pursuant to 28 U.S.C. 2254(e)(1), the petitioner bears the burden of rebutting this presumption of correctness by clear and convincing evidence.

## LAW AND ARGUMENT

I.  **Claim alleging that "Corey Miller is actually innocent of the murder of Steve Thomas and his conviction violates the Eighth and Fourteenth Amendments."**

In his first claim for relief, Petitioner asserts he is actually innocent of the murder of Steve Thomas. He contends that the Louisiana Fifth Circuit Court of Appeal's dismissal of his actual innocence claim on November 2, 2015 "constitutes 'an unreasonable application of clearly established' federal precedent concerning claims of actual innocence." Of significance, Petitioner's claim is subject to the doctrine of procedural default for the reasons discussed in the foregoing section titled "Exhaustion."

Moreover, Miller's's first claim does not present a cognizable ground for federal habeas relief. To date, the United States Supreme Court has not recognized a freestanding claim of actual innocence to be an independently cognizable federal habeas claim, but has instead held that "actual innocence" may be used as a gateway through which a petitioner may pass to overcome a procedural bar to the consideration of the merits of their constitutional claims, or the expiration of the statute

of limitations, the petitioner in the instant case is not seeking to avoid a procedural bar or the expiration of the statute of limitations. *McQuiggin v. Perkins*, 569 U.S. 392 , 133 S.Ct. 1924, 1931 (2013); *see also Merryman v. Davis,* 17-50914, 2019 WL 3071992 at *3 (5th Cir. July 12, 2019), — Fed. Appx. — . It is the respondent's position that this claim is subject to the doctrine of procedural default and should be dismissed for the reasons set forth in the foregoing section titled "Exhaustion."

II.   **Claim alleging that "Corey Miller's rights to a fair trial, an impartial jury, and due process under the Sixth and Fourteenth Amendments were violated during jury deliberations when at least one juror voted guilty based on pressure to end deliberations, rather than on the evidence."**

In his second claim for relief, Petitioner contends that his right to a fair trial and due process of law under the Sixth and Fourteenth Amendments were violated based upon the allegation that "at least one juror voted guilty based on pressure to end deliberations, rather than on the evidence." It is the respondent's position that this claim is subject to the doctrine of procedural default and should be dismissed for the reasons set forth in the foregoing section titled "Exhaustion"

III.   **Claim alleging that "Corey Miller's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments were violated when he was denied the effective assistance of counsel."**

In order for a federal habeas claim of ineffective assistance of counsel to have merit, the petitioner must demonstrate both (1) that his counsel's performance was deficient, i.e that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment, and (2) that the deficient performance prejudiced the defense, i.e. that the errors were so serious as to deprive the petitioner of a fair trial. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). If a petitioner makes an insufficient showing on either

component of the ineffective assistance of counsel inquiry, the remaining prong of the test need not be examined. *Strickland*, 466 U.S. at 697.

To satsify the prejudice requirement, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probabiltiy is "a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. The likelihood of a different result msut be substantial and not just conceivable. *Harrington*, 562 U.S. at 112, citing *Strickland*, 466 U.S. at 693. Of further significance, "[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (internal quotation marks omitted).

For purposes of federal habeas review, the issue of ineffective assistance of counsel presents a mixed question of law and fact. *Motley v. Collins*, 18 F.3d 1223, 1226 (5th Cir. 1994). As such, the question is whether the state courts' denial of relief was contrary to or an unreasonable application of United States Supreme Court precedent. *Murphy v. Johnson*, 205 F.3d 809, 813 (5th Cir. 2000). The Fifth Circuit Court of Appeals has noted that:

> It bears repeating that the test for federal habeas purposes is not whether [the petitioner] made [the *Strickland*] showing. Instead, the test is whether the state court's decision - that [the petitioner] did *not* make the *Stickland*-showing -was contrary to, or an unreasonable application of, the standards, provided by the clearly established federal law (*Strickland*), for succeeding on his IAC claim. Of course, in reaching our decision, we must consider the underlying *Strickland* standards.

*Schaetzle v. Cockrell*, 343 F.3d 440, 444 (5th Cir. 2003) (emphasis in original). Furthermore, as the

Supreme Court emphasized:

> The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland's* standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), "an unreasonable application of federal law is different from an incorrect application of federal law." *Williams, supra*, at 410, 120 S.Ct. 1495. A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

*Harrington*, 562 U.S. at 101. Notably, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *White v. Woodall*, 572 US. 415, 419-420, 134 S.Ct. 1697, 1702, 188 L.Ed.2d 698 (2014), quoting *Harrington v. Richter*, 131 S.Ct. At 786-787 (internal quotation marks omitted).

Of further significance, "because *Strickland's* is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied the standard," and a "doubly deferential judicial review" applies to a *Strickland* claim evaluated under § 2254(d)(1). *Knowles v. Mirzayance*, 556 U.S. 111, 112, 129 S.Ct.1411, 1413, 173 L.Ed.2d 251 (2009). Controlling caselaw requires federal courts to "afford both the state court and the defense attorney the benefit of the doubt." *Woods v. Etherton*, — U.S. — , 136 S.Ct. 1149, 1151, 194 L.Ed.2d 333 (2016), citing *Burt v. Titlow*, 571 U.S. 12, 15, 134 S.Ct. 10, 13, 187 L.Ed.2d 348 (2013)(internal quotation marks omitted).

In denying Writ No. 20-KH-322, the Louisiana Fifth Circuit Court of Appeal found as follows :

Ineffective assistance of trial counsel claims
In considering relator's ineffective assistance of trial counsel claims, the trial court applied the correct standard under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The Strickland test requires, in part, that the relator "affirmatively prove prejudice." Id. at 693. In Williams v. Taylor, 529 U.S. 362, 394, 120 S.Ct. 1495, 146 L.Ed.389 (2000), the Court went so far as to say that the petitioner bears the "highly demanding" and "heavy burden" in establishing actual prejudice. "[I]t is not the State's burden to disprove conjectured theories of prejudice." State v. Thomas, 12-1410 (La. 9/4/13), 124 So.3d 1049, 1053.

In the instant case, the trial court's January 23, 2019 denial makes clear that it relied on multiple sources of record in considering relator's APCR claims, including relator's application and attached documents, the State's response to relator's claims, as well as the official record. From a review of these resources, without more, the trial court was able to adjudicate relator's claims and articulate its specific findings in support of its ruling to deny those claims. For example, one of relator's APCR claims had previously been addressed on appeal. [FN 3] For another claim, the court determined that the evidence presented by relator was not proper under La. C.E. art. 606(B). [FN 4] As to the remainder of the ineffective assistance of trial counsel claims, the trial court found relator failed to comply with La. C.Cr.P. art. 926 (B)(3), which states that in post-conviction rlief, a petition shall allege a statement of the grounds upon which relief is sought, specifying with reasonable particularity the factual basis for such relief. Thus, from the face of relator's APCR, the trial court was able to determine that relator had failed to meet his heavy burden of establishing actual prejudice, as required by Strickland v. Washington, supra.

Based on the showing made, we find no abuse of the trial court's discretion in denying relator's APCR claims related to trial counsel without an evidentiary hearing. Mason v. Cooley, 2018-0110 (La. 4/8/19), 267 So.3d 59; Tassin v. Whitley, 602 So.2d 721, 722-723 (La. 1992).

Ineffective assistance of appellate counsel

Relator claimed in his APCR that appellate counsel failed to provide him with the effective assistance of counsel "generally, specifically, and cumulatively." The trial court found that relator's APCR, on its fact, failed to comply with La. C.Cr.P. art. 926 (B)(3), which states that in post-conviction relief, a petition shall allege a statement of the grounds upon which relief is sought

Based on the showing made, we find no abuse of the trial court's discretion in denying relator's APCR claims related to appellate counsel without an evidentiary hearing. [FN 5]

> [FN 5] As explained by the Fourth Circuit in State v. Mead, 14-1051 (La. App. 4 Cir. 4/22/15), 165 So.3d 1044, 1050-51:
>
>> A prisoner filing an application for post-conviction relief must prove that he is entitled to the relief in question. See La. C.Cr.P. art. 930.2. His application for post-conviction relief should include a "statement of the grounds upon which relief is sought, specifying with reasonable particularity the basis for such relief." La. C.Cr. P. art. 926 (B)(3). This requires a prisoner to explain the relief desired and his reasons justifying that relief be granted.

*State ex rel. Miller v. State*, 20-KH-322 (La. App. 5 Cir. 12/11/20)(unpublished writ decision).

In denying Miller's subsequent writ application (Writ No. 21-KP-0305), the Louisiana Supreme Court stated that "[a]pplicant fails to show that he received ineffective assistance of counsel under the standard of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)." *State ex rel. Miller v. State*, 21-KP-0305 (La. 10/05/21) — So.3d — .

The claims set forth in Cole's instant habeas petition are cursory and conclusory. The United States Fifth Circuit Court of Appeals "has made clear that conclusory allegations of ineffective assistance of counsel do not raise a constitutional issue in a federal habeas proceeding." *Miller v. Johnson*, 200 F.3d 274, 282 (5th Cir. 2000). Therefore, the State respectfully maintains that claim three should be denied on that basis. Regardless, even if further review is accorded, each individual subclaim fails on the merits.

***Alleged failure to locate defense witnesses and impeachment witnesses:***

In his first subclaim, Miller argues that his trial counsel was ineffective because he "did not call any live witnesses and instead played the audio recordings of four defense witnesses who testified at the first trial: Keshawn Scott, Vance LaFrance, Vanessa Henry, and Hashim Smith." (Rec. Doc. 1-1, p. 24). Miller argues that the failure to present live witnesses detracted from the force of his case and that there is a reasonable probability of a different result had the witnesses testified in-person. This claim does not warrant relief.

In the instant case, counsel's decision not to call live witnesses in lieu of the admission of previous testimony is a classic example of a strategic choice by counsel. It is, therefore, virtually unassailable as a claim of ineffectiveness. Counsell had represented Miller for years which included the first trial in this matter. Thus, he was well-positioned to know which witnesses to call and not call. As the Supreme Court stated in *Hinton v. Alabama*, 571 U.S. 263, 134 S.Ct. 1081 (2014), under *Strickland*, supra, strategic choices made after thorough investigation of law and relevant to plausible options are virtually unchallengeable.

Miller lists five witnesses he claims trial counsel should have presented as live testimony: (1) Keshawn Scott; (2) Vance LaFrance; (3) Vanessa Henry; (4) Kirk Edwards; and (5) Hashim Smith. Counsel knew the substance of the testimony of those witnesses from their previous testimony. He knew their testimony was not accepted as credible as shown by the first jury's guilty verdict. Thus, this court may pretermit any inquiry into the deficient performance prong of the *Strickland* inquiry because the prejudice claim is foreclosed by the jury's finding of guilt in the first trial. That is, the result would have been the same had counsel presented these witnesses live as he did in the first trial. Their testimony was rejected. Thus, the prejudice prong cannot be met.

Despite the unavailing testimony offered by these witnesses, counsel chose to present it via transcripts in lieu of live testimony. Counsel knew firsthand the appearance each made in testifying and determined not to present live witnesses. This is classic trial strategy. Moreover, the testimony of these witnesses was summarized by the Louisiana Fifth Circuit Court of Appeal in its opinion affirming Miller's conviction on appeal and is reported in the *Statement of the Facts*, herein. A review of this summary of the witnesses' testimony refutes Miller's claim that not presenting the testimony live was error. In fact, on this record, Miller's contention that he was prejudiced by counsel's presentation of these witnessess' testimony via transcripts instead of in-person testimony is wholly speculative and conclusory. As previously noted, the witnesses testified in-person at the first trial and defendant was convicted. Thus Miller cannot meet his burden of demonstrating a reasonable probability of a different result, but for the use of their recorded testimony. As such this claim does not warrant relief.

*Alleged failure to conduct an adequate investigation:*

In his second subclaim, Miller contends that his trial counsel failed to conduct an adequate investigation, based upon allegations that trial counsel failed to locate and call: 1) witnesses who allegedly knew that Miller did not shoot Thomas; 2) witnesses who allegedly could have impeached the testimonies of Darnell Jordan and Kenneth Jordan; and 3) witnesses who allegedly "could have testified about improper pressure from law enforcement and impeached the credibility of lead Detective Clogher." In his application for post conviction relief, Miller listed the names of fourteen people and what they allegedly would have testified to, without offering anything further. (St. R., pp. 21896-21897).

Of significance, effective, competent representation includes the duty to conduct reasonable investigations:

> Strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.  In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.

*Strickland*, 466 U.S. at 690-91, 104 S.Ct. at 2066.

"An attorney need not pursue an investigation that would be fruitless, much less one that would be harmful to the defense." *Harrington v. Richter*, 562 U.S. 89, 108, 131 S.Ct. 770, 789, 178 L.Ed.2d 624 (2011); citing *Strickland*, 104 S.Ct. at 2052.  Similarly, "[a]n attorney can avoid activities that appear "distractive from more important duties." *Harrington*, 131 S.Ct. at 789; citing *Bobby v. Van Hook*, 558 U.S. 4, 11, 130 S.Ct. 13, 19, 175 L.Ed.2d 255 (2009)(*per curiam*).  Counsel is entitled to formulate a strategy that is reasonable at the time and to balance limited resources with effective trial tactics and strategies.  *Id.*  A reviewing court should "evaluate the conduct from counsel's perspective at the time." *Id.*

In the instant case, Miller did not provide affidavits from any of the fourteen alleged witnesses. (St. R., p. 21896-897).  He failed to demonstrate that any of them would have been available to testify, or would be available to testify in the future, nor does he show that the testimony would have been favorable or changed the outcome.  As such, Miller's claims are conclusory with no supporting factual bases.  On this record and under the applicable law, Miller's allegations alone were insufficient to warrant relief.  Moreover, Miller states that these witnesses were identified by the police investigation and appears to assert that trial counsel's investigators interviewed them. (St. R., p. 21896).  Thus, as Miller's attorney had knowledge of these individuals and their alleged

testimony, his decision not to call them can only be attributed to his strategic decisions.  Considering the record and counsel's experience and knowledge of the case, the presumption of competence and the highly, indeed doubly, deferential review this Court must accord counsel's representation, this claim has no merit and must be denied.

*Failure to file a motion for new trial alleging irregularities in jury deliberations.*

In his third subclaim, Miller contends that trial counsel counsel should have filed a motion for new trial based upon alleged jury deliberation "irregularities."  Miller alleges that if counsel had "at least interviewed Ms. Bazile and Ms. Jacobs before sentencing and filed a motion for new trial," counsel could have expanded the record "to include proof that racial animus plagued deliberations, and Ms Jacob switched her vote to end deliberations and not because she believed [he] was guilty".[5]

As an initial matter, it should be noted that, while trial counsel did not file a written motion for new trial following Miller's second trial, trial counsel *did* make an oral motion for new trial on August 14, 2009, based upon rulings relating to previously urged motions for mistrial regarding the testimony of Darnell Jordan and Kenneth Jordan, the non-unanimous jury verdict, and the racial makeup of the jury in connection with the non-unanimous verdict.  (St. R., pp. 4400-4412).  Further, it should be noted trial counsel's motion to withdraw was also granted on August 14, 2009.  (St. R., p. 4084).  Thus, trial counsel was no longer counsel of record on August 26, 2009, which is the date of the Times Picayune article reporting an interview with Mary Jacob.

In any event, Miller's claims of deficient performance and prejudice in this regard are wholly speculative and conclusory.   Based upon the relevant law, Miller cannot meet his burden under

---

[5]  In support of this contention, Miller points to: 1) a Times Picayune article which appeared on August 26, 2009 and reported an interview given by Juror Mary Jacobs; and 2) a statement that post conviction counsel subsequently obtained from Mary Jacob.

*Strickland,* let alone the doubly deferential standard applicable on federal habeas review.  It should

be noted that the decision to file or not file such a motion by trial counsel on this record, can only

be a strategic choice.  Such a matter of strategic choice is not a basis for a finding of deficient

performance.  Trial counsel certainly knew the procedure relative to seeking a new trial as shown

by his previous success in the litigation that resulted in overturning  Miller's conviction following

his first trial, and his success in having the Louisiana Supreme Court affirm that ruling.   Therefore,

the respondent respectfully submits that relief is not warranted to Miller's claim.

IV.     **Claim alleging that "Corey Miller's rights under the Fourteenth Amendment were
        violated when the prosecution failed to disclose exculpatory evidence under *Brady v.
        Maryland* and *Napue v. Illinois*, pertaining to the recanted statements of Kenneth
        Jordan and Darnell Jordan."**

In his fourth claim, Miller alleges *Brady/Napue* violations based upon the June 23, 2018

affidavit executed by Kenneth Jordan and the June 28, 2018 affidavit signed by Darnell Jordan.  As

the state courts correctly determined, this claim has no merit.

In *Brady v. Maryland*, the United States Supreme Court held that "the suppression by the

prosecution of evidence favorable to an accused upon request violates due process where the

evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the

prosecution."  373 U.S. 83, 87, 83 S.Ct. 1194, 1196-1197, 10 L.Ed.2d 215 (1963).  Evidence which

impeaches the testimony of a witness, where the reliability or credibility of the witness may be

demonstrate that: (1) the prosecution suppressed evidence; (2) the evidence was favorable to the

defendant because it was either exculpatory or impeaching; and (3) the evidence was material.

*United States v. Edwards,* 442 F.3d 258, 264 (5ᵗʰ Cir. 2006).

Evidence is considered material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).  The Supreme Court has defined a "reasonable probability" as one "sufficient to undermine confidence in the outcome." *Bagley,* 473 U.S. at 682.  Notably, "a reasonable probability does not mean that the defendant 'would more likely than not have received a different verdict with the evidence,' only that the likelihood of a different result is great enough to 'undermine[] confidence in the outcome of the trial.'" *Smith v. Cain*, 565 US. 73, 75, 132 S.Ct. 627, 630, 181 L.Ed.2d 571 (2012), quoting *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995); *see also Weary v. Cain*, — U.S. — , 136 S.Ct. 1002, 1006, 194 L.Ed.2d 78 (2016).

Of significance, it is not enough that the evidence might have been helpful to the defendant. *See, e.g., Kyles v. Whitley*, 514 U.S. 419, 436-437, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)("[T]he Constitution is not violated every time the government fails or chooses not to disclose evidence that might prove helpful to the defense.").  A reviewing court must determine whether the allegedly suppressed evidence, considered collectively and in light of all of the evidence at trial, could reasonably be taken to put the entire case in a different light so as to "undermine [] confidence in the outcome of the trial." *United States v. Edwards*, 442 F.3d at 267 (5th Cir. 2006), quoting *Kyles*, 514 u.S. at 434, 115 S.Ct. 1555 (internal quotations omitted).  A reversal of a criminal conviction "is required upon a 'showing that the favorabl evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *Youngblood v. West Virginia*, 547 U.S. 867, 870, 126 S.Ct. 2188, 2190, 165 L.Ed.2d 269 (2006), quoting *Kyles*, 514 U.S. at 435, 115 S.Ct. 1555; *see also United States v. Agurs*, 427 U.S. 97, 109-110, 96 S.Ct. 2392, 49 L.Ed.2d

342 (1976)("The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense.").  Furthermore, as recognized by the United States Fifth Circuit Court of Appeals:

> When evidence is equally available to both the defense and the prosecution, the defendant must bear the responsibility of failing to conduct a diligent investigation. *Herrera v. Collins*, 954 F.2d 1029, 1032 (5th Cir.1992), *aff'd*, 506 U.S. 390, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993).  In this sense, *Brady* applies only to the discovery, after trial[,] of information which had been know to the prosecution but unknown to the defense."  *United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).

*Kutzner v. Cockrell*, 303 F.3d 333, 336 (5th Cir. 2002).

In *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), the Supreme Court held that a prosecutor's knowing use of, or deliberate failure to correct, perjured testimony violates a defendant's Fourteenth Amendment rights.  In order to obtain federal habeas relief, a petitioner must demonstrate that: 1) the testimony was actually false, 2) the state knew it was false, and 3) the testimony was material.  *Canales v. Stephens*, 765 F.3d 551, 573 (5th Cir. 2014).  "Importantly, due process is not implicated by the prosecution's introduction or allowance of false or perjured testimony unless the prosecution actually knows or believes the testimony to be false or perjured; it is not enough that the testimony is challenged by another witness or is inconsistent with prior statements."  *Kutzner v. Cockrell*, 303 F.3d 333, 337 (5th Cir. 2002); *see also Kutzner v. Johnson*, 242 F.3d 605, 609 (5th Cir. 2001)(recognizing that "[c]onflicting or inconsistent testimony is insufficient to establish perjury").

As observed by the United States Fifth Circuit Court of Appeals, "[t]his circuit has long viewed recanting affidavits with 'extreme suspicion.'" *Summers v. Dretke*, 431 F.3d 861, 872 (th Cir.

35

2005), *see also United States v. Smith*, 433 F.2d 149, 150 (5th Cir. 1970) ("recantations are generally looked upon with the 'utmost suspicion'").

On application for supervisory writs from the state district court's January 23, 2019 ruling of Miller's allegation of *Brady/Napue* violation based upon the the June 23, 2018 affidavit executed by Kenneth Jordan and the June 28, 2018 affidavit signed by Darnell Jordan, the Louisiana Fifth Circuit found as follows:

> On June 26, 2018, relator filed a supplemental and amended memorandum in support of his initial application for post-conviction relief which raised claims pursuant to Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). The supplement contained two separate affidavits from trial witnesses, Darnell Jordan and Kenneth Jordan, both of whom recanted their prior testimony. Relator used the affidavits as support for his claims.

> In denying these particular claims, the trial court relied on the record and the State's reply, and provided both detail and specificity in its analysis. With regard to Darnell Jordan's affidavit, the court concluded:

>> Looking at the recantation of Darnell Jordan, the record reflects that he testified consistently before the grand jury, at the first trial in 2003, and at the second trial in 2009 . . . Petitioner claims that the State withheld evidence that Darnell Jordan recanted his statement to Det. Clogher prior to trial. As the State points out in its response, the record refutes this claim, as well as the affidavits of Det. Clogher and the prosecutors. The information regarding Darnell Jordan's inconsistent statements was presented to the jury during Darnell Jordan's testimony at trial. As to the recantation of Darnell Jordan, in considering all evidence including the record, all transcribed trial and grand jury testimony and affidavits, petitioner is not entitled to relief.

> As to Kenneth Jordan's affidavit, the court concluded:

>> Petitioner also submits an affidavit of Kenneth Jordan, alleging that he was coerced by deputies to falsely identify Corey Miller as the shooter, and that he was offered leniency in regard to a possible charge regarding his daughter's death. The court notes that the only

36

evidence petitioner presented is the affidavit of Kenneth Jordan. His claim regarding immunity was presented at trial and refuted by Assistant District Attorney Tim McElroy's testimony. The only immunity offered has been filed into the court record. As the State points out in its response, Kenneth Jordan is incorrect in his affidavit as to being arrested in January 2003 for the death of his daughter, as petitioner's Supplemental and Amended Memorandum refutes the affidavit, stating that the criminal records reveal that he was never charged or arrested for carnal knowledge of a juvenile. Nor was he ever arrested in relation to the death of his daughter. Petitioner's claim that Kenneth Jordan told the prosecution that his 2003 recorded statement was not true is contrary to the record in this case. As the State relays in its response, due to petitioner's first post conviction being overturned, the State's file has been disclosed, as would any such statement had it been made.

This allegation is vague and conclusory, as Kenneth Jordan does not state who he told, or when such statement was ever made.

As to petitioner's claim that Kenneth Jordan was coerced into lying, such claim is not even supported by Kenneth Jordan's affidavit. This claim is purely speculative. Petitioner's claim regarding Kenneth Jordan's recantation, which is completely unsupported and refuted by the record in this case and by the witness' testimony, and viewed in light of the law's disdain towards recantations, must fail.

The court concluded that, pursuant to La. C.Cr.P. art. 930.2, relator had failed to prove his claims brought under Brady and Napue.

As noted above, La. C.Cr.P. art. 929 gives authority to the court to grant or deny relief without further proceedings if it can determine that the factual and legal issues can be resolved based upon the application and answer, and supporting documents, including relevant transcripts, depositions, and other reliable documents supported by either party or available to the court. Given the volume of existing information contained in the record from which the trial court could draw upon to analyze the relator's claims, and specifically the prior testimony of Darnell Jordan and Kenneth Jordan, on the showing made, we find no abuse of discretion in the trial court determining the merits of the related claims without an evidentiary hearing. We also find no error in the trial court's conclusion that the relator failed to show that he had sufficiently proven his claim, as required by La. C.Cr.P. art. 930.2.

Accordingly, for the foregoing reasons, and on the showing made, the relator's writ application is denied.

*State ex rel. Corey Miller*, 20-KH-322 (La. App. 5 Cir. 12/11/20)(unpublished writ decision).

In denying Miller's subsequent writ application (Writ No. 21-KP-0305), the Louisiana Supreme Court found that "[A]pplicant fails to show the state withheld material exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d (1963)." *State ex rel. Miller v. State*, 21-KP-0305 (La. 10/5/21), — So.3d — .

The state court rulings were legally and factually sound.

***Darnell Jordan*:**

It is particularly appropriate to look upon the June 28, 2018 affidavit of Darnell Jordan with utmost suspicion. He testified consistently (1) at the first trial in 2003, (2) at the second trial in 2009 and (3) before the grand jury, with no hint of what his affidavit of June 28, 2018 alleges. Indeed, at both trials, Darnell Jordan testified that he immediately identified the Miller as the gunman to Det. Nichols. This was certainly before any pressure could be exerted upon him by any prosecutor or investigator. His trial testimony is echoed by the testimony of Det. Nichols, who verified that Darnell Jordan told him the killer was "C-Murder." (St. R., p. 3593). This clearly refutes the affidavit of Darnell Jordan which Miller would have this court accept as truthful - years after his immediate identification of Miller as the shooter and years after his sworn testimony in three proceedings in which he consistently identified Miller as the shooter. Not only does this illustrate the basis for viewing recantations with the utmost suspicion, but Darnell Jordan's testimony provided below shows that the basis of this claim is non-existent.

*Darnell Jordan's testimony before the grand jury:*

Darnell Jordan's initial testimony was before the grand jury.[6]  He testified that he ws certain he saw "Rapper C-Murder" kill Steve Thomas.  When questioned whether he had any doubt in his mind about whether it was C-Murder, he testified "I know it was C-Murder".  (St. R., pp. 22267-22268).

*Darnell Jordan's testimony at the first trial:*

At the first trial, Darnell Jordan testified that he saw it all happen.  He saw people in Miller's ground beating, punching and kicking Steve Thomas while Miller stood back.  When the beating was over, he saw Miller's arm go underneath "the pile", heard "a pop" and saw "flash and sparks" from under the pile, coming from Miller's hand.  Again, there was no doubt in his mind that Miller shot and killed Steve Thomas.  (St. R., pp. 22214-22217).

Although Miller contends that the state did not disclose statements of Jordan that did not identify Miller as the shooter prior to the first trial, such statements were presented by the state through the questioning of Darnell Jordan at the first trial.  As his direct testimony continues, Darnell Jordan admitted to having lied at time to the investigators about the identity of the shooter because he was afraid for his life.  (St. R., pp. 22217-22219.  Not only did the state present Darnell Jordan's admission that he lied, but defense trial counsel reinforced it in great detail on cross-examination:

> Q.    Now you told us that at the scene that night, you told - - you went up and told
>        Detective Nichols what you just told this jury; is that correct?
>
> A.    I told him, yes.
>
> Q.    But when the other officers came to ask you about that statement you denied
>        saying that; is that correct?
>
> A.    Yes.

---

[6]  The grand jury transcripts were made public during the proceedings in the state district court.

(St. R., p. 22225; see also St. R. pp. 22225-22227 (with regard to the extensive cross-examination on this point)).

*Darnell Jordan's testimony at the second trial:*

At the second trial, Darnell Jordan testified consistent with his previous testimonies. Once again, there was no doubt in his mind he saw the defendant shoot and kill Steve Thomas. (St. R., pp. 3244). He testified that he told Det. Nichols just a few minutes after the shooting that he saw "C-Murder" shoot Steve Thomas. (St. R., pp. 3518, 3527). In addition to the above as refuting Miller's claims of failing to disclose and ineffective assistance of counsel is further testimony of Darnell Jordan at the second trial. He testified that he spoke with Dets. Labadie and Clogher along with Lieutenant Thurman that night and told them he did not know who did it because he was "a little scared". (St. R., pp. 3542-3546).

Once again, at the second trial, defense counsel reinforced with great detail Darnell Jordan's admission that he lied when he told Det. Labadie that night that he did not know who did it even after he had told Det. Nichols a few minutes after the shooting that it was "C-Murder." (St. R., pp. 3565-3579). A few days after he spoke with investigators that night, Darnell Jordan received a phone call that caused him to be concerned for his life. He then called Det. Nichols because he was afraid of "C-Murder" and concerned for his life. About five days after the murder, he met with Dets. Nichols and Thurman, along with Lieutenant Thurman, and identified C-Murder as the killer. (St. R., pp. 3550-3554). The direct examination of Darnell Jordan concluded as follows:

> Q.   Okay. Are you absolutely sure that the flash you saw from that gun came from the end of that man's arm?
>
> A.   Yes.

Q.      Who killed Steve Thomas?

A.      C-Murder.

(St. R., p. 3560).

All things considered - the statement of Darnell Jordan, his testimony, the record and the affidavits submitted to the state district .court, it is clear that the state courts correctly determined, this claim has no merit

**Kenneth Jordan:**

Similarly Miller's claim of a *Brady/ Napue* violation regarding the  June 23, 2018 affidavit executed by Kenneth Jordan has no merit.  In the affidavit, it is contended that unnamed deputies coerced Kenneth Jordan to falsely identify Miller as the shooter and that he was offered leniency in regard to his daughter's death. (St. R., pp. 21650-21652).  The trial record refutes this claim in addition to its inherent untrustworthiness as discussed above.  Just as Miller's claims of uncalled witnesses contain no support beyond his allegations, Miller's claim regarding Kenneth Jordan suffers the same defect.

Of significance, Assistant District Attorney Tim McElroy testified during the second trial in this matter that, as a child abuse screener, he reviewed the charges relative to the death of Kenneth Jordan's child.  (St., R., pp. 3682, 3685).  The mother was charged and pled guilty to manslaughter. (St. R., p. 3686).  Two others were charged as accessories.  (St. R., p. 3687).   In reviewing the case, Mr. McElroy interviewed Kenneth Jordan. (R., pp. 3687).  He was asked if Kenneth Jordan had received any kind of deal from the Sheriff's Office.  He had not.  Mr. McElroy testified that Kenneth Jordan did not receive any kind of deal and that there was no reason for him to be offered a deal. (St. R., p. 3698).  He also testified relative to the process of granting immunity and was emphatic in

41

denying that the police could grant immunity, i.e., make a deal.  (St. R., pp. 3699-3713).  Thus, this record testimony, as well as who is (the district attorney) and is not (the Sheriff's Office) authorized by law to offer deals to witnesses/suspects, refutes the statement of Kenneth Jordan that the Sheriff's Office offered him leniency in his case if he cooperated and implicated Miller.   Miller's counsel cross-examined Mr. McElroy in detail about the immunity process in particular as it relates to a motion to compel. (St. R., pp. 3699-3713).  Indeed, the motion to compel Kenneth Jordan's testimony was reduced to writing, disclosed, and filed into the record. Indeed, Miller  included it as one of his trial exhibits (for record purposes). (R. 3883).

Miller contends that the state failed to disclose what Kenneth Jordan said in his June 23, 2018, affidavit - that he falsely identified defendant as the perpetrator because of coercion by investigating detectives.  This assertion is incorrect.  It is belied by the record of his testimony, his January 27, 2003 statement to Det. Clogher and the affidavit of Det. Donald Clogher.  Additionally, his assertion that he was arrested in January 23, 2003 for the death of his daughter is incorrect.  He ws not arrested for that offense.  (St. R., p. 21646).  At trial when the state said he was never arrested for carnal knowledge, defense counsel replied, "I'm not saying he was".  (St. R., p. 3890).  Also, as noted, he was not, contrary to his affidavit arrested for the death of his child.  This reinforces the lack of any credibility this affidavit purports to have.

Miller's claim is also not supported by the affidavit and the record.  Kenneth Jordan's affidavit states that he was held in the custody of the JPSO jail after being arrested on a material witness warrant. (St. R., p. 21651).  In fact at Miller's second trial, Kenneth Jordan testified that when he was taken to the Jefferson Parish Correctional Center after his arrest as a material witness, "They fingerprinted me, took my picture and, about an hour later, they put me in protective custody."

42

(St. R., p. 3575).  When asked how many nights he spent in jail, he replied, "no nights." (St. R., p. 3576).  He said he had been treated well and, although arrested, his presence was voluntary.  (St. R. 3575-3577).

To the extent that Miller relies upon the unsubstantiated claim that Jordan "told the JPSO Officers that [his] 2003 statement was not the true" and that the State failed to disclose this alleged information, this claim was refuted by the record in that virtually the entire State's file was disclosed after Miller's conviction was vacated following his first trial.  Further, Kenneth Jordan's conclusory allegations offer no details such as when, where, or to whom, such statements were made. Nonetheless, during state post conviction proceedings, the State submitted the affidavits of Det. Donald Clogher; Assistant District Attorneys Doug Freese, David Wolff, and Shannon Swaim, and former Assistant District Attorney Roger Jordan to refuting this claim. (St. R., pp. 22237-22241).

Additional support, if any is needed, is found in the prior statement and testimony of Kenneth Jordan.  In his January 27, 2003, statement to Detective Clogher, he stated that he was at the Platinum Club when he saw the defendant and his entourage arrive.  He related that a fight began with Steve Thomas being beaten.  Then, "And after all of 'em jumped him, you know, C-Murder came, stood right there and shot him."  (St. R., pp. 22257-22262).

Kenneth Jordan testified at Miller's second trial as follows:

Q.      And how many people were beating on him and stomping him?

A.      It was about a good six, seven of them.

Q.      Okay.  And did you hear anything?

A.      No, I didn't hear nothing, but after the fight was over, C-Murder stood over him and shot him one time.

(St. R., p. 3861).

Q.      Did you ever contact the police to tell them what you saw?

A.      No.

Q.      Okay.  Now I want to fast forward to - - first of all, why didn't you contact the police and tell them what you saw?

A.      Be honest, cuz I was scared for my life and prior to me hearing, like, what they could do - - what C-Murder people could do to you and prior to me hearing things like something happened to people that was in jail and - - I was scared for my life.  To be honest.

Q.      You've mentioned C-Murder quite a few times, do you see C-Murder in the courtroom?

A.      Yes right there.

Q.      Can you please point him out and describe what he's wearing?

A.      That yellow or gold and glasses.

Q.      Thank you, sir. Let the record reflect that the witness has identified the defendant before the bar.  Are you sure that's the man that shot and killed Steve Thomas?

A.      Yes.

Q.      Are you positive?

A.      Yes.

Q.      And you were there?

A.      Yes.


Q.      And you were afraid to talk to the police, is that correct?

A.      Yes I was.

(St. R., p. 3559).

Q.      Okay.  And were you asked to look at a photographic line-up?

A.      Yes.

                              ****

Q.      Is that the photographic line-up?

A.      Yes.

Q.      And did you make an identification?

A.      Sure did.

Q.      Who did you pick out?

A.      Number five.

                              ****

Q.      And who's that?

A.      C-Murder.

Q.      And why did you pick him out?  Why did you identify him for Detective
        Clogher?

A.      He was the killer.

Q.      Because he's the killer.  Did you sign your name to the back of that?

A.      Yes, that's my signature.

                              ****

Q.      C-Murder?

A.      Um-hum.

Q.      Number five?

A.      Yes.

Q.      Okay. And you were positive?

A.      Yes.

(St. R., pp. 3875-3876).

Similarly, the affidavits of Darnell Jordan and Kenneth Jordan do not support Miller's baseless claim of a *Napue* violation.  Kenneth Jordan's affidavit does not mention the prosecutors or assistant district attorneys.  Similarly Darnell Jordan's affidavit is silent as to his allegedly telling the prosecutors that Miller did not kill Steve Thomas.  Its only mention of the District Attorney's Office is on the concluding page where Darnell Jordan states that he needs protection from the District Attorney's Office.  This  accusation that the state violated its ethical duty of disclosure is based on nothing - certainly not the affidavits of Darnell Jordan and Kenneth Jordan.  While Miller accuses the prosecutors of violating their ethical duty to disclose alleged recantations, it is glaringly obvious that this allegation is not supported by either the affidavit of Darnell Jordan or Kenneth Jordan, and the allegation is refuted by the affidavits of the prosecutors.  (St. R., pp. 22238-22241).

These claims, on this record, show the soundness of the law's skepticism toward recantations. The petitioner has failed to establish that the state court decision was incorrect or erroneous, much less that he has met the more demanding habeas standard of proving that the decision was objectively unreasonable as required by AEDPA with regard to his *Brady*/ *Napue* claims.  Accordingly, the petitioner is not entitled to federal habeas relief on this claim.

## RESERVATION OF RIGHTS

The respondent respectfully maintains that the petition of Corey Miller should be dismissed with prejudice on the foregoing basis.  However, the respondent does not waive any defenses and/or

procedural objections and would respectfully reserve the right to submit additional documentation, defenses, procedural objections, argument on the merits, and/or harmless error argument. Additionally the respondent would respectfully request the Court to raise *sua sponte* any and all applicable limitations defenses, lack or exhaustion as to claims/arguments, and/or procedural defaults. *See Day v. McDonough*, 547 U.S. 198, 209, 126 S.Ct. 1675, 1684, 164 L.Ed.2d 376 (2006) (holding that a district court is permitted to consider *sua sponte* the issue of the timeliness of a state petitioner's habeas petition); *see also Tigner v. Cockrell*, 264 F.3d 521, 526 (5th Cir. 2001) (finding that a reviewing court "may raise a petitioner's failure to exhaust *sua sponte*"); *Magouirk v. Phillips*, 144 F.3d 348, 360 (5th Cir. 1998) (concluding that "a federal district court may, in the exercise of its judicial discretion, raise procedural default *sua sponte*").

## CONCLUSION

The respondent respectfully submits that the petition filed by Corey Miller should be dismissed with prejudice for the reasons set forth in the instant response.

Respectfully Submitted,

**PAUL D. CONNICK, JR.**
DISTRICT ATTORNEY
24th JUDICIAL DISTRICT
PARISH OF JEFFERSON
STATE OF LOUISIANA

/s/ Juliet Clark
JULIET CLARK
BAR ROLL NO. 23451
ASSISTANT DISTRICT ATTORNEY
DISTRICT ATTORNEY'S OFFICE
PARISH OF JEFFERSON
200 DERBIGNY STREET
GRETNA, LOUISIANA 70053
(504) 368-1020

**CERTIFICATE OF SERVICE**

I do hereby certify that a true and correct copy of the foregoing document has been filed with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to the following:

JANE HOGAN
BAR ROLL NO. 35172
310 NORTH CHERRY STREET
HAMMOND, LOUISIANA 70401
(985) 542-7730


/s/ Juliet Clark_____
JULIET CLARK

48