## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **COREY MILLER** | **CIVIL ACTION** |
| **VERSUS** | **NO. 21-1413** |
| **TIMOTHY HOOPER, WARDEN** | **SECTION "R"(4)** |

## REPORT AND RECOMMENDATION

The matter was referred to a United States Magistrate Judge to conduct hearings, including an evidentiary hearing if necessary, and to submit proposed findings and recommendations pursuant to **28 U.S.C. § 636(b)(1)(B) and (C)**, and as applicable, **Rule 8(b) of the Rules Governing Section 2254 Cases**.  Upon review of the entire record, the Court has determined that this matter can be disposed of without an evidentiary hearing.  *See* **28 U.S.C. § 2254(e)(2)**.[1]

## I.    Factual and Procedural Background

Petitioner Corey Miller ("Miller") through counsel filed this petition for federal habeas corpus relief pursuant to 28 U.S.C. § 2254.[2]  Miller is a convicted inmate incarcerated in the Elayne Hunt Correctional Center in St. Gabriel, Louisiana.[3]  On February 28, 2002, Miller, also known as rapper C-Murder,[4] was indicted by a Jefferson Parish Grand Jury for the second degree murder of 16-year old Steve Thomas in the Platinum Club in Harvey, Louisiana, on January 12, 2002.[5]  Miller entered a plea of not guilty on March 6, 2002.[6]

---

[1] Under 28 U.S.C. § 2254(e)(2), an evidentiary hearing is held only when the petitioner shows that either the claim relies on a new, retroactive rule of constitutional law that was previously unavailable or a factual basis that could not have been previously discovered by the exercise of due diligence and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner.

[2] ECF No. 1.

[3] ECF No. 1.

[4] Miller's rapper moniker was used in the indictment and referred to by witnesses and in state court pleadings.

[5] St. Rec. Vol. 1 of 91, Indictment, 2/28/02; St. Rec. Vol. 18 of 91, Grand Jury Return, 2/28/02.

[6] *Id.*, Minute Entry, 3/6/02.

The record reflects that, in the early morning hours of January 12, 2002, 16-year old Steve Thomas ("Thomas") was at the Platinum Club on Manhattan Boulevard where a rap contest was held.[7]   When Thomas left the stage onto the dance floor, he was beaten and kicked by a group of men who were in the bar with Miller, who was known as C-Murder, a local celebrity rapper. Thomas was shot during the scuffle and died of a bullet wound through his heart.

Deputy Brian Singleton of the Jefferson Parish Sheriff's Office was patrolling when he received a call that shots were fired inside of the Platinum Club.   He arrived as a large crowd of 75 to 150 people were screaming and exiting the club.   He made his way through the crowd and saw around 100 or 200 patrons still inside the club.   He also saw the victim, 16-year old Steve Thomas, who was lying on his back with a single gunshot wound to his chest.   Deputy Singleton tried to speak to Thomas but Thomas was unable to communicate.   Deputy Singleton called for medical assistance, and the doors to the club were locked.   He also obtained the names, telephone numbers, and addresses of the remaining patrons.   Those he spoke with claimed to have seen nothing.

Darnell Jordan ("Darnell") was on duty as security employee at the Platinum Club and knew Miller was at the club.   He recalled that at some point, a fight broke out in the area between the pool table and the dance floor.   He saw 15 or 20 people beating a person who was lying on his back trying to protect himself from kicks and punches.   Darnell ran towards the fight to break it up.   On his way, he grabbed Miller and told him to "chill out."   Miller responded "alright," but then tried to make his way through to the fight.   Miller did not strike the victim with his foot or his

---

[7] The facts were taken from the published opinion of the Louisiana Fifth Circuit Court of Appeal on direct appeal following Miller's 2009 trial.   *State v. Miller*, 83 So. 3d 178, 182-86 (La. App. 5th Cir. 2011); St. Rec. Vol. 1 of 91, 5th Cir. Opinion, 10-KA-718, at 3-10, 12/28/11.

fist, but seemed to be trying to get into the fight.  Darnell was about one yard away when he saw Miller reach his hand into the pile of people, and he heard one shot.  He saw the gun flash from the end of Miller's arm.  Darnell did not see Miller with a gun, but whatever flashed was in Miller's hand.

Darnell believed that there were between 250 and 300 people in the club.  Many people ran out of the club after the shooting, including Miller and the individuals involved in the fight. Darnell called 9-1-1, but he did not identify the shooter on the call.  A few minutes after the fight, Darnell told Detective Kevin Nichols of the Jefferson Parish Sheriff's Office, that the shooter was without doubt "C-Murder," Miller's rapper moniker.  Darnell knew and trusted Detective Nichols because Nichols worked as a detail officer for the club.

Detective Nichols was working a detail in the parking lot of the Platinum Club at the time of the shooting.  He saw people leaving in a hurried manner, so he thought there must have been a fight.  When he got to the entry doors, he was told there had been a shooting.  Detective Nichols entered the club and saw the victim lying on his back.  Detective Nichols talked to Darnell, who worked in security at the club.  Darnell told the detective that he saw C-Murder shoot the victim. The Detective collected 25 to 30 names on the scene, but no one admitted seeing anything.

Detective Donald Clogher was notified of the shooting at the Platinum Club, and ultimately was primarily responsible for the investigation.  He saw between 100 and 150 people still in the club when he arrived.  He talked to Darnell, as security at the club, and asked him about what he had seen.  Darnell placed Miller in the immediate vicinity of the murder, but did not name Miller as the shooter as he had done with Detective Nichols.  Darnell later would testify that he denied knowing who the shooter was because he feared retaliation from Miller and his "clique."  Darnell

was transported to the Detective Bureau and interviewed further, but he provided no additional information.

The officers interviewed other witnesses at the Bureau that night. Detective Clogher reported that Denise Williams ("Williams") said she witnessed the murder, and that Derrick Taylor was the shooter. Williams was concerned that she was singled out by police as a witness and was upset when she met with Detective Clogher. Detective Clogher believed Williams was not being truthful. She eventually admitted that she lied about Taylor being the shooter because she was afraid for her own safety because of Miller's group.

Sometime after the shooting, Darnell received a phone call from one of the club owners and was told something about the incident that caused him to be concerned for his life and afraid of Miller. He called Detective Nichols to provide him information. On January 17, 2002, Darnell met with Detective Nichols, Detective Clogher, and Lieutenant Thurman and told them that Miller was the shooter. He identified Miller in a photographic lineup as the person who killed Steve Thomas. Darnell would later testify that he decided at that time to tell the truth and identify Miller, because Thomas's father lost his son and it was the right thing to do.

Miller was arrested on January 18, 2002. He was read his rights and agreed to make a statement to Detective Clogher, but not a recorded statement. He told officers that he was innocent, and was at the Platinum Club talking to the DJ when the incident occurred. Miller also told Detective Clogher that he heard the gunshot and was immediately pushed out of the club by an unknown individual. Miller asked the detective about the investigation, the level of cooperation the police were receiving from witnesses, and who had identified the shooter. Detective Clogher believed that Miller was fishing for the identification of the witnesses and to determine who had

been threatened out of cooperating.  Detective Clogher determined over the course of the investigation that Miller's statements were contradicted by others on numerous occasions.

Kirk Edwards ("Edwards") was the DJ at the Platinum Club at the time of the shooting. He had seen Miller a couple of times before, but he denied seeing Miller in the Platinum Club on the night of the incident.  Edwards saw a disturbance across the dance floor and turned on the lights just before the gunshot went off.  Edwards could not identify Miller as being involved in the fight, but he was sure that at no time during the night did Miller go to the DJ booth to talk to him.

About a year after the murder, Kenneth Jordan ("Kenneth") was at the Jefferson Parish detective bureau as a material witness in the investigation into the death of his baby daughter. Kenneth told police that he was at the Platinum Club when Thomas was shot on January 12, 2002. As a result of this information, on January 27, 2003, Detective Clogher interviewed Kenneth. During the interview, Kenneth identified Miller as the shooter.

Kenneth told the detective that unlike regular guests, celebrities like Miller were allowed into the club ahead of the line and without being checked with the metal detector wand.  He saw Miller and his group enter without being screened.  He recalled that there was a rap contest at the club that night.  When the victim, Thomas, exited the stage after his session, a person wearing a "CP3" hoodie bumped into Thomas and then attacked him.  Kenneth explained that the phrase CP3 was a gang reference to the Calliope Housing Project in New Orleans' third police district. Kenneth identified the gang symbol in a photograph of Miller.

Kenneth believed Thomas was fighting for his life while the CP3 group of six or seven people attacked him.  He saw Miller watching the fight.  When the people stopped beating Thomas, Kenneth was about five or six feet from Miller.  He saw Miller stand over the victim and shoot

him once.  The shot rang Kenneth's ears, and he saw the fire come from the gun.  Kenneth ran out of the club behind the CP3 group and Miller.

Kenneth did not talk to the police at the time or contact the police, because he was scared for his life if he came forward as a witness against Miller.  He had heard what Miller's "people" could do and what was happening to people in jail.  He decided to tell the truth at that time, because he knew how it felt to lose a child.

Miller was first tried before a jury over the course of fourteen non-consecutive days in September of 2003, and was found guilty as charged by unanimous verdict.[8]  On April 6, 2004, the state trial court granted Miller's motion for a new trial finding that the prosecution withheld *Brady*[9] material.[10]  The Louisiana Fifth Circuit Court of Appeal granted the State's subsequent writ application and vacated the order granting the new trial.[11]  On December 12, 2005, however, the Louisiana Supreme Court granted Miller's related writ application and by separate order issued March 10, 2006, reversed the appellate court and reinstated the state trial court's grant of a new trial.[12]

Following several more years of discovery and pretrial proceedings, Miller was tried a second time before a jury on August 3 through 7, 10, and 11, 2009, and found guilty as charged of

---

[8] St. Rec. Vol. 35 of 91, Trial Minutes, 9/8/03; Trial Minutes, 9/9/03; Trial Minutes, 9/10/03; Trial Minutes, 9/11/03; Trial Minutes, 9/15/03; Trial Minutes, 9/16/03; Trial Minutes, 9/17/03; Trial Minutes, 9/18/03; Trial Minutes, 9/19/03; Trial Minutes, 9/22/03; Trial Minutes, 9/24/03; Trial Minutes, 9/26/03; Trial Minutes, 9/29/03; Trial Minutes, 9/30/03.

[9] *Brady v. Maryland*, 373 U.S. 83, 97 (1963).

[10] St. Rec. Vol. 35 of 91, Minute Entry, 4/6/04; St. Rec. Vol. 80 of 91, Hearing Transcript, 4/6/04.

[11] St. Rec. Vol. 81, 5th Cir. Order, 04-KH-682, 3/10/05; St. Rec. Vol. 80 of 91, State's 5th Cir. Writ Application, 04-KA-682, 6/10/04; *see also*, St. Rec. Vol. 81 of 91, 5th Cir. Order, 04-KH-682, 3/24/05 (rehearing refused).

[12] *State v. Miller*, 917 So. 2d 1084 (La. 2005); St. Rec. Vol. 81 of 91, La. S. Ct. Order, 2005-K-1111, 12/12/05 (granting Miller's writ); *State v. Miller*, 923 So. 2d 625 (La. 2006); La. S. Ct. Order, 2005-K-1111, 3/10/06 (reversing appellate court and reinstating trial court order).

second degree murder by a 10-2 verdict.[13]  On August 14, 2009, the state trial court denied the oral motion for new trial urged by Miller's counsel.[14]  After Miller waived legal delays, the state trial court sentenced him to life in prison without benefit of parole, probation, or suspension of sentence.[15]

On direct appeal, Miller's counsel asserted six errors:[16]  (1) at trial, there were prejudicial and unsubstantiated allegations made that Miller threatened witnesses and obstructed the investigation and (a) the allegations did not tend to prove a material issue or have independent relevance, (b) the allegations were not proven by clear and convincing evidence, (c) the bad acts were introduced through hearsay without protection of his confrontation rights, and (d) the state referenced uncharged, unsupported, prejudicial bad acts evidence in its closing arguments; (2) the State engaged in the systematic elimination of prospective black jurors; (3) the trial court allowed jurors to examine the 9-1-1 recording transcripts during deliberations; (4) the sustained deadlock and duress of the jury necessitated mistrial; (5) a juror's consultation of the Bible during deliberations undermined Miller's right to have the verdict based solely on the evidence; and (6) the non-unanimous jury verdict was unconstitutional.

---

[13] St. Rec. Vol. 1 of 91, Trial Minutes, 8/3/09; Trial Minutes, 8/4/09; Trial Minutes, 8/5/09; Trial Minutes, 8/6/09; Trial Minutes, 8/7/09; Trial Minutes, 8/10/09; Trial Minutes, 8/11/09; St. Rec. Vol. 5 of 91, Jury Verdict (accepted), 8/11/09; St. Rec. Vol. 9 of 91, Trial Transcript, 8/3/09; St. Rec. Vol. 10 of 91, Trial Transcript (continued), 8/3/09; St. Rec. Vol. 11 of 91, Trial Transcript (continued), 8/3/09; St. Rec. Vol. 11 of 91, Trial Transcript, 8/4/09; St. Rec. Vol. 12 of 91, Trial Transcript (continued), 8/4/09; St. Rec. Vol. 13 of 91, Trial Transcript (continued), 8/4/09; St. Rec. Vol. 13 of 91, Trial Transcript, 8/5/09; St. Rec. Vol. 14 of 91, Trial Transcript (continued), 8/5/09; St. Rec. Vol. 15 of 91, Trial Transcript, 8/6/09; St. Rec. Vol. 10 of 91, Trial Transcript, 8/7/09; St. Rec. Vol. 16 of 91, Trial Transcript (continued), 8/7/09; St. Rec. Vol. 16 of 91, Trial Transcript, 8/10/09; St. Rec. Vol. 17 of 91, Trial Transcript (continued), 8/10/09; St. Rec. Vol. 17 of 91, Trial Transcript, 8/11/09.

[14] St. Rec. Vol. 5 of 91, Sentencing Minutes, 8/14/09.

[15] *Id*.; St. Rec. Vol. 17 of 91, Sentencing Transcript, 8/14/09.

[16] St. Rec. Vol. 5 of 91, Appeal Brief, 10-KA-718, 12/16/10; *see also*, *id*., Reply Brief, 10-KA-718, 5/13/11 (copy also in St. Rec. Vol. 82 of 91).

On December 28, 2011, the Louisiana Fifth Circuit affirmed Miller's conviction and sentence finding that Miller's first and fifth claims were not preserved for appeal, and that otherwise, all of his claims were meritless.[17]  On May 18, 2012, the Louisiana Supreme Court denied Miller's related writ application without stated reasons.[18]

The United States Supreme Court also denied Miller's application for writ of certiorari on February 19, 2013.[19]  Miller's conviction and sentence became final that same day.  *See Giesberg v. Cockrell*, 288 F.3d 268, 270 (5th Cir. 2002) (under the AEDPA, a state conviction is final when the United States Supreme Court denies a petition for writ of certiorari); *Crutcher v. Cockrell*, 301 F.3d 656, 657 (5th Cir. 2002) (same); *see also*, *State v. Hoffman*, 768 So. 2d 592, 592 (La. 2000) (same applied to finality under state law).

One year later, on February 19, 2014, Miller through counsel filed an initial application for post-conviction relief which asserted ten claims:[20] (1) he is actually innocent because of a lack of credible evidence; (2) at least one juror based the verdict on extraneous pressure because she wanted to "get out of here"; (3) the state trial court used improper instructions to the deadlocked jury in violation of *Allen v. United States*, 164 U.S. 492 (1896); (4) a Bible in the jury room was an extraneous influence on jury deliberations; (5) the state trial court failed to declare a mistrial based on the reports of the obvious incapacity of one of the jurors; (6) his confrontation rights were violated when hearsay was used to present unfounded claims of threats to witnesses; (7) he received ineffective assistance of trial counsel when counsel failed (a) to object to the Bible in the

---

[17] *Miller*, 83 So. 3d at 178; St. Rec. Vol. 1 of 91, 5th Cir. Opinion, 10-KA-718, 12/28/11.
[18] *State v. Miller*, 89 So. 3d 1191 (La. 2012); St. Rec. Vol. 81 of 91, La. S. Ct. Order, 12-K-0282, 5/18/12; *id.*, La. S. Ct. Writ Application, 12-K-0282, 1/27/12; St. Rec. Vol. 82 of 91, La. S. Ct. Writ Application (continued), 12-K-0282, 1/27/12.
[19] *Miller v. La.*, 568 U.S. 1157 (2013).
[20] St. Rec. Vol. 72 of 91, Initial Application for Post-Conviction Relief, 2/19/14.

jury room, (b) to attempt to locate witnesses and instead relied on audio recordings of their prior testimony, (c) to conduct adequate investigation into the facts and circumstances of the offense and Miller's defense, and (d) failed to file a motion for new trial based on the irregularities in jury deliberations and on grounds that the ends of justice would be served by a new trial; (8) appellate counsel was ineffective (no reasons identified); (9) the prosecution failed to disclose *Brady* evidence (no specifics identified); and (10) the non-unanimous jury verdict was unconstitutional.

On December 8, 2014, Miller's counsel filed an amendment to the post-conviction application to reiterate the initial claims and add at least one additional argument in support of claim 7(c), *i.e.* trial counsel was also ineffective because of an inadequate effort to impeach certain witnesses.[21]

On June 19, 2015, the State filed its procedural objections to all but two of Miller's claims, specifically 7 and 8 above, on the following grounds:[22] (1) actual innocence was not a proper post-conviction claim under La. Code Crim. P. art. 930.3; (2) the arguments regarding juror pressure were asserted and rejected on direct appeal and were barred from post-conviction review by La. Code Crim. P. art. 930.4(A) and for relying on extrajudicial material not allowed under La. Code Evid. art. 606(B), one of which also was stricken on direct appeal; (3) the Louisiana Fifth Circuit had already held on direct appeal that the trial court did not give a prohibited *Allen* charge, the claim also was not preserved for appeal in violation of La. Code Crim. Proc. art. 841, and otherwise, if it was not raised on appeal and could have been, the claim was now barred from review by La. Code Crim. P. art. 930.4(B); (4) the Bible issue was addressed on appeal when the Louisiana Fifth Circuit determined that there was no contemporaneous objection under La. Code

---

[21] St. Rec. Vol. 71 of 91, First Amended Application for Post-Conviction Relief, 12/8/14.
[22] *Id*., State's Procedural Objections to Amended Application for Post-Conviction Relief, 6/19/15.

Crim. P. art. 841 to preserve it for appeal and was barred by Art. 930.4(A), and the extrajudicial material supporting the claim was prohibited by La. Code Evid. art. 606(B); (5) the juror capacity argument was raised and rejected on direct appeal and was barred by Art. 930.4(A); (6) the hearsay argument was raised and rejected on direct appeal and was barred by Art. 930.4(A); (9) there was no substantive argument under *Brady* in the brief, and the claim failed to state a claim under La. Code Crim. P. art. 926(B)(3) and could be summarily dismissed under La. Code Crim. P. art. 928; and (10) the non-unanimous jury verdict issue was raised and rejected on direct appeal and was barred by Art. 930.4(A).

On August 26, 2015, after receiving Miller's reply to the State's procedural objections, the state trial court sustained the State's objections and dismissed Miller's procedurally barred claims, specifically claim numbers 1 through 6, 9, and 10 in both Miller's initial and first amended applications for post-conviction relief.[23]  On September 21, 2015, the state trial court granted the State's request to stay proceedings on the remaining claims, numbers 7 and 8, to await resolution of Miller's writ application seeking review of the procedural dismissals.[24]

On December 29, 2015, the Louisiana Fifth Circuit denied Miller's writ application on the procedural dismissal.[25]   The court also found no error in the trial court's dismissal of Miller's actual innocence claim (claim one) under La. Code Crim. P. art. 930.3.  The court also held that La. Code Crim. P. art. 930.4(A) barred post-conviction review of Miller's post-conviction claims two through five.[26]

---

[23] St. Rec. Vol. 86 of 91, Trial Court Order, 8/26/15; *see also*, St. Rec. Vol. 71 of 91, Response to State's Procedural Objections, 7/2/15.

[24] *Id*., Trial Court Order, 9/21/15; State's Motion to Stay, 9/18/15.

[25] St. Rec. Vol. 86 of 91, 5th Cir. Order, 15-KH-679, 12/29/15.

[26] The parties failed to provide a copy of this writ application for the court to determine whether claims six, nine, and ten were not included in the writ application or simply were not specifically addressed by the appellate court. This, however, does not alter the resolution of Miller's claims before the court.

Thirty-one days later, on January 29, 2016, Miller's counsel filed a writ application with the Louisiana Supreme Court seeking review of the procedural dismissal only as to claims one and two through five.[27]  By order issued October 28, 2016, the Court declined to consider the writ application finding it was untimely filed under La. S. Ct. R. X§5(a).[28]

On June 26, 2018,[29] Miller's counsel filed a supplemental and amended memorandum in support of the initial application for post-conviction relief to add two more claims.[30]  This effectively lifted the stay previously imposed by the state trial court.  The first supplemental claim, designated the "eleventh" claim, was asserted under *Brady* and *Napue*[31] arguing that the newly obtained June 23, 2018, affidavit from witness Kenneth Jordan established that Miller did not kill Thomas.  Miller argued that the affidavit also indicated that Kenneth was threatened by Jefferson Parish Sheriff Office ("JPSO") detectives with felony charges and ten years in prison if he did not testify at Miller's trial.  Miller asserted that this was an offer of leniency that was not was not disclosed to the defense.  He further contended that the alleged threat or coercion constituted a *Napue* violation because prosecutors had been told by Kenneth that his 2003 statement was not true and they made him testify to the false statement.[32]  Miller also claims that because Kenneth told law enforcement and prosecutors that his 2003 statement was not true, and that statement constituted *Brady* that was not disclosed to the defense.

---

[27] St. Rec. Vol. 88 of 91, La. S. Ct. Writ Application, 2016-KP-0207, 1/29/16.

[28] *State v. Miller*, 203 So. 3d 218 (La. 2016); St. Rev. Vol. 88 of 91, La. S. Ct. Order, 2016-KP-0207, 10/28/16.

[29] One month before this, on May 22, 2016, Miller submitted a pro se supplemental application to the state trial court.  St. Rec. Vol. 71 of 91, Supplement to Application, 5/22/16.  However, on May 31, 2016, the court refused to consider and dismissed the *pro se* petition because it was not filed through his retained counsel.  *Id*., Trial Court Order, 5/31/16.

[30] St. Rec. Vol. 71 of 91, Supplemental and Amended Memorandum in Support of Initial Application for Post-Conviction Relief, 6/26/18.

[31] *Napue v. Illinois*, 360 U.S. 264, 269 (1959).

[32] St. Rec. Vol. 71 of 91, Supplemental and Amended Memorandum in Support of Initial Application for Post-Conviction Relief, 6/26/18

Supplemental claim "twelve" was a re-urging of Miller's request for review of his actual innocence claim based on Kenneth's affidavit and recantation of his statement that Miller was the shooter.

On July 2, 2018, Miller filed a second supplemental and amended memorandum urging another claim "twelve" in which he referenced another new affidavit from witness Darnell Jordan in which Darnell stated that his statements and testimony that Miller was the shooter were not truthful.[33]  Miller argued that Darnell told detectives on the night of the murder that C-Murder did not do the shooting.  The affidavit also outlined that, when Darnell was later arrested in California, he was held under arrest in a hotel where he told the officer that the written statement they handed him was not what he had told detectives.  Miller also argued that Darnell was tricked into identifying Miller's as the shooter when they showed him the photographic lineup.  Miller argued that this was a *Brady* violation because the State did not disclose that Darnell told detectives that his prior statement was not true.  He also argued that it was a *Napue* violation because Darnell was forced or coerced to testify consistently with a fabricated statement that had been falsified by detectives.

In the same second supplemental and amended memorandum, Miller asserted additional unnumbered arguments in which he claimed that Darnell's affidavit was new evidence of his actual innocence.

On September 21, 2018, the State filed a memorandum in opposition to Miller's new and remaining original claims.[34]  The State contended that Miller failed to meet his burden of proof

---

[33] St. Rec. Vol. 83 of 91, Second Supplemental and Amended Memorandum in Support of Initial Application for Post-Conviction Relief, 7/2/18.
[34] St. Rec. Vol. 70 of 91, State's Opposition Memorandum, 9/21/18 (exhibits continued into Vol. 71).

under *Strickland v. Washington*, 466 U.S. 668 (1984), in his seventh claim of ineffective assistance of trial counsel. The State argued that Miller could prove no deficiency or prejudice from trial counsel's actions. The State also argued that there was no prejudice from any alleged extraneous influence or duress on the jury since the verdict in the first and second trial were both guilty.

In addition, the State argued that the juror in alleged distress, and who had the Bible, maintained her not-guilty vote; therefore, she was not influenced by any alleged circumstances during deliberations. The State again argued that Miller was prohibited from relying on a former juror's affidavit and newspaper articles by La. Code Evid. art. 606(B).

The State further asserted that defense counsel made a strategic decision to rely on the recorded testimony rather than recall defense witnesses live because he knew these witnesses were not found credible in the first trial that also ended in a guilty verdict. As for the uncalled witnesses listed in Miller's post-conviction memorandum, the record supports a showing that counsel made a decision not to call them because their known statements were not beneficial to the defense.

The State argued that the decision to file a motion for new trial was a strategic decision. The State also noted that Miller's trial counsel did in fact urge an oral motion for new trial and had withdrawn from the case before the newspaper article about the jury's deliberations was published. As for Miller's claim addressing ineffective assistance of appellate counsel, the State urged that it be dismissed because it was not briefed and no specific allegations were made.

With regard to the *Brady* and *Napue* claims, the State further argued that recantation by a witness was not reviewable on post-conviction under La. Code Crim. P. art. 930.3. The State also argued that Darnell had already admitted during trial that he lied to the officers about his flip-flopping statements and defense counsel cross-examined him on the issue. Similarly, Kenneth's

affidavit did not indicate that he told deputies someone else shot Thomas, only that he disclaimed the written statement that was handed to him before the second trial.

Miller's counsel filed a rebuttal on December 5, 2018, urging the state trial court to weigh the credibility of the affidavits relied upon by the State to refute those offered by Kenneth and Darnell. Miller's counsel also urged the court to consider the original state trial court's description of the "corruption" in the investigation that was disclosed after Miller's first trial.[35]

On January 23, 2019, the state trial court denied Miller's supplemental and remaining original claims as meritless.[36]  The court found that, under *Strickland* and based on the Louisiana Fifth Circuit's rulings on direct appeal, Miller could prove no prejudice from counsel's failure to object to the Bible in the jury room.  The court declined to consider the juror affidavit finding that it violated La. Code Evid. art. 606(B).  The court resolved that trial counsel's decision regarding presentation of witnesses' testimony was trial strategy.

In addition, Miller could not show prejudice or that the live testimony versus recorded statements changed the outcome of trial, both of which ended with guilty verdicts.  The court also found the list of possible witnesses was speculative and conclusory where Miller's summary of the witnesses expected testimony was in conflict with the witnesses actual statements.  Further, the decision to call witnesses was part of counsel's trial strategy.  The court also held that the filing of a motion for new trial was a matter of strategy and Miller's arguments were unsupported and demonstrated no prejudice.

The court dismissed the ineffective assistance of appellate counsel claim for failure to provide specific grounds as required by La. Code Crim. P. art. 926(B)(3).

---

[35] St. Rec. Vol. 69 of 91, Rebuttal to State's Opposition, 12/5/18.
[36] *Id*., Trial Court Order, 1/23/19.

Finally, with regard to the new affidavits from Kenneth and Darnell, the court found them suspect and unreliable and to contain no *Brady* material. The court noted that Darnell testified consistently at the grand jury hearing and at both trials. His lies to officers were addressed at trial. Kenneth's claims regarding the offer of immunity were also addressed at trial and deemed unfounded. In addition, the court held that Kenneth's affidavit was factually incorrect because he was never arrested in 2003 in connection with his daughter's death and was not facing charges or offered immunity. The court also determined that Kenneth provided no specific facts or proof that he told prosecutors in 2003 that his recorded statement was not true. He also did not indicate when he allegedly spoke with officers or identify any officers. The court found his affidavit vague and conclusory and that it did not support Miller's assertion that Kenneth was coerced into testifying to a false statement.

On September 16, 2020, Miller's counsel filed a writ application with the Louisiana Fifth Circuit which asserted only that the state trial court erred in summarily denying the post-conviction application and amended application and the trial court in denying the request for an evidentiary hearing.[37] On December 11, 2020, the Louisiana Fifth Circuit found Miller's writ application was untimely filed beyond the extensions granted by the state trial court.[38] The court nevertheless examined the merits of Miller's arguments and found that the trial court did not abuse its discretion in denying the claims without an evidentiary hearing. The court further commented that the trial court did not err in its conclusion that Miller failed to sufficiently prove his *Brady* and *Napue* claims as required by La. Code Crim. P. art. 930.2.

---

[37] St. Rec. Vol. 85 of 91, 5th Cir. Writ Application, 20-KH-322 (undated copy). The court's staff contacted the clerk of the Louisiana Fifth Circuit and was advised that Miller's writ application was electronically filed at 11:53 p.m. on September 16, 2020.

[38] St. Rec. Vol. 84 of 91, 5th Cir. Order, 20-KH-322, 12/11/20. The writ application also challenged a tangent order from the state trial court addressing access to sealed records. It was found untimely as to that order as well.

In the Louisiana Supreme Court, Miller's counsel again asserted no substantive claims, and instead urged only that the Louisiana Fifth Circuit erred in adopting the trial court's summary denial and in finding no error in the trial court's denial without an evidentiary hearing.[39]  On October 5, 2021, the Louisiana Supreme Court denied Miller's writ application finding that he failed to show ineffective assistance under *Strickland* and failed to show that the State withheld material exculpatory evidence under *Brady*.[40]

While pursuing the foregoing writ applications, on September 24, 2020, Miller's counsel also filed a motion in the state trial court seeking leave to file and additional time to brief another amended and supplemental post-conviction application to include challenges to the non-unanimous jury verdict and assert a *Brady* claim based on DNA testing.[41]  On October 19, 2020, the state trial court stayed this new application for thirty days to allow Miller's counsel to file a supporting brief.[42]  The deadline expired on November 18, 2020 and no supplemental brief was filed.

By March 26, 2021, Miller's counsel file nothing more, and the state trial court denied relief on the proposed claims.[43]  The court held that the Supreme Court's ruling in *Ramos v. Louisiana*, 140 S. Ct. 1390 (2020), was not retroactively applicable to Miller's conviction on collateral review, making the claim untimely under La. Code Crim. P. art. 930.8 and procedurally barred.  The court also held that the *Brady* claim was speculative, conclusory, and unsupported

---

[39] St. Rec. Vol. 83 of 91, La. S. Ct. Writ Application, 2021-KP-0305 (undated copy).

[40] *State ex rel. Miller v. State*, 325 So. 3d 370 (La. 2021); St. Rec. Vol. 91 of 91, La. S. Ct. Order, 2021-KP-00305, 10/5/21.

[41] St. Rec. Vol. 68 of 91, Motion to Amend and Supplement, 9/24/20.

[42] *Id*., Trial Court Order, 10/19/20.

[43] *Id*., Trial Court Order, 3/26/21.

and presented without evidence, explanation, or law.  The court dismissed that claim, citing La. Code Crim. P. arts. 928, 930.3, and 930.4.

Undaunted, on April 1, 2021, Miller's counsel filed another "supplemental" application for post-conviction relief challenging the non-unanimous jury verdict under *Ramos*.[44]  On April 8, 2021, the state trial court denied the application as repetitive and impermissibly successive.[45]

Miller's counsel filed a writ application with the Louisiana Fifth Circuit seeking review of the state trial court's March 26, 2021, ruling on the non-unanimous verdict and the *Brady* claim based on the DNA blood test results which excluded Miller.[46]  The Louisiana Fifth Circuit denied relief finding no error in the trial court's ruling.[47]  The record does not reflect that Miller sought further review of this ruling.

## II.      **Federal Petition**

On July 25, 2021, Miller through counsel filed this federal petition for habeas corpus relief in which he asserted four grounds for relief:[48] (1) he is actually innocent of the murder and his conviction violates the Eighth and Fourteenth Amendments as demonstrated by the recanting affidavits of Darnell Jordan and Kenneth Jordan; (2) Miller's conviction was obtained in violation of his Sixth and Fourteenth Amendments rights to due process, a fair trial, and an impartial jury, when at least one juror voted to convict based on pressure to end deliberations rather than on the evidence; (3) Miller's conviction was obtained in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments because trial counsel rendered deficient performance when he failed to conduct an adequate investigation, opted to play recordings of defense witnesses rather than call

---

[44] *Id.*, Supplemental Application for Post-Conviction Relief, 4/1/21.
[45] *Id.*, Trial Court Order, 4/8/21.
[46] St. Rec. Vol. 89 of 91, 5th Cir. Writ Application, 21-KH-221 (undated copy).
[47] *Id.*, 5th Cir. Order, 21-KH-221, 5/13/21.
[48] ECF No. 1 at 5; ECF No. 1-1, at 3, 9.  *See also* ECF No. 2 (additional exhibits).

live witnesses, and failed to file a motion for new trial based on irregularities in the jury's deliberations; (4) Miller's Fourteenth Amendment right to due process was violated when the prosecution failed to disclose exculpatory evidence under *Brady* and *Napue* concerning the recanted statements of Kenneth Jordan and Darnell Jordon.  As relief, Miller seeks an evidentiary hearing or a remand to the state trial court for a hearing on his claims, or the grant of a new trial.[49]

On October 16, 2021, the State filed a response in opposition to Miller's petition asserting that Miller's first two claims were not properly exhausted and that the third and fourth claims are meritless.[50]  The State argues that Miller's actual innocence and jury deliberation claims were not exhausted because they were not properly presented to the Louisiana Supreme Court.  Instead, the Court declined to consider Writ No. 16-KP-0207 because it was not timely filed under La. S. Ct. R. X§5, leaving the claims now unexhausted and procedurally defaulted for purposes of further state court review.[51]

The State also asserts that in the alternative, the actual innocence claim is not cognizable as a free standing claim.[52]  The State further contends that Miller has failed to establish that the state courts' denial of relief was contrary to Supreme Court precedent.  He has not established either factor under *Strickland* to prove ineffective assistance of counsel.  He also has not shown that the recanting affidavits are truthful, reliable, or inclusive of *Brady*/*Napue* evidence.

Miller did not file a reply to the State's opposition although he was provided with an opportunity to do so.[53]

---

[49] ECF No. 1, at 16.
[50] ECF No. 20.  The State's response also expressly reserves its right to assert additional defenses, including timeliness, exhaustion, and procedural default.  *Id*. at 46-47.
[51] *Id*. at 15-19.
[52] *Id*. at 20, 23-24.
[53] ECF No. 7, at 2.

## III.   General Standards of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214,[54] applies to Miller's petition, which was electronically filed by his counsel on July 25, 2021.  The threshold questions on habeas review under the amended statute are whether the petition is timely and whether the claim raised by the petitioner was adjudicated on the merits in state court; *i.e.* the petitioner must have exhausted state court remedies and must not be in "procedural default" on a claim.  *Nobles v. Johnson*, 127 F.3d 409, 419-20 (5th Cir. 1997) (citing 28 U.S.C. § 2254(b), (c)).

As referenced above, the State has asserted that state court review of two of Miller's claims, actual innocence and jury deliberations, was not properly exhausted in the state courts, and the claims now are procedurally barred from review because Miller may not be able to return to the state courts to complete exhaustion.[55]  The Court nevertheless finds that the claims are meritless and may be resolved without exhaustion.  28 U.S.C. § 2254(b).  Thus, for the reasons that follow, Miller is not entitled to federal habeas relief and his petition should be dismissed with prejudice.

## IV.   Standards of a Merits Review

### A.   Claims Addressed on the Merits by the State Courts

The standard of review under the AEDPA is governed by § 2254(d) and the Supreme Court's decision in *Williams v. Taylor*, 529 U.S. 362 (2000).  It provides different standards for questions of fact, questions of law, and mixed questions of fact and law.

---

[54] The AEDPA comprehensively revised federal habeas corpus legislation, including 28 U.S.C. § 2254, and applied to habeas petitions filed after its effective date, April 24, 1996.  *Flanagan v. Johnson*, 154 F.3d 196, 198 (5th Cir. 1998) (citing *Lindh v. Murphy*, 521 U.S. 320 (1997)).  The AEDPA, signed into law that date, does not specify an effective date for its non-capital habeas corpus amendments.  Absent legislative intent to the contrary, statutes are effective at the moment they are signed into law.  *United States v. Sherrod*, 964 F.2d 1501, 1505 n.11 (5th Cir. 1992).

[55] ECF No. 20, at 13-19.

A state court's determinations of questions of fact are presumed correct and the Court must give deference to the state court findings unless they were based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d)(2) (2006); *see Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000). The amended statute also codifies the "presumption of correctness" that attaches to state court findings of fact and the "clear and convincing evidence" burden placed on a petitioner who attempts to overcome that presumption. 28 U.S.C. § 2254(e)(1).

A state court's determination of questions of law and mixed questions of law and fact are reviewed under § 2254(d)(1), as amended by the AEDPA. The standard provides that deference be given to the state court's decision unless the decision is "contrary to or involves an unreasonable application of clearly established federal law" as determined by the United States Supreme Court. *Hill*, 210 F.3d at 485. The "critical point" in determining the Supreme Court rule to be applied "is that relief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." *White v. Woodall*, 572 U.S. 415, 427 (2014) (citing *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). "Thus, 'if a habeas court must extend a rationale before it can apply to the facts at hand,' then by definition the rationale was not 'clearly established at the time of the state-court decision.'" *White*, 572 U.S. at 426 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 666 (2004)).

A state court's decision can be "contrary to" federal law if: (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law; or (2) the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams*, 529 U.S. at 405-06, 412-13; *Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Hill*,

210 F.3d at 485.  A state court's decision can involve an "unreasonable application" of federal law if it correctly identifies the governing rule but then applies it unreasonably to the facts.  *White*, 572 U.S. at 426-27; *Williams*, 529 U.S. at 406-08, 413; *Penry*, 532 U.S. at 792.

The Supreme Court in *Williams* did not specifically define "unreasonable" in the context of decisions involving unreasonable applications of federal law.  *See Williams*, 529 U.S. at 410. The Court, however, noted that an unreasonable application of federal law is different from an incorrect application of federal law.  *Id.*  "'[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied [a Supreme Court case] incorrectly.'"  *Price v. Vincent*, 538 U.S. 634, 641 (2003) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002)) (brackets in original); *Bell v. Cone*, 535 U.S. 685, 699 (2002).

Thus, under the "unreasonable application" determination, the Court need not determine whether the state court's reasoning is sound, rather "the only question for a federal habeas court is whether the state court's determination is objectively unreasonable."  *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002).  The burden is on the petitioner to show that the state court applied the precedent to the facts of his case in an objectively unreasonable manner.  *Price*, 538 U.S. at 641 (quoting *Woodford*, 537 U.S. at 24-25); *Wright v. Quarterman*, 470 F.3d 581, 585 (5th Cir. 2006). In addition, review under § 2254(d)(1) is limited to the record before the state court that adjudicated the claim on the merits.  *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

### B.    Claims Not Addressed on the Merits by the State Courts

The AEDPA's deferential standard of review applies only to claims adjudicated on the merits by the state courts.  28 U.S.C. § 2254(d).  When claims are not fully adjudicated on the merits in state court, or as here where there is no complete exhaustion, the deferential AEDPA

standards of review do not apply.  *Cullen*, 563 U.S. at 185-86; *Henderson v. Cockrell*, 333 F.3d 592, 597 (5th Cir. 2003).  Instead, the federal habeas court's review falls under pre-AEDPA *de novo* standards.  *Id.* at 598 (citing *Jones v. Jones*, 163 F.3d 285, 299-300 (5th Cir. 1998) (applying *de novo* standard of review to ineffective assistance of counsel claims that were raised in state court, but not adjudicated on the merits)); *Carty v. Thaler*, 583 F.3d 244, 253 (5th Cir. 2009).

Therefore, the Court will consider Miller's actual innocence and jury deliberations claims *de novo*, although the claims would fail under either standard.  *See Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010) (a claim that fails under a de novo review would necessarily fail under AEDPA's deferential standard of review).

## V.   <u>Discussion</u>

### A.   <u>Actual Innocence (Claim One)</u>

Miller contends that he has maintained his actual innocence and in 2018, obtained the affidavits of Kenneth Jordan and Darnell Jordan in which they each profess they lied when they said Miller was the shooter.  Miller argues that these recantations withdraw the only eye-witness testimony provided at trial that established him as the shooter.  With these recantations, he argues, no reasonable juror would have found him guilty.  He also urged the state courts, and now this federal habeas court, to consider his claim of actual innocence and release him or direct a retrial.

Notwithstanding the veracity and reliability of the alleged new evidence (*see Brady/Napue* discussion *infra*), Miller has failed to state a claim of constitutional magnitude to warrant federal habeas review or relief.  It has long been a habeas rule that "the existence merely of newly discovered evidence relevant to the guilt of a state prisoner is not a ground for relief on federal habeas corpus."  *Herrera v. Collins*, 954 F.2d 1029, 1034 (5th Cir.1992) (quoting *Townsend v. Sain*, 372 U.S. 293, 317 (1963)).

22

> Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding . . .   This rule is grounded in the principle that federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution - not to correct errors of fact.

*Herrera v. Collins*, 506 U.S. 390, 400 (1993) (affirming *Herrera*, 954 F.2d at 1029).  The Supreme Court in *Herrera* reiterated its long-standing resolve that "a claim of 'actual innocence' is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits."  *Id*. at 404.  In other words, the Supreme Court has never recognized "freestanding claims of actual innocence."  *Id*. at 405.

Thus, the Supreme Court has never held that actual innocence itself would entitle a petitioner to habeas relief.  *Id*. at 426 ("Accordingly, the Court has no reason to pass on, and appropriately reserves, the question whether federal courts may entertain convincing claims of actual innocence.  That difficult question remains open.").  Instead, the Court has recognized that actual innocence may only serve as "a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits."  *Schlup v. Delo*, 513 U.S. 298, 315 (1995).  Procedural default is not at issue here.  This Court is addressing the merits of Miller's unexhausted claims pursuant to its authority under 28 U.S.C. § 2254(b) rather than the State's defense of technical procedural bar through failure to properly exhaust.  Miller, therefore, has no basis to urge actual innocence as a gateway to review of the merits of his claims.

Accordingly, even under a *de novo* review, Miller has no recognized constitutional right to assert a free standing actual innocence claim for this Court to address on habeas review.  *Herrera*, 506 U.S. at 404.  To the extent relevant, the Court also notes that, under AEDPA standards, the state courts' denial of relief on his free-standing actual innocence claim was not contrary to or an

unreasonable application of Supreme Court precedent.  Miller, therefore, is not entitled to federal habeas relief and his claim must be dismissed as meritless.

### B.    Jury Deliberations (Claim Two)

Miller argues that he was denied his rights to a fair trial, an impartial jury, and due process when at least one juror, Edith M. Jacob ("Jacob"),[56] voted guilty based on pressure to end deliberations rather than on the evidence.  Miller claims specifically that his "constitutional rights were violated and there is a reasonable probability that the jury would have remained deadlocked, causing a mistrial, but for the belief by Jacob that the only way to end the deliberations and protect a younger juror was to change her own vote from 'guilty under duress' to guilty."[57]  As support for this claim of "reasonable probability," Miller points to a post-trial newspaper article interview with juror Jacob (the juror who wanted to end deliberations) and Jacob's subsequent affidavit asserting racial slurs and harassment of juror Geralneigh Bazile, all of which were stricken and not considered by the state courts on direct appeal or post-conviction review as they comprised materials outside of the evidence and impermissible under La. Code Evid. art. 606.

### 1.    Background Facts Related to the Deliberations

Miller's counsel asserted challenges to the verdict on direct appeal to the Louisiana Fifth Circuit based on issues with jury deliberations, including the alleged duress felt by juror Jacob, as well as other arguments not before this federal habeas court.[58]  The state appellate court found that

---

[56] Miller's counsel refers to this juror as "Mary Jacob" but her name in the record is "Edith M. Jacob."  *See*, *e.g.*, St. Rec. Vol. 1 of 91, Trial Minutes, 8/3/09 (and all trial minutes thereafter).  In addition, she is referenced as both Jacob and Jacobs in the state court pleadings, rulings, and transcripts.  For example, her name is spelled two ways in the Louisiana Fifth Circuit's appellate opinion.  *See* 83 So. 3d at 201 (referencing "juror Jacob" and "juror Jacobs" on the same page).  This Court will use one spelling of her name, Jacob, in this opinion.

[57] ECF No. 1-1, at 22.  In the state courts, Miller's counsel argues the verdict was contrary to due process in light of the reported behavior of a different juror, Bazile, and the pressure placed on the jury by the state trial judge.  These claims are not presented to this court in Miller's counsel filed pleadings in this court.

[58] Miller has not in this court specifically or separately asserted his state claims challenging the presence of juror Bazile's Bible, the use of the 9-1-1 transcript, and the state trial judge's alleged "*Allen*-like" jury charge.

Miller's challenge to the jury deliberations was not preserved for review on appeal as required by

La. Code Crim. P. art. 841.  The appellate court, nevertheless, alternatively considered the merits

of the claim providing detailed reasons for the denial of relief.  This Court, having independently

and thoroughly reviewed the state court pleadings, rulings, and transcripts, finds that the Louisiana

Fifth Circuit on direct appeal provided a fair summary of the relevant incidents surrounding the

jury deliberations at Miller's trial:

> In the present case, during deliberations, the jury informed the judge by its third note that they had a vote and could not move forward because no one would change their vote.  The jury requested guidance from the court as to how to move forward. The trial judge explained to the parties how he wanted to proceed. Defense counsel stated he had no objection to the judge's supplemental instructions, but objected to the judge telling the jury whether the time they had spent was a long time for deliberations.  The judge informed the jury that they should consult with one another and consider each other's views.  The judge also explained that the jury should decide the case for themselves.  He said, "[d]o not hesitate to reexamine your own views and to change your opinion if you are convinced wrong, but do not surrender your honest belief as to the weight and effect of the evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict."  The judge said for them not to feel pressure to change their opinions, but to consider each other's views.  The jury's next note informed the judge that they were making headway, but were exhausted.  They felt they needed to rest and indicated they wanted to go to a hotel.
>
> On the following morning, the jury began deliberations at 8:45 a.m. Thereafter, the jury indicated by its sixth note that a juror was sleeping in the jury room, reading a Bible, and quoting and writing scriptures.  The jury asked what it should do because the juror wanted off the jury and did not seem to be able to handle the process.  The judge informed the jury that they took an oath and had a duty to deliberate and consider each other's views and then to make up each of their minds, announcing their positions if they could.  The judge informed the jury that there could be no extraneous materials in the jury room and if there was a Bible it needed to be removed.  The judge reminded the jury they needed to decide the case based on the law and facts as given to them and as heard through the evidence, using their common sense and no extraneous factors.
>
> When the judge spoke with the juror that was referred to in the jury's sixth note, Bazile, he informed her that her vote mattered and she did not have to change her mind but she could change it if she believed she was wrong.  Another juror, Vitrano, spoke to the judge about Bazile and voiced concerns that the process was not being able to be done as a group.  The judge informed him that it was early in the morning.  Defense counsel expressed that he had no objection to the way this

25

was handled.  The judge then told the jury that hopefully they could make some headway, and he suggested that they take a break and then take another "stab at it."

At 11:00 a.m., the jury returned a guilty verdict that was found to be invalid. When the jury was polled, it was learned that the ten of twelve verdict included juror Jacob's handwritten note that her verdict was "yes," but "under duress to get out of here."  Defense counsel noted there was a problem, and the trial judge agreed. The judge informed the jury that the verdict was "ten to two" which was a legal verdict, but in this case one juror said that the juror's vote was under duress to "get out of here."  The judge informed the jury that this was invalid, and reminded the jury of the instruction that said that changing one's mind for the sole purpose of reaching a verdict could not be done.  The judge added that if the jury strongly felt that the vote would not change, they should let him know after they discussed it. He reminded the jury not to vote "yes" or "no" for the sole purpose of returning a verdict.  The judge then sent the jury back for further deliberations.  Defendant did not specifically object to the trial court's further instruction or the manner in which he handled the jury's invalid verdict.

However, defendant moved for a mistrial because the jury had indicated by note the prior day its inability to reach a verdict, then one of the jurors expressed pressure and coercion, and then another juror indicated she voted for the verdict under duress to reach a verdict.  Defendant moved for a mistrial because the jury manifested its inability to reach a verdict.  This motion for mistrial was denied.  The judge believed he had been clear that voting a certain way to get a vote was not valid and that they should let him know if they could not reach a verdict.  Defendant noted his objection.

After further deliberations, a ten of twelve verdict was returned at 1:39 p.m., and the judge found this to be a legal verdict.  In polling, juror Jacobs indicated that this was her verdict.

*Miller*, 83 So. 3d at 200-01.

As explained previously, Miller's counsel attempted on direct appeal to discredit the verdict based on a newspaper article which included interview statements from juror Jacob and her description of the tense jury deliberations as an explanation for her wanting to "get out of here."  The Louisiana Fifth Circuit declined to consider the extraneous evidence as prohibited by state law and held that the claim was not preserved for appeal and otherwise was meritless.  *Id*. at 205.  The Louisiana Supreme Court denied Miller's related writ application without stated reasons. Miller's counsel again sought to present the newspaper article and an affidavit from juror Jacob as support for the same or similar challenges brought on post-conviction review.  Again, the state

26

trial and appellate courts declined to consider the extraneous evidence, citing the prior appellate opinion and other state law, including La. Code Evid. art. 606(B), which prohibits use of juror statements to challenge a verdict.   Miller's related Louisiana Supreme Court writ was not considered because it was untimely filed.

### 2.   Due Process and Jury Proceedings

"Central to the right to a fair trial, guaranteed by the Sixth and Fourteenth Amendments, is the principle that 'one accused of a crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on . . . circumstances not adduced as proof at trial.'"  *Holbrook v. Flynn*, 475 U.S. 560, 567 (1986) (quoting *Taylor v. Kentucky*, 436 U.S. 478, 485 (1978)).  The Due Process Clause also guarantees an accused the right to a trial by an impartial jury.  *Duncan v. Louisiana*, 391 U.S. 145 (1968).  A jury is initially cloaked with a presumption of impartiality.  *De La Rosa v. Texas*, 743 F.2d 299, 306 (5th Cir. 1984).

To maintain this ideal, the Supreme Court "has clearly established a constitutional rule forbidding a jury from being exposed to an *external* influence."  *Oliver v. Quarterman*, 541 F.3d 329, 336 (5th Cir. 2008) (emphasis added).  However, when as here, the allegation is one that a juror was under an *internal* influence imposed during deliberations, the rule is different.  *See Tanner v. United States*, 483 U.S. 107, 117-18 (1987) (discussing the history and application of the "external" versus "internal" influence distinction).

There is a valid distinction to be drawn between jury panels tainted by outside influence, such as publicity or communication with third parties, and jury panels exposed to internal influences from other jurors.  *Id*.; *United States v. Webster*, 750 F.2d 307, 338 (5th Cir. 1984) (citing *United States v. Chiantese*, 582 F.2d 974, 978 (5th Cir. 1978)), *cert. denied*, 471 U.S. 1106 (1985).  In the situation of internal influence, there is *no* presumption of prejudice and *no*

requirement that a trial court investigate or hold a hearing.  The courts "will not inquire into the jury's deliberative process absent a showing of external influences on the jurors." *Greer v. Thaler*, 380 F. App'x 373, 382 (5th Cir.) (citing *Tanner*, 483 U.S. at 120-21), *cert. denied*, 562 U.S. 986 (2010).  The mental processes of the jury in its deliberations simply are not subject to judicial scrutiny.  *United States v. Vincent*, 648 F.2d 1046, 1049-50 (5th Cir. 1981); *United States v. Duzac*, 622 F.2d 911, 913-14 (5th Cir. 1980); *United States v. D'Angelo*, 598 F.2d 1002, 1004 (5th Cir. 1979).

Thus, the Supreme Court has consistently refused to permit consideration of juror testimony regarding alleged instances of jury misconduct occurring during deliberations absent a showing that some *external or extraneous influence* was brought to bear on the jury.  *See Tanner*, 483 U.S. at 118-27 (holding "long-recognized and very substantial concerns support the protection of jury deliberations from intrusive inquiry" and precluded consideration of allegations that some jurors abused alcohol or took illegal drugs during the trial).[59]  A trial court's denial of a hearing on an *internal* jury issue does not violate the Constitution when the evidence is inadmissible.  *Tanner*, 483 U.S. at 126-27.  The Fifth Circuit has explained that, while a jury verdict may be attacked on the basis that jurors considered outside or extrinsic evidence, "(*e.g.*, newspapers, statements by

---

[59] *See also*, *Smith v. Phillips*, 455 U.S. 209, 221 (1982) (proper to consider evidence showing a juror in a criminal trial had applied for employment with the District Attorney's office); *Parker v. Gladden*, 385 U.S. 363, 364-66 (1966) (proper to consider testimony some but not all jurors had overheard a bailiff's negative comments about the defendant); *Remmer v. United States*, 347 U.S. 227, 228-30 (1954) (considering testimony from a juror that he was offered a bribe by a third-party); *McDonald v. Pless*, 238 U.S. 264, 265-69 (1915) (juror testimony regarding a quotient verdict was inadmissible for the purpose of impeaching the verdict); *Hyde v. United States*, 225 U.S. 347, 384 (1912)(improper to consider juror testimony that a bargain had been struck between jurors deliberating to convict one defendant in exchange for acquitting another); *Mattox v. United States*, 146 U.S. 140, 149 (1892) (holding it was appropriate to consider juror affidavits regarding statements about the defendant's criminal history allegedly made to the jurors during deliberations by a court bailiff because those alleged statements constituted a potential extraneous influence on the jury's deliberations).

court personnel)," a "jury's internal deliberations cannot result in a mistrial." *United States v. Straach*, 987 F.2d 232, 241 (5th Cir. 1993).

In this case, Miller argues that juror Jacob succumbed to *internal* pressure during the deliberation process to vote guilty only to end deliberations rather than base her verdict strictly on the evidence.  There is no doubt that Jacob qualified her first guilty vote with an expression that her vote was under duress to end deliberations.  Her second polling contained *no* such qualifier, and she also did *not* change her vote.  Jacob and the other jurors were told after the first polling that no one had to vote a certain way just to return a verdict to end deliberations.

A court can look no further into the internal influences Jacob may have felt or perceived in the jury room and in maintaining her guilty verdict.  The law is consistent and the mandate is clear; no court can look to post-verdict affidavits or testimony from a juror regarding the internal deliberation process and no such affidavit or testimony can form the basis of a mistrial.  *Id*.; *United States v. Black*, 843 F.2d 1456, 1464 n.7 (D.C. Cir. 1988) ("[A] juror's affidavit is incompetent to impeach the verdict for internal error; juror affidavits may only be used for the narrow purpose of showing "extraneous influence," such as prejudicial publicity.").

The concerns of juror Jacob are not unique, and the courts have consistently found no basis to breach the sanctity of deliberations or disrupt a verdict when *internal* pressure influenced a juror's vote.  For example, in *Straach*, 987 F.2d at 232, the post-verdict affidavits of two jurors suggested that they were pressured by other jurors into compromising their verdicts to vote "guilty" on some counts.  The Court held that the affidavits could not be used to support a mistrial because this pressure did not constitute an "outside influence" on the jurors.  *Id*. at 241-42.  In *United States v. Brito*, 136 F.3d 397 (5th Cir.), *cert. denied*, 523 U.S. 1128 (1998), a juror alleged that threats and insults directed towards *her* by other jurors during deliberations caused her to

29

render her verdict involuntarily.  The Fifth Circuit held that this did not constitute an "outside influence" on the jury's deliberations and thus, was inadmissible and could not be used to impeach the verdict. *Id*. at 414.

Even if this Court were to entertain Miller's bald allegation that racial slurs were used against juror Bazile, a young African-American female, Miller has failed to demonstrate that any such pressure swayed her persistent and consistent not-guilty vote.  That is, any slurs clearly had no influence on juror Bazile who held her position and voted not to convict Miller each time, something she told the state trial court she adamantly decided early in deliberations.

There also is no showing that any alleged racial slurs or other verbal pressure was used on juror Jacob *herself* with the purpose of influencing her vote of guilty.  Curiously, there also is no suggestion by Miller, or attributed to juror Jacob, that any harassment or threats or slurs were aimed at the other African-American jurors, including juror Trosclair, who also voted not-guilty in both jury polls.  There is no indication or claim that juror Trosclair was in any way pressured or intimidated or harassed or slurred with his steadfast vote of not guilty.  For that matter, Miller does not mention the sole African-American juror who consistently voted guilty or contend that this juror was either influenced, intimidated, or otherwise racially bullied into voting guilty.[60] Nevertheless, any internal pressures would not be sufficient to impeach the verdict.

Furthermore, Miller's reliance on *Pena-Rodriguez v. Colorado*, 137 S. Ct. 855 (2017), is misplaced.  In that case, the Supreme Court did *not* address the use of racial slurs *between* jurors as internal influences during their deliberations.  Instead, the Court was concerned with a juror's "clear" use of racial animus against a defendant rather than facts as the basis for voting *guilty*.

---

[60] *See* St. Rec. Vol. 17 of 91, Sentencing Transcript, at 15, 8/14/09 (defense counsel providing statistics of the verdict vote).

Miller has not argued or demonstrated that any juror based a *guilty* vote on improper racial bias against him.  He has only alleged that "bullying" occurred with no specific racial references against a young juror who happened to be African-American.  In *Pena-Rodriguez*, the Court focused its ruling on race-based vote of guilty, not bickering between jurors:

> For the reasons explained above, the Court now holds that where a juror makes a clear statement that indicates he or she relied on racial stereotypes or animus to convict a criminal defendant, the Sixth Amendment requires that the no-impeachment rule give way in order to permit the trial court to consider the evidence of the juror's statement and any resulting denial of the jury trial guarantee."

*Id*. at 869.  There is *no* such allegation in Miller's case.  The Supreme Court made clear in *Pena-Rodriguez* that to qualify as an exception to the bar, "the statement must tend to show that racial animus was a significant motivating factor in the juror's vote to convict."  *Id*. at 869.  Neither juror Jacob nor Miller himself have asserted an allegation that any juror made a clear statement that his or her guilty vote was based on Miller's race or any racial animus towards Miller.

The Supreme Court also made clear in *Pena-Rodriguez* that "[n]ot every offhand comment indicating racial bias or hostility will justify setting aside the no-impeachment bar to allow further judicial inquiry."  Miller asserts that non-specific race-implied comments were made to juror Bazile during jurors' attempts to get her to participate in deliberations.  The record, however, reflects that Bazile did *not* report any racial comments or threats to her when she explained her position to the state trial judge.  Bazile also made very clear to the state trial judge (and there is no argument to the contrary) that she made her decision to vote not guilty *before* she gained access to

a Bible and apparently before the alleged outbursts amongst jurors.  Miller has made no showing that the Bible had any outside influence on her or any other juror.[61]

Miller also arguably contends that the state trial judge's comments to jurors and encouragement for continued deliberations had an undue influence on juror Jacob's decision to maintain her guilty vote to end deliberations and protect juror Bazile from further ridicule, things only known through the inadmissible evidence, *i.e.* Jacob's affidavit and newspaper article. Nevertheless, "[t]he trial judge must enjoy wide discretion in determining when to declare a mistrial on grounds of a deadlocked jury." *Lowenfield v. Phelps*, 817 F.2d 285, 293 (5th Cir. 1987). "To amount to a constitutional deprivation, the trial judge's action must constitute coercion that denies the accused a fundamentally fair trial." *Id*.

However, encouraging a jury to fulfill its duties is not undue coercion. "A judge may encourage jurors who are having difficulty reaching a verdict to deliberate longer, and to give due consideration and respect to the views of their peers." *Straach*, 987 F.2d at 242 (citing *Allen*, 164 U.S. at 492). "It is not only permissible but proper for a trial judge to ask a jury to continue deliberating if it appears that further deliberation might be fruitful in helping the jury reach a unanimous verdict." *Coleman v. Quarterman*, 456 F.3d 537, 548 (5th Cir. 2006). The "real question is whether the jury was required to deliberate an unreasonable length of time or for unreasonable intervals or was threatened with the prospect of such unreasonably lengthy deliberations." *United States v. Kimmel*, 777 F.2d 290, 295 (5th Cir. 1985); *see Thompson v. Cain*, 161 F.3d 802, 810 (5th Cir. 1998).

---

[61] The consultation of the Bible during deliberations may under some circumstances constitute an impermissible external influence. *See Oliver*, 541 F.3d at 339-40. However, the Bible's presence in deliberations is harmless when the record lacks "even fair support" to show that the Bible influenced the jury's verdict. *Id*. at 343 (quoting *Rushen v. Spain*, 464 U.S. 114, 120 (1983)). Here, there is no assertion or showing that the Bible or its verses read aloud by juror Bazile impacted any juror's vote, not even her own.

In Miller's case, the state trial court's actions were not coercive or fundamentally unfair. Contrary to Miller's assertions, there also is no indication in the record that the state trial judge placed unreasonable time burden on Miller's jury, which was provided regular meals and outdoor breaks at appropriate times.

The record reflects that the jury was sent to deliberate at 11:21 a.m. on August 10, 2009.[62] The jury was deliberating "a little bit more than three hours" when they sent the judge a note ("Jury Note 3") asking how to proceed when no one would change their vote.[63]  With consent of counsel, the judge reread that portion of the instructions which directed the jurors to "consult with one another, consider each other's views and discuss the evidence with the objective of reaching a just verdict."[64]  The judge also included the language that the juror's should not surrender their "honest belief as to the weight and effect of the evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict."[65]  About five hours later, around 8:00 p.m., the jury sent the judge a note (Jury Note 4) indicating that they were exhausted and wanted to stop for the night and return to finish in the morning.[66]  The jury requested to be sent to a hotel for the night and deliberations stopped for the night to begin at 9:00 a.m. the next morning.[67]  By the end of the day, the jury was deliberating about eight hours, including cigarette breaks, meals, and trips in and out of the courtroom.

The jury began deliberating at 8:45 a.m. on August 11, 2009.[68]  About 30 minutes later, the jury sent the trial judge a note reporting that there was a juror, later determined to be juror

---

[62] St. Rec. Vol. 1 of 91, Trial Minutes, 8/10/09.
[63] St. Rec. Vol. 17 of 91, Trial Transcript (continued), at 107-108, 8/10/09.
[64] *Id*. at 112.
[65] *Id*.
[66] *Id*. at 114.
[67] *Id*. at 117-118.
[68] St. Rec. Vol. 1 of 91, Trial Minutes, 8/11/09.

Bazile, who was not participating or cooperating in the deliberations.[69]  The judge told the jurors to again evaluate their convictions and listen to each other's views.[70]  The court spoke at the bench with juror Bazile about her need to participate but that she did not have to change her mind.[71]  The judge also reread a portion of the jury charges to all jurors regarding the duty to deliberate but not compromise just for the sake of returning a verdict.[72]

Less than two hours later, before 11:00 a.m., the judge was advised that the jury had reached a verdict.[73]  The court also was advised that juror Bazile, who always maintain her position that Miller was not guilty, did not want to leave the jury room and was throwing up.[74]  The jury eventually appeared together around 11:00 a.m. and announced its ten to two verdict of guilty.[75]  During polling, it was determined that juror Jacob qualified her guilty vote as being "under duress to get out of here."[76]  The judge declared the verdict invalid and sent the jury back to deliberate. The court reminded the jury that they did not have to change their minds for the sole purpose of reaching a verdict: "But I don't [sic] any juror to vote any way, yes or no, for the mere purpose of returning a verdict."[77]

At 1:39 p.m., the jury returned with a second ten to two verdict which was accepted by the court.  This verdict was comprised of guilty votes from ten jurors, nine of whom were white and one African American, and two not guilty votes, both from African-American jurors.[78]  Bazile who

---

[69] *Id.*; St. Rec. Vol. 17 of 91, Trial Transcript, at 2, 8/11/09.
[70] St. Rec. Vol. 17 of 91, Trial Transcript, at 5, 8/11/09.
[71] *Id.* at 12-13.
[72] *Id.* at 16.
[73] *Id.* at 23; St. Rec. Vol. 1 of 91, Trial Minutes, 8/11/09.
[74] St. Rec. Vol. 17 of 91, Trial Transcript, at 23, 8/11/09.
[75] *Id.*
[76] *Id.* at 26.
[77] *Id.* at 27, 28.  After sending the jury back to deliberate, the judge and counsel noted that juror Jacob had been seen "comforting Ms. Bazile."  *Id.* at 29.
[78] St. Rec. Vol. 17 of 91, Sentencing Transcript, at 15, 8/14/09 (defense counsel providing statistics of the verdict vote).

34

early on concluded that Miller was no guilty maintained her position and voted not guilty. Likewise, Jacob maintained her guilty vote despite any frustrations experienced during the deliberations process.

Thus, on the second day of deliberations, the jury deliberated for less than five hours, including outdoor cigarette breaks and trips in and out of the courtroom.  Spanning both days, the jury deliberated less than 13 hours to determine Miller's guilt.  This was not an extraordinary amount of time, nor was it without reports from the jury that they were in fact making headway towards a sound verdict.

The trial judge, therefore, did not abuse his discretion in instructing the jury to continue its deliberations when the first instruction was made after only three hours and the second was only thirty minutes into the second morning of deliberations (which began some 12 hours after they stopped for the night and were sent to a hotel to rest for the night).  *See United States v. Fields*, 483 F.3d 313, 340 (5th Cir. 2007) (instruction to jury to "keep deliberating" was appropriate when the jury had been deliberating for only six hours).  The judge's charge also is not considered an external influence on the jury that would warrant further scrutiny into their deliberations.  *Vincent*, 648 F.2d at 1049-50 (juror's claim that he felt pressured to agree with other jurors due to the judge's charge that the jury do its best to reach agreement did not amount to "outside influence" brought to bear on juror).

For the foregoing reasons, Miller has not shown a basis for this court (or the state courts) to have inquired into the internal circumstances of the jury's deliberations or juror Jacob's post-verdict statements.  Miller has not pointed to or demonstrated that any external influence permeated the deliberations in violation of his due process rights.  Instead, he has only asserted internal pressures within the deliberations that cannot form the basis of a challenge to the verdict.

Considering the foregoing *de novo* review, Miller has not established a violation of his constitutional rights or any basis for this court to grant federal habeas relief.  To whatever extent his similar claims were considered and denied as meritless by the Louisiana Fifth Circuit and Louisiana Supreme Court on direct appeal, he also has failed to establish that the denial of relief by the state courts was contrary to, or an unreasonable application of Supreme Court law under AEDPA standards.

C.    **Effective Assistance of Counsel (Claim Three)**

Miller alleges that he was denied effective assistance of counsel during his second trial when his trial counsel failed to locate defense witnesses to call live at trial and instead played their recorded testimony from the first trial, failed to investigate exculpatory and impeachment defense witnesses, and failed to file a motion for new trial based on irregularities in the jury deliberations.

In its opposition response, the State asserts that Miller's claims can be dismissed as speculative and conclusory.  The State further argues that, as the state courts determined, Miller cannot meet his burden of establishing deficient performance or prejudice under *Strickland*.

Miller asserted his ineffective assistance of counsel arguments on post-conviction review in the state courts.  As outlined previously, the state trial court denied him relief on these claims finding that the complained of actions involved counsel's trial strategy and were otherwise speculative and conclusory.  The court also resolved that Miller could show no prejudice resulting from counsel's strategic choices because the outcome of the second trial was the same as the first, guilty, even though the recorded witnesses testified live before the first jury.  The Louisiana Fifth Circuit denied relief after finding Miller's writ application was untimely filed and alternatively found no error in the denial of relief without an evidentiary hearing based on Miller's failure to

establish either *Strickland* prong.  The Louisiana Supreme Court also denied relief citing to Miller's failure to show he was entitled to relief under *Strickland*.

In *Strickland*, the Supreme Court established a two-part test for evaluating claims of ineffective assistance of counsel in which the petitioner must prove deficient performance and prejudice therefrom.  *See Strickland*, 466 U.S. at 687.  The petitioner has the burden of proving ineffective assistance of counsel by a preponderance of the evidence.  *Montoya v. Johnson*, 226 F.3d 399, 408 (5th Cir. 2000); *Jernigan v. Collins*, 980 F.2d 292, 296 (5th Cir. 1992).  In deciding ineffective assistance claims, a court need not address both prongs of the conjunctive *Strickland* standard, but may dispose of such a claim based solely on a petitioner's failure to meet either prong of the test.  *Amos v. Scott*, 61 F.3d 333, 348 (5th Cir. 1995).

To prevail on the deficiency prong, petitioner must demonstrate that counsel's conduct failed to meet the constitutional minimum guaranteed by the Sixth Amendment.  *See Styron v. Johnson*, 262 F.3d 438, 450 (5th Cir. 2001).  "The defendant must show that counsel's representation fell below an objective standard of reasonableness."  *Strickland*, 466 U.S. at 687-88; *Andrus v. Texas*, 140 S. Ct. 1875, 1881 (2020).  The analysis of counsel's performance must take into account the reasonableness of counsel's actions under prevailing professional norms and in light of all of the circumstances.  *See Strickland*, 466 U.S. at 689; *Carty*, 583 F.3d at 258.  The reviewing court must "judge . . .  counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct."  *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000) (quoting *Strickland*, 466 U.S. at 690).  Petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation.  *Harrington*, 562 U.S. at 104 (citing *Strickland*, 466 U.S. at 689).  "[I]t is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight."  *Bell*, 535 U.S. at 702

(citing *Strickland*, 466 U.S. at 689).  As a result, federal habeas courts presume that trial strategy is objectively reasonable unless clearly proven otherwise.  *Strickland*, 466 U.S. at 689; *Johnson v. Dretke*, 394 F.3d 332, 337 (5th Cir. 2004) (counsel's "'conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness.'") (quoting *United States v. Jones*, 287 F.3d 325, 331 (5th Cir. 2002)); *Geiger v. Cain*, 540 F.3d 303, 309 (5th Cir. 2008).

Furthermore, "[t]he petitioner must 'affirmatively prove,' and not just allege, prejudice." *Day v. Quarterman*, 566 F.3d 527, 536 (5th Cir. 2009) (quoting *Strickland*, 466 U.S. at 695).  To prove prejudice, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Andrus*, 140 S. Ct. at 1881; *Williams v. Thaler*, 602 F.3d 291, 310 (5th Cir. 2010).  In this context, "a reasonable probability is a probability sufficient to undermine confidence in the outcome." *Cullen*, 563 U.S. at 189 (quoting *Strickland*, 466 U.S. at. 694).  This standard requires a "substantial," not just "conceivable," likelihood of a different result. *Harrington*, 562 U.S. at 112.  To determine whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial." *Crockett v. McCotter*, 796 F.2d 787, 793 (5th Cir. 1986).  Thus, conclusory allegations of ineffective assistance of counsel, with no showing of effect on the proceedings, do not raise a constitutional issue sufficient to support federal habeas relief.  *Miller v. Johnson*, 200 F.3d 274, 282 (5th Cir. 2000) (citing *Ross v. Estelle*, 694 F.2d 1008, 1012 (5th Cir. 1983)).

On habeas review, the Supreme Court has clarified that, in applying *Strickland*, "[t]he question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom."

38

*Harrington*, 562 U.S. at 105.   The *Harrington* Court went on to recognize the high level of deference owed to a state court's findings under *Strickland* in light of AEDPA standards of review:

> The standards created by *Strickland* and §2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so.   The *Strickland* standard is a general one, so the range of reasonable applications is substantial.   Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d).   When § 2254(d) applies, the question is not whether counsel's actions were reasonable.   The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Harrington*, 562 U.S. at 105 (citations and quotation marks omitted).

The federal habeas court's scrutiny of counsel's performance under § 2254(d), therefore, is "doubly deferential."   *Cullen*, 563 U.S. at 190 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 112 (2009)).   The federal courts must take a "highly deferential" look at counsel's performance under the *Strickland* standard through the "deferential lens of § 2254(d)."   *Id.* (citing *Strickland*, 466 U.S. at 689, and quoting *Knowles*, 556 U.S. at 121 n.2).   This Court must also apply the "strong presumption" that counsel's strategy and defense tactics fall "within the wide range of reasonable professional assistance."   *Strickland*, 466 U.S. at 690; *Moore v. Johnson*, 194 F.3d 586, 591 (5th Cir. 1999).

Federal habeas courts presume that trial strategy is objectively reasonable unless clearly proven otherwise by the petitioner.   *Strickland*, 466 U.S. at 689; *Geiger*, 540 F.3d at 309; *Moore*, 194 F.3d at 591.   In assessing counsel's performance, a federal habeas court must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time of trial. *Strickland*, 466 U.S. at 689; *Neal*, 286 F.3d at 236-37; *Clark v. Johnson*, 227 F.3d 273, 282-83 (5th Cir. 2000).   Tactical decisions, when supported by the circumstances, are objectively reasonable and do not amount to unconstitutionally deficient performance.   *Lamb v. Johnson*, 179

F.3d 352, 358 (5th Cir. 1999) (citing *Rector v. Johnson*, 120 F.3d 551, 564 (5th Cir. 1997), and *Mann v. Scott*, 41 F.3d 968, 983-84 (5th Cir. 1994)).

The denial of effective assistance of counsel under *Strickland* is a mixed question of law and fact. *Clark v. Thaler*, 673 F.3d 410, 416 (5th Cir. 2012); *Woodfox v. Cain*, 609 F.3d 774, 789 (5th Cir. 2010). The Court must determine whether the state courts' denial of relief was contrary to or an unreasonable application of Supreme Court law. Miller has failed to meet this burden considering the doubly-deferential standards under the AEDPA and *Strickland* necessary to prove his entitlement to federal habeas relief.

### 1. Failure to Locate and Call Defense Witnesses in Person instead of Playing Recordings of Prior Testimony

Miller complains that his trial counsel failed to locate defense witnesses and instead decided to play audio recordings of the witnesses' prior trial testimony. He argues that the failure to secure these witnesses to testify live was deficient performance and resulted in prejudice. He contends that counsel's decision "was not trial strategy"[79] because counsel stated he did not "want paper read to juries."[80] Citing state law, Miller also argues that he only had to show a reasonable probability of a different result not prove a different result would have occurred with live testimony.[81] Miller also suggests that at least one of those witnesses, Hashim Smith, gave a statement in 2015 that he had the same phone number in 2003 and 2009 and that he was never contacted by the State or defense counsel and would have testified if someone had reached out to him.

---

[79] ECF No. 1-1, at 21.
[80] Miller misquoted counsel in his brief at ECF No. 1-1, at 21.. This excerpt is from the transcript. St. Rec. Vol. 15 of 91, Trial Transcript, at 89, 8/7/09.
[81] ECF No. 1-1, at 22.

The State argues that counsel's decision to call live witnesses was a strategic choice.  The State contends that Miller's counsel was well aware of the testimony of the five witnesses Miller believes should have been called live.  Counsel also would have known that these witnesses were not found credible by the first jury based on the guilty verdict after the first trial.  Miller therefore is unable to show prejudice or the likelihood of a different result had the witnesses been called live at the second trial.

As ultimately determined by the state courts, trial counsel's decision to default to the playing of the prior testimony rather than live testimony was a reasonable, strategic decision, especially under the circumstances of Miller's case.  Initially, contrary to Miller's assertions, trial counsel's "paper read to juries" comment, when placed in context, clearly establishes that counsel in fact made efforts to locate witnesses and a strategic decision under the circumstances to rely on the audio tape recordings, rather than cede to the fact that none of his subpoenaed witnesses, including Smith, had appeared for trial.  Specifically, counsel's "paper read to juries" comment was a rhetorical statement which came after lengthy discussions at the bench regarding the efforts counsel made to locate the witnesses who had not appeared despite subpoenas and whether he could rely on the recordings.  In other words, when counsel made the "paper read to juries" comment, he was clarifying that he had in fact made efforts to find <u>and</u> subpoena the witnesses because he did not favor having cold transcripts read to the jury.  And, of course, transcripts were not read to the jury; the jury instead heard the recordings just as the witnesses and questions had been heard live in the first trial.

While playing the transcripts may not have been trial counsel's first choice, he reasonably shifted his strategy to best provide a defense for Miller rather than proceed with no defense witnesses.  Under *Strickland*, this was a "conscious and informed decision on trial tactics and

strategy" and that decision "cannot be the basis of constitutionally ineffective assistance of counsel" without some showing that it was ill chosen and permeated the trial with unfairness. *Richards v. Quarterman*, 566 F.3d 553, 564 (5th Cir. 2009); *Martinez v. Dretke*, 404 F.3d 878, 885 (5th Cir. 2005).

Miller has not established that trial counsel's decision was ill-chosen or prejudicial under the circumstances of the case.  The state trial judge was faced with both the State and defense reporting witnesses who had not appeared despite subpoenas having been issued.  The state trial judge made very clear to the attorneys that he was going to proceed with trial with or without the played transcripts:

> THE COURT:  I mean, look, from my prospective, just so we're all on the same page, you know, this needs to go away.  It needs to be shelved, no matter what happens.  And I don't want somewhere down the road, you know, an appeals court saying that the transcripts should have, you know, that the case is so old.[82]

Miller's counsel reasonably opted to convince the court to allow the recorded transcripts to be played so the jury would hear those witnesses profess that Miller was not the shooter and felt pressured during the investigation.

Furthermore, while Miller refers to the 2015 solicited comments from Hashim Smith, the record establishes that counsel (and the State) provided the state trial court with efforts made to locate the witnesses.  The record is clear that trial counsel subpoenaed Smith and five other defense witnesses,  Condell Sullen, Vanessa Henry, Bianca Hanson, Vance LaFrance, and Keshawn Scott, to appear at the second trial.[83]   He issued another subpoena to a witness Debbie Labie, who had

---

[82] St. Rec. Vol. 15 of 91, Trial Transcript, at 91, 8/7/09.
[83] *Id*. at 85.

not testified at the first trial.  However, none of the witnesses, not even the willing Smith, appeared for trial.[84]

There also is no indication in the record that Miller's trial counsel had a phone number for Smith in 2003 or 2009.  Miller's counsel stated to the trial court that he "used the best information available," to him and the subpoenas were issued to the best known address of each witness.[85]  He recalled prior discussions with the court that "Katrina had whacked people all over the place."[86]  Miller's counsel advised the court that he "searched in the only methods available to [him] . . . I talked to people that knew these people."[87]  He continued that "[f]or a while I was having my investigator work without pay," which is why he notified the state trial court he was out of resources because Miller stopped paying him.[88]  Miller's counsel further stated to the state trial court, "… the record is going to be clear, that I gave the best information I have.  Do you think I want paper read to the jury?"  These statements, contrary to Miller's assertions, make clear that counsel was not lessening his effort to compile witnesses and effectively represent Miller simply because he was not being paid.

Miller's counsel also had the following brief but relevant exchange with the state trial court:

> THE COURT:  You know, look, if you tell me you looked in the phone book, you talked to people, and you looked on the internet, I'm satisfied.
>
> MR. RAKOSKY:  Okay.  I can't honestly say about searching on the internet.
>
> THE COURT:  Well, you know.  I'm giving you an example.

---

[84] *Id*. at 78.
[85] *Id*. at 80, 86.
[86] *Id*. at 88.
[87] *Id*. at 88-89.
[88] The state trial court was well aware that Miller had stopped paying his counsel before trial and had denied counsel's motion to withdraw because there was no one in line to enroll and Miller would not qualify for indigent representation.

MR. RAKOSKY:  I know I tried.

THE COURT:  You know, like I said, I think that his burden in light of the resources and age of this case, and the fact that he's working for nothing is going to be measured accordingly, okay? […][89]

Based on the record, Miller's counsel was left with no choice under the circumstances of the case and the tone of the state trial judge's comments, but to opt to use the recordings in lieu of live testimony from the missing witnesses.

Another indication that counsel's decision was well considered and strategic is his indication that he would not present the recordings of at least two witnesses who had testified previously.[90]  He was discriminating in his choice of which witnesses he was willing to present, knowing the unsuccessful (guilty) result from the first trial.

After explaining his efforts to locate and subpoena the witnesses, Miller's counsel was able to present a defense of innocence to the jury through the recordings.  Miller has not demonstrated a deficiency in counsel's strategic decisions and performance under *Strickland* to establish any error in the state courts' factual or legal conclusions.

Miller also did not establish that counsel's actions were prejudicial under *Strickland*. Contrary to the state law relied upon by Miller,[91] under *Strickland*, "[t]he petitioner must 'affirmatively *prove*,' and not just allege, prejudice."  *Day*, 566 F.3d at 536 (quoting *Strickland*, 466 U.S. at 695) (emphasis added).  As stated above, to prove prejudice, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

---

[89] *Id*. at 92.

[90] *Id*. at 84 ("I'm not going to call all of them."); *id*. at 96 & 134 (specifically referring to witnesses "Flowers and Gilmore" from the first trial); St. Rec. Vol. 16 of 91, Trial Transcript (continued), at 143, 8/7/09 (same).

[91] The state courts' alleged failure to follow state law is not a basis for federal habeas review.  *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (federal habeas review does not lie for errors of state law).

proceeding *would have been* different." *Strickland*, 466 U.S. at 694 (emphasis added); *Andrus*, 140 S. Ct. at 1881. Therefore, Miller would have to prove a "substantial," not just "conceivable," likelihood of a different result. *Harrington*, 562 U.S. at 112. As the state courts concluded, Miller has not and cannot meet this burden.

Miller asserts that the playing of the recorded testimony prejudiced the defense because the jury did not hear live testimony from witnesses that Miller was not the shooter. However, as discussed by the state courts, when the first jury in 2003 heard the live testimony of these same witnesses, the result was a _unanimous_ guilty verdict returned after about three and one-half hours of deliberations (including time for three jury questions/responses by the trial judge).[92] In the scheme of litigation, the defense at the second trial, using recorded witness testimony, arguably had better results. With the recorded testimony, the jury returned a ten-to-two verdict of guilty after the arguably contentious and longer deliberations discussed previously in this Report. Nevertheless, Miller has not proven a reasonable probability that the result would have been different in the second trial with live testimony from these defense witnesses.

Miller, therefore, has not shown that his counsel's decision to rely on recorded testimony was anything other than sound trial strategy that avoided (not caused) an unfair trial and provided Miller with a plausible defense. Miller also has not established that the state courts' denial of relief on this claim was contrary to or an unreasonable application of *Strickland*. Miller is not entitled to relief on this claim.

---

[92] St. Rec. Vol. 50 of 91, Trial Transcript (first trial), at 230-31, 9/30/03 (jury poll counted); St. Rec. Vol. 35 of 91, Trial Minutes (first trial), 9/30/03.

2.      **Failed to Investigate Exculpatory and Impeachment Defense Witnesses**

Miller next argues that his trial counsel was ineffective when he failed to conduct an adequate investigation to locate other exculpatory and impeachment defense witnesses. Specifically, he argues that with investigation, counsel could have located witnesses to testify that Miller was not the shooter, that would impeach or contradict the testimony of Darnell Jordan and Kenneth Jordan, and that would testify about undue pressure from law enforcement and impeach the credibility of Detective Clogher.  Miller asserts that trial counsel failed to recall witness Krystal St. Cyr ("St. Cyr") at the second trial.  In addition, Dorian Lovely, Shantrel Charles, and Jameka Powell could have been called to impeach Detective Clogher's testimony by testifying that they felt pressured to implicate Miller.  Miller asserts that these three witnesses should have been interviewed and called to testify at Miller's second trial.  Miller claims that the reasonable conduct by counsel is governed by the ABA standards defining counsel's duty to investigate including "all avenues leading to facts relevant to the merits of the case."  ECF No. 1-1, at 26-27.

The State argues that Miller's claim is speculative and conclusory because he failed to provide supporting proof in the state courts or here to support the claims that these witnesses would have testified as he suggests they would have at trial.  The State further argues that the record demonstrates that Miller's counsel was aware of St. Cyr's testimony from the first trial, and would have based his decision not to call her knowing that testimony.  The record also shows that counsel was aware of and may have interviewed the other listed witnesses because they were identified in the police investigation.  The State contends that, under *Strickland* standards, counsel's decision not to call these witnesses must be attributed to trial strategy, as was resolved by the state courts.

Miller's arguments on this point focus heavily on whether counsel's investigation efforts met *Strickland* standards based on reasonableness as defined by the ABA, not the United States

Supreme Court as required by the AEDPA.  Nevertheless, on habeas review, the key question is not whether counsel's performance fell below the *Strickland* standards but whether the state court's application of *Strickland* was reasonable under the doubly deferential standards set forth above. *Harrington*, 526 U.S. at 101.  On habeas review, "federal courts are to afford '*both* the state court and the defense attorney the benefit of the doubt.'" *Woods v. Etherton*, 578 U.S. 113, 117 (2016) (emphasis added) (quoting *Burt v. Titlow*, 571 U.S. 12, 15 (2013)).

In considering *Strickland* on habeas review, the federal courts recognize that "an attorney must engage in a reasonable amount of pretrial investigation and 'at a minimum, . . . interview potential witnesses and . . . make an independent investigation of the facts and circumstances in the case . . ..'" *Harrison v. Quarterman*, 496 F.3d 419, 425 (5th Cir. 2007) (quoting *Bryant v. Scott*, 28 F.3d 1411, 1415 (5th Cir. 1994)).  However, "[m]ere conclusory allegations" that counsel failed to investigate or interview and call witnesses are insufficient to support a claim of ineffective assistance of counsel.  *Green v. Johnson*, 160 F.3d 1029, 1042 (5th Cir. 1998) (citation omitted). For this reason, claims of uncalled witnesses and insufficient investigation are not favored in federal habeas corpus review because allegations of the content of a prospective witness testimony and investigation results are largely speculative.  *Sayre v. Anderson*, 238 F.3d 631, 635-36 (5th Cir. 2001) (citing *Lockhart v. McCotter*, 782 F.2d 1275, 1282 (5th Cir. 1986)); *Murray v. Maggio*, 736 F.2d 279, 282-83 (5th Cir. 1984) (complaints of uncalled witnesses are not favored in federal habeas review and a petitioner must overcome a strong presumption that counsel's decision whether or not to call a particular witness was a strategic one).  To overcome this, a habeas petitioner "who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome

of the trial." *Gregory v. Thaler*, 601 F.3d 347, 352 (5th Cir. 2010) (quoting *United States v. Green*, 882 F.2d 999, 1003 (5th Cir. 1989)).

In addition, as held by the state courts in Miller's case, the presentation of testimonial evidence is a matter of trial strategy. *Id.* With regard to strategy and investigation, the Supreme Court applies a "heavy measure of deference" to counsel's choices:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland*, 466 U.S. at 690-691.

The state courts found that Miller's claims were speculative and conclusory and that he failed to meet his burden of demonstrating that counsel provided ineffective assistance and counsel's decision not to call witnesses was a reasonable trial strategy. This is likely so because Miller assumes that trial counsel did not "investigate" the witnesses he listed in his federal petition simply because the witnesses were not called to testify at the second trial. This assumption is insufficient to meet Miller's burden of demonstrating deficient performance.

With regard to St. Cyr, Miller can hardly prove that counsel did not investigate to what she would have testified since St. Cyr, like Smith (above), testified at the first trial. Trial counsels comments in the record make clear that when deciding who to subpoena and call at the second trial, he assessed or evaluated the witnesses, like St. Cyr and Smith, who testified in the first trial and who apparently were found not credible, demonstrated by the unanimous guilty verdict after that first trial.

48

Miller's general expectations as to what the other witnesses, Lovely, Charles, and Powell may have testified is also unsupported by anything but is merely speculation. A habeas petitioner must demonstrate, *inter alia*, "that the witness was available to testify and would have done so," and provide "the content of the witness's proposed testimony." *Woodfox*, 609 F.3d at 808; *Day*, 566 F.3d at 538 (same). The Fifth Circuit has further cautioned that "the seemingly technical requirements of affirmatively showing availability and willingness to testify '[are] not a matter of formalism.'" *Hooks v. Thaler*, 394 F. App'x 79, 83 (5th Cir. 2010) (quoting *Woodfox*, 609 F.3d at 808).

Miller has not established these required points. He instead, as determined by the state courts, merely assumes without any support that his trial counsel did not interview these witnesses and speculates without support as to what these people would have testified. He has provided no proof or indication that these witnesses, Lovely, Charles, and Powell, would have willingly testified if called and would have testified as indicated in notations on a notice of discovery. This is insufficient to support his claim or state a constitutional violation. *See*, *e.g.*, *Cox v. Stephens*, 602 F. App'x 141, 146 (5th Cir. 2015) (rejecting claim based on failure to call witnesses at trial, because petition "failed, through affidavits or otherwise, to demonstrate that these witnesses would have testified; identify the content of their testimony; or support that their testimony would have been favorable"); *Anthony v. Cain*, No. 07-3223, 2009 WL 3564827, at *8 (E.D. La. Oct. 29, 2009) (". . . a petitioner must come forward with evidence, such as affidavits from the uncalled witnesses, on that issue."); *Combs v. United States*, Nos. 08-CV-0032 & 03-CR-0188, 2009 WL 2151844, at *10 (N.D. Tex. July 10, 2009) ("Unless the movant provides the court with affidavits, or similar matter, from the alleged favorable witnesses suggesting what they would have testified to, claims of ineffective assistance of counsel fail for lack of prejudice."); *Harris v. Director, TDCJ-CID*,

49

No. 06cv490, 2009 WL 1421171, at *7 (E.D. Tex. May 20, 2009) ("Failure to produce an affidavit (or similar evidentiary support) from the uncalled witness is fatal to the claim of ineffective assistance.")

Nonetheless, based on Miller's conclusory arguments, these witnesses and St. Cyr would have been cumulative of the testimony trial counsel presented at the second trial regarding Miller's innocence and alleged police tactics during the investigation.  "Counsel's decision not to present cumulative testimony does not constitute ineffective assistance."  *Coble v. Quarterman*, 496 F.3d 430, 436 (5th Cir. 2007); *Lavernia v. Lynaugh*, 845 F.2d 493, 498 (5th Cir. 1988) (failure to call witnesses whose testimony would have been cumulative did not prejudice defendant under the *Strickland* analysis).  As discussed above, trial counsel clearly made strategic decisions as to which witnesses (especially among those appearing at the first trial) he would call at the second trial.  The fact that the defense strategy was not successful, *i.e.* Miller was convicted, does not equate to ineffective assistance.  *See Martinez v. Dretke*, 99 F. App'x 538, 543 (5th Cir. 2004) ("Again, an unsuccessful strategy does not necessarily indicate constitutionally deficient counsel.").

Miller also has not shown a reasonable probability that the jury would have rendered a different verdict had the uncalled witnesses testified.  *See*, *e.g.*, *Schwander v. Blackburn*, 750 F.2d 494, 500-01 (5th Cir. 1985).  As stated above, Miller's expectations as to what the uncalled witnesses would have testified to are based primarily on Miller's speculation.  Further, their purported testimony would have been to attempt to undermine the credibility of government witnesses.  The jury was instructed on assessing the credibility of witnesses and was free to disbelieve them in light of the testimony that was presented.

Miller, therefore, has not shown that his counsel was ineffective or that the state courts' denial of relief on this claim was contrary to or an unreasonable application of *Strickland*.  Miller is not entitled to relief on this claim.

### 3.    Failed to File Motion for New Trial Based on Irregularities in Jury Deliberations

Miller argues that his trial counsel was ineffective when he failed to file a motion for new trial based on the problems during the jury deliberations.  Miller again argues that the jurors could have been called to testify regarding any outside influences or extraneous prejudicial information was improperly brought to the jury's attention, citing La. Code Evid. art. 606.  Miller also again refers to the Supreme Court opinion in *Pena-Rodriguez* regarding juror racial animus.  Miller claims that his prior post-conviction counsel interviewed witnesses and found that deliberations were "plagued" with outside influences, citing to the presence of the Bible and scriptures read aloud, and "explicit statements of racial animus."  ECF No. 1-1, at 29.  Miller argues that trial counsel should have recognized concerns based on the length of deliberations, the notes sent to the trial judge, failure to reach a verdict, and conveyance to the court of claims that one jury member was vomiting and "losing it."  *Id*.  Miller again relies on the post-trial, inadmissible statements from jurors to support his concerns that things were amiss in the jury room.

The State responds asserting that on August 14, 2009, Miller's trial counsel did in fact orally move for a new trial re-urging grounds previously urged in motions for mistrial regarding the testimony of Darnell Jordan and Kenneth Jordan, the non-unanimous jury verdict, and the racial makeup of the jury in light of the non-unanimous jury verdict.  The State also asserts that Miller's trial counsel withdrew on August 14, 2009, which was twelve days before the newspaper published the statement made by juror Jacob on August 26, 2009.  The State further argues that,

as the state courts held, Miller's arguments are speculative and conclusory.  In addition, the filing of a motion for new trial is a strategic choice, and the record demonstrates counsel's ability to assert successful motions for new trial, as he did after the first trial.

To address the reasonableness of the denial of relief on this claim under *Strickland*, the Court references its prior detailed discussion of the record related to the jury deliberations in the Court's discussion of Miller's second claim above.  Based on that reasoning and the discussion that follows here, coupled with the doubly deferential standards of *Strickland*, Miller has not demonstrated that counsel was ineffective or prejudicial in failing to assert a motion for new trial based on the jury deliberations.

As an initial matter, Miller's trial counsel did challenge aspects of the jury's deliberations by argument, motion for mistrial, and objections, all to no avail.  For example, when the jury first indicated they were deadlocked, Miller's counsel objected when the trial judge indicated he would tell the jury that three hours of deliberation was not a long time in a case like this.[93]  Counsel repeatedly argued that it was "inappropriate" to comment on the length of deliberations.[94]  His objection was noted for the record.[95]

On the second morning of deliberations, August 11, 2009, the jury advised the court of a juror's (Bazile) refusal to participate and the presence of her Bible.[96]  In response, the state trial judge indicated a desire to bring the jurors in to instruct them again on their duties to deliberate and indicate his desire to tell the jury to let each person speak their piece one at a time going around the room.[97]  Miller's counsel objected and advised the court that he believed it was "inappropriate"

---

[93] St. Rec. Vol. 17 of 91, Trial Transcript (continued), at 108-11, 8/10/09.
[94] *Id*. at 109, 110.
[95] *Id*. at 111.
[96] *Id*., Trial Transcript, at 2, 8/11/09.
[97] *Id*. at 2-3.

to instruct the jury on how to specifically instruct its deliberations.[98]  He also objected to the trial

court's suggestion that juror's had a duty to announce their positions.[99]  He further objected to the

state trial judge singling out a juror (Bazile) for discussions at the bench because it may be "an

undue influence upon that juror" and "intrusion upon the deliberative process."[100]  Counsel's

objections to these matters were noted for the record.[101]  Miller's counsel also objected to the

Court's decision not to speak to a second juror (Vitrano) once the court had decided to head down

the "dangerous path" of speaking with jurors.[102]

After the first verdict was deemed improper after polling, Miller's counsel also moved for

a mistrial based on the jury's prior inability to reach a verdict and juror Jacob's statement that her

verdict was under duress.[103]  The motion was denied and counsel's objection noted for the

record.[104]  These facts from the record support the state courts' conclusions that counsel was not

ineffective and acted with reasonable strategy in addressing the jury's deliberations.

Further demonstration of counsel's strategic decisions about whether to file a motion for

new trial based on the jury and other considerations, the record reflects the following exchange

was had at the bench after the second verdict was read:

MR. WOLFE:
        Ron, you're not required to file a motion for new trial?

MR. RAKOSKY:
        I don't know why.

MR. WOLFE:
        I don't know, I mean - -

---

[98] *Id*. at 3.
[99] *Id*. at 6.
[100] *Id*. at 7, 8.
[101] *Id*. at 4, 6, 7.
[102] *Id*. at 17.
[103] *Id*. at 32.
[104] *Id*. at 34.

MR. RAKOSKY:

> No, I'm not required.  I mean if something comes up between now and Friday that makes me think I'm going to, I will alert you all.  But based on - - I mean, obviously there are lots of issues.  But, you know, there's nothing that I'm aware of that I'd essentially ruled differently on.  And it doesn't have to be filed to protect his record on appeal, so - - just, Judge, so you'll know, I will not only be here for sentencing, but I will have [a] motion to appeal, and I will have another motion to withdraw.[105]

Miller's trial counsel cannot be found ineffective for failing to file a motion that he determined to be baseless or likely unsuccessful.  *See Miller v. Thaler*, 714 F.3d 897, 904 n.6 (5th Cir. 2013) (counsel is not required to make futile motions or objections).  At the sentencing hearing, Miller's counsel presented supplemental exhibits in support of a written motion for mistrial he previously filed and which was denied concerning the testimony of Darnell Jordan and Kenneth Jordan.[106]  He also discerned a basis for orally urging a motion for new trial based on the non-unanimous jury verdict.[107]  The record supports the state courts' determination that counsel acted knowledgably and reasonably in the strategic decisions he made at each step of the trial process, including the decision not to further challenge the jury deliberations, his objections having been preserved on the record already.

Furthermore, Miller has not demonstrated before the state courts or here that there were unconstitutional "problems" during deliberations, *i.e.* improper outside influences on the jury's verdict, improper external pressures on the jury, or racial bias underlying the verdict, to have supported a motion for new trial.  As discussed in detail in addressing Miller's second claim regarding his rights to a fair trial and unbiased jury, Miller has not indicated that there was any

---

[105] *Id*. at 43.
[106] *Id*., Sentencing Transcript, at 4-5, 8/14/09.
[107] *Id*. at 14.

wrongful influence or pressure on the jury, or racial animus in the verdict, to have supported the filing of a motion.

With regard to the presence of the Bible, juror Bazile advised the state trial judge that she committed to her not guilty verdict *before* she gained access to a Bible.  Miller has not alleged or shown that her spouting of scriptures aloud influenced any of the other jurors or the verdict.[108] There was no basis for Miller's counsel to seek a new trial based on the presence of the Bible in this case.

Miller also has not pointed to any basis for counsel to have suspected or found racial animus or motivation underlying the verdict itself.  In fact, Miller has not shown but instead assumes that racial hostility existed because juror Bazile was African-American and the target of "bullying" in the jury room.  Nevertheless, even assuming there were racial undertones in the comments bantered amongst jurors in the jury room, the Supreme Court has decreed that "[n]ot every offhand comment indicating racial bias or hostility" warrants judicial scrutiny of deliberations or the verdict.  *Pena-Rodriguez*, 137 S. Ct. at 869.  Miller has not shown any racial bias or animus to have been a "significant motivating factor in the juror's vote to convict."  *Id*.  Without signs or showing of this racial animus in the verdict itself, there was no basis for Miller's trial counsel to have filed a motion for a new trial on the grounds that the jury was arguing in the jury room.  Miller also has not shown that such a motion likely would have been successful or the outcome of the proceedings would have been different had it been urged.

---

[108] As noted previously, the presence and consultation of the Bible during deliberations may under some circumstances constitute an impermissible external influence.  However, the Bible's presence in deliberations is harmless when the record lacks "even fair support" to show that the Bible influenced the jury's verdict.  *See Oliver*, 541 F.3d at 343 (quoting *Rushen*, 464 U.S. at 120).

For these and the foregoing reasons addressed under Miller's second claim, Miller has not established that his counsel was unreasonable or prejudicial in failing to file a motion for new trial based on the "problems" during jury deliberations.  He therefore has not shown that the state courts' denial of relief was contrary to or an unreasonable application of *Strickland*.

### 4.      Summary of Miller's Ineffective Assistance of Counsel Claim

For the foregoing reasons, Miller failed to establish deficient performance or prejudice resulting from his trial counsel's strategic decisions regarding the calling of witnesses, the presentation of testimony, and the filing of motions.  As concluded by the state courts, Miller's claims are presumptive and conclusory and fail to meet either prong of the *Strickland* standard. Thus, Miller has not shown that the state courts' denial of relief was contrary to or an unreasonable application of *Strickland* or other Supreme Court precedent.

### D.      Recantation Affidavits and *Brady*/*Napue* Violations (Claim Four)

Miller asserts that the State violated the doctrines under *Brady*, 373 U.S. at 97 and *Napue*, 360 U.S. at 269, because the prosecution failed to advise Miller that witnesses Darnell Jordan and Kenneth Jordan knew that Miller was not the shooter and were pressured to testify falsely by police officers who provided each of them with copies of their respective prior statements or testimony. In support of this, Miller relies on the 2018 affidavits from Darnell and Kenneth allegedly "detailing misconduct and other material information" that was not revealed to the defense.  ECF No. 1-1, at 27, ¶4.

The State contends that the claim is meritless, as determined by the state courts.  The State argues that the affidavits are not credible and are contrary to the record.  The State urges, as the state courts held, that Darnell testified consistently about Miller as the shooter in grand jury proceedings and in both trials.  The jury in both trials heard Darnell's testimony regarding his

earlier inconsistent statements given to police based on his fear of Miller and his gang.  Similarly, the State urges, as the state courts held, that the jury also heard testimony explaining that Kenneth identified Miller to detectives during the investigation of his daughter's death, but this was not under threat of being charged or offer of leniency.

### 1.   Background

Miller presented the 2018 affidavits of Darnell Jordan and Kenneth Jordan with his last amended state court post-conviction application in support of his claims under *Brady* and *Napue*. Miller's *Napue* violations allegedly occurred when Darnell and Kenneth each were coerced by different police officers at different times and locations into testifying falsely that Miller was the shooter.  Miller contends, based on the respective affidavits of Darnell and Kenneth, that each man felt compelled to testify in accordance with his own prior "false" statement/testimony that Miller was the shooter, because his prior statement/testimony was presented to him on paper by a deputy. Miller deduces, therefore, that the State failed to disclose that each man, Darnell and Kenneth, retracted as false their prior statement/testimony and this failure violated his rights under *Brady*.

The earliest affidavit was that of Kenneth Jordan dated June 23, 2018, almost nine years after Miller's trial.  In the affidavit, Jordan asserts that the person he saw shoot Steve Thomas was not Miller.[109]  He claims that, on January 20, 2003, about a year after the murder, he was arrested for the murder of his infant daughter.[110]  After his arrest, he claims he was questioned about the murder by JPSO deputies.[111]  He claims in the affidavit that the deputies offered him leniency in his criminal case if he cooperated and gave a statement that Miller was the shooter, and that this

---

[109] St. Rec. Vol. 83 of 91, Kenneth Jordan's Affidavit, at 1, ¶3-4, 6/23/18.  Other copies of the affidavit appear in several locations throughout the state court record.
[110] *Id*. at ¶5.
[111] *Id*. at ¶6.

would give him justice for the death of his daughter.[112]  Kenneth stated that he told officers he saw

the shooter, and it was not Miller.[113]  The officers pressured him to lie by holding criminal charges

with a ten year sentence over his head.  They allegedly told him he could go home if he said what

they told him to say about Miller, after feeding him details about the incident.[114]  Kenneth claims

he was not called by the State in the first trial, but deputies continuously looked for him in his

neighborhood, causing him to feel pressured.[115]  He also claims his family was harassed for years,

because deputies knew Miller was not the killer.[116]  He also claims that, prior to the 2009, he was

arrested at his grandmother's home in Georgia on a "material witness bond," and held in the JPSO

jail to testify in the 2009 trial.[117]  He claims he told deputies that his 2003 statement was not true,

but "[t]hey kept saying, 'It's in black & white now, too late.'"[118]

　　　Darnell Jordan's affidavit, dated June 28, 2018, was handwritten by the notary and signed

by Darnell with some initialed modifications.[119]  Darnell indicates that, although he testified at

both trials, he was certain that Miller was not the shooter.[120]  Darnell states that if "I had seen C-

Murder shoot that guy – I would have said it on the 911 call."[121]  He also states he told the manager

that night that he did not see anything, but he made Darnell talk to detectives anyway.[122]  He

recalled that he told the deputies that he saw the fight, and the deputies asked him if Miller did the

---

[112] *Id.* at ¶7.
[113] *Id.* at 2, ¶8.
[114] *Id.* at ¶9.
[115] *Id.* at ¶11.
[116] *Id.* at ¶14.
[117] *Id.* at ¶12.
[118] *Id.* at ¶13.
[119] St. Rec. Vol. 83 of 91, Darnell Jordan's Affidavit, 6/28/18.  Other copies of the affidavit appear in several locations throughout the state court record.
[120] *Id.* at 1.
[121] *Id.* at 1-2.
[122] *Id.* at 2.

murder.  He recalls telling them that "C-Murder – didn't do this!"[123]  He states that detectives had him "identify C-Murder's picture and sign it," but he was tricked.[124]  He signed it because they told him to but did not know that he was signing the photo of the shooter.  He told deputies that he pulled Miller out of the fight and had nothing in his hands or in his waistband.[125]  He recalled that the flash from the gunshot came from the other side of the pile, but no one asked him that at trial.

Darnell also claims that when it came time for the first trial, he stayed in California to avoid testifying because they wanted him to say it was C-Murder.[126]  He claims he "was scared of them."[127]  When the police arrested him in California, he was placed in shackles to fly back to New Orleans.  He was placed in a hotel room for one week and would not allow him to talk to anyone.[128]  He claimed that Detective Clogher gave him a paper with a statement on it.  He claims he told Detective Clogher that was not what he said, and the Detective told him, "You said it."[129]  Darnell also states that when he said he was sure on the stand, he meant he was sure that Miller did not do it.  He claims he was not able to tell the whole story in court.  He also indicates that while he was in jail, Miller's trial attorney went to see him.  Darnell claims that a sergeant told him he did not have to talk to him.  He "felt" like the sergeant was telling him not to, so Darnell did not speak with Miller's counsel.[130]

Before the second trial, police came to get him from his mother-in-law's house with guns drawn.  He was taken to isolation in the jail for a few days before being moved to a hotel.  He was

---

[123] *Id.*
[124] *Id.*
[125] *Id.* at 3.
[126] *Id.* at 4.
[127] *Id.*
[128] *Id.* at 4-5.
[129] *Id.* at 5.
[130] *Id.* at 6.

eventually allowed to talk to his wife.  He claims he now feels he needs "protection from the cops

and the District Attorneys [sic] Office and detectives on Maple St." fearing retaliation for talking

to Miller's post-conviction counsel.[131]

The state trial court found that the affidavits of Darnell and Kenneth were not reliable, the

State's counter-affidavits were credible, and that Miller failed to meet his burden of proof under

La. Code Crim. P. art. 930.2:[132]

> The court finds the recantation evidence presented in this case to be suspect and not reliable.  Looking at the recantation of Darnell Jordan, the record reflect that he testified consistently before the grand jury, at the first trial in 2003, and at the second trial in 2009.  At all of these events, he testified that on the night of the murder, he immediately identified the defendant as the gunman to Det. Nichols, and prior to him having had any contact with other investigators and/or prosecutors. Det. Nichols also testified to this.  This testimony goes against petitioner's claim that Darnell Jordan was tricked into testifying as he did.  Furthermore, Darnell Jordan testified that he denied to several other investigators that Corey Miller was the shooter and that he gave a false description of the shooter.  Darnell Jordan also stated at trial that he was scared of C-Murder, and reiterated that he was testifying truthfully.  He testified that he picked C-Murder from the line-up and identified him as the shooter.
>
> Petitioner claims that the State withheld evidence that Darnell Jordan recanted his statement to Det. Clogher prior to trial.  As the State points out in its response, the record refutes this claims, as well as the affidavits of Det. Clogher and the prosecutors.  The information regarding Darnell Jordan's inconsistent statements was presented to the jury during Darnell Jordan's testimony at trial.  As to the recantation of Darnell Jordan, in considering all evidence include the record, all transcribed trial and grand jury testimony and affidavits, petitioner is not entitled to relief.
>
> Petitioner also submits an affidavit of Kenneth Jordan, alleging that he was coerced by deputies to falsely identify Corey Miller as the shooter, and that he was offered leniency in regard to a possible charge regarding his daughter's death.  The court notes that the only evidence petitioner presented is the affidavit of Kenneth Jordan.  His claim regarding immunity was presented at trial and refuted by Assistant District Attorney Tim McElroy's testimony.  The only immunity offered has been filed into the record.
>
> As the State points out in its response, Kenneth Jordan is incorrect in his affidavit as to being arrested in January 2003 for the death of his daughter, as

---

[131] *Id*. at 7.
[132] St. Rec. Vol. 69 of 91, Trial Court Order, at 3, 1/23/19.

petitioner's Supplemental and Amended Memorandum refutes the affidavit, stating that the criminal records reveal that he was never charged or arrested for carnal knowledge of a juvenile.

Petitioner's claim that Kenneth Jordan was coerced into lying, such claims is not supported by Kenneth Jordan's affidavit.  This claim is purely speculative.

Petitioner's claim regarding Kenneth Jordan's recantation, which is completely unsupported and refuted by the record in this case and by the witness's testimony, and viewed in light of the law's disdain towards recantations, must fail.

Thus, the state trial court entered findings of fact and determinations of credibility that the affidavits from Darnell and Kenneth were suspect and not reliable, and ultimately failed to support or prove his *Brady* and *Napue* claims.

In seeking review in the Louisiana Fifth Circuit, Miller's counsel asserted only that the state trial court erred in summarily denying the amended post-conviction application without an evidentiary hearing.  After deeming Miller's writ application to be untimely, the Louisiana Fifth Circuit found no error in the trial court's summary dismissal of this claim without an evidentiary hearing.  The appellate court also found no error in the state trial court's conclusion that Miller failed to meet his burden of proof on the underlying *Batson*/*Napue* claims.

Before the Louisiana Supreme Court, Miller's counsel again only argued that it was error for the Louisiana Fifth Circuit to adopt the state trial court's summary dismissal without an evidentiary hearing.   The Louisiana Supreme Court denied Miller's writ application finding in relevant part that he failed to show a violation under *Brady*.

### 1.    Claim that State Courts Erred by Not Holding Evidentiary Hearing

Underlying much of Miller's arguments is his assertion that the state courts erred in dismissing his claims without an evidentiary hearing.  However, it is well settled that, "[i]nfirmities in state habeas corpus proceedings do not constitute grounds for federal habeas relief."  *Vail v. Procunier*, 747 F.2d 277, 277 (5th Cir. 1984); *see also Wheat v. Johnson*, 238 F.3d 357, 361 (5th

Cir. 2001) ("[I]nfirmities in state habeas proceeding are not proper grounds for federal habeas relief."); *Hallmark v. Johnson*, 118 F.3d 1073, 1080 (5th Cir. 1997) ("[I]nfirmities in state habeas proceedings do not constitute grounds for relief in federal court.").  An attack on the validity of the state habeas corpus proceeding does not impact the validity of the underlying state criminal conviction which is the focus of federal habeas relief.  *See Rudd v. Johnson*, 256 F.3d 317, 319-20 (5th Cir. 2001) ("[A]n attack on the state habeas proceeding is an attack on a proceeding collateral to the detention and not the detention itself.").

The fact that the state courts denied Miller relief without an evidentiary hearing does not present a cognizable federal habeas claim.

### 2.   Presumption of Correctness under § 2254(e)(1) with regard to Recanting Affidavits

Miller contends in part that the state courts holding that the affidavits from Darnell and Kenneth were suspect, not reliable, and ultimately contained untruths, was unreasonable, because Miller believes the affidavits to be truthful and the state trial courts' resolution of the matter was without an evidentiary hearing.  The purported evidence supporting Miller's *Napue* and *Brady* claims is the same, *i.e.* the recanting affidavits of Darnell Jordan and Kenneth Jordan, and the state courts' factual determinations on both claims were intertwined.  Thus, to the extent necessary, the factual determinations on both claims are considered together under the standards of § 2254(d)(2). *See Isaac v. Cain*, 588 F. App'x 318, 326-28 (5th Cir. 2014).[133]

As an initial matter, the state courts' factual findings underlying the denial of relief are *presumed* correct under the AEDPA, without regard for whether a state court evidentiary hearing

---

[133] *Compare Isaac*, 588 F. App'x at 326-28 (addressing *Brady* under § 2254(d)(1) and (2)), *with Reeder v. Vannoy*, 978 F.3d 272, 280 (5th Cir. 2020) ("Indeed, *Brady* claims are properly considered under § 2254(d)(1) rather than § 2254(d)(2) because they "involve mixed questions of law and fact.") (quoting *Floyd v. Vannoy*, 894 F.3d 143, 161 (5th Cir. 2018)).

was held.  *Valdez v. Cockrell*, 274 F.3d 941, 949 (5th Cir. 2001) (holding that a "full and fair hearing" is not a precondition to according a presumption of correctness to state court findings of fact nor to applying § 2254(d)'s standards of review).  Deference to the state courts' factual findings is mandated under § 2254(e)(1):

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

This presumption of correctness applies to *all* factual findings, including credibility determinations.  *See Hall v. Quarterman*, 534 F.3d 365, 371 n.22 (5th Cir. 2008) ("State credibility determinations also received AEDPA deference on habeas review, but not when overcome by clear and convincing evidence."); *Richards*, 566 F.3d at 563 (holding a state habeas court's credibility findings are entitled to a presumption of correctness under § 2254(e)(1)); *see also*, *e.g.*, *Smith v. Quarterman*, 626 F.3d 392, 405 (5th Cir. 2008) (applying the presumption of correctness to the state habeas court's finding that the attorneys' affidavits were credible).  The presumption of correctness is often considered even stronger when the conclusions were reached on post-conviction review by the same judicial officer who presided over the trial.  *See Murphy v. Johnson*, 205 F.3d 809, 813 (5th Cir. 2000) ("The presumption is especially strong when, as here, the state habeas court and the trial court are one and the same.").  Thus, the AEDPA's deferential scheme is mandatory and applies to all claims adjudicated on the merits in state court.  *Valdez*, 274 F.3d at 950.

For Miller to overcome the presumption of correctness afforded the state court's factual findings, including the credibility findings relative to the affidavits of Darnell Jordan and Kenneth Jordan, he must come forth with clear and convincing evidence showing that the state courts'

factual findings, including the credibility findings, were incorrect.  *Isaac*, 588 F. App'x at 326 (citing 28 U.S.C. § 2254(e)(1)).  Miller has failed to do so.

Preliminarily, both federal and Louisiana law recognize a long-standing view that "recantations are highly suspicious."  *Id*. (citing *Spence v. Johnson*, 80 F.3d 989, 1003 (5th Cir. 1996) ("[R]ecanting affidavits and witnesses are viewed with extreme suspicion by the courts." (citation and internal quotation marks omitted)), and *State v. Prudholm*, 446 So. 2d 729, 736 (La. 1984) ("[R]ecantations are highly suspicious and, except in rare circumstances, a motion for new trial should not be grated on the basis of a recantation since that disclaimer is tantamount to admission of perjury so as to discredit the witness at a later trial."); *see also*, *Schlup*, 513 U.S. at 324 (newly-discovered evidence must be reliable to warrant federal habeas review).  After recognizing this as the law, the state trial court in Miller's case addressed the inconsistencies between the trial testimony, the affidavits of Darnell and Kenneth compared to those presented by the State, and other evidence within the record.  The state trial court's decision, adopted by the higher state courts, determined that the affidavits of Darnell and Kenneth were suspect and unreliable to stand as proof that *Brady* or *Napue* violations occurred.

In finding the affidavits unreliable, the state trial court noted that the affidavits each contained assertions that were factually inaccurate and in conflict with other aspects of the record aside from the alleged recanted statement/testimony.  For example, Kenneth Jordan was never arrested for his daughter's murder or offered immunity.  The court determined that this was all established by evidence presented at the second trial.  The jury had the opportunity to consider Kenneth's claims and apparently rejected them.  As another example, the circumstances of Darnell's material witness and sequestration were also presented at Miller's trials.  Based on the trial record and the affidavits presented by the State on post-conviction review, the state trial court

discredited the affidavits from Darnell and Kenneth.  Thus, as outlined in its reasons, the state trial court found numerous internal contradictions and established falsities in the affidavits which led to its determination that the affidavits were not credible and were instead "suspect and not reliable" as *Brady* or *Napue* evidence.

Miller has presented no other evidence, much less clear and convincing evidence, that the state courts' factual (or legal) conclusions were incorrect.  Miller continues to rely solely on the conflicting affidavits of his witnesses and the State's witnesses to convince this court to re-evaluate the credibility of Darnell's and Kenneth's affidavits.  As noted above, that is not the province of this federal habeas court.  Instead, it is Miller's burden to bring forth clear and convincing evidence of error in the state courts' factual and credibility determinations.  Without meeting this high burden, the factual and credibility determinations are entitled to the presumption of correctness under § 2254(e)(1), regardless of whether the state habeas court held an evidentiary hearing versus a paper hearing.  *See Morrow v. Dretke*, 367 F.3d 309, 315 (5th Cir. 2004) (reliance on a paper record without live testimony does not preclude the AEDPA presumption of correctness that attaches to state court findings); *Avila v. Quarterman*, 560 F.3d 299, 307 (5th Cir. 2009) (federal district court improperly re-evaluated state habeas court's credibility determination based on an evaluation of conflicting affidavits); *Valdez*, 274 F.3d at 951 (presumption of correctness applies without state court evidentiary hearing); *see also*, *Carter v. Johnson*, 131 F.3d 452, 460 n.13 (5th Cir. 1997); *Hudson v. Quarterman*, 273 F. App'x 331, 2008 WL 1708998, at *1 (5th Cir. 2008); *Bass v. Dretke*, 82 F. App'x 351, 2003 WL 22697282, at *3 (5th Cir. 2003).

In summary, Miller has not shown clear and convincing evidence to overcome the presumed correctness of the state courts' findings under § 2254(d)(2).  The state courts' factual and credibility findings resolved that the affidavits of Darnell Jordan and Kenneth Jordan were

suspect and not reliable and therefore, were afforded no credibility to recant their prior trial testimony, establish that testimony as false, or to establish impropriety by state officials in inducing their respective trial testimony.   It is of no moment under the AEDPA that these credibility determinations were made on a paper record without an evidentiary hearing.  *Morales v. Thaler*, 714 F.3d 295, 303 (5th Cir. 2013) ("AEDPA does not allow federal habeas courts to gainsay state courts' assessments of credibility on a cold paper record.").   These findings are afforded deference through the presumption of correctness and are applied by this court in assessing the reasonableness of the denial of relief on Miller's *Brady* and *Napue* claims.

### 3.        No Unreasonable or Contrary Application of Law

Miller asserted a *Napue* claim in the state courts based on Darnell Jordan's and Kenneth Jordan's affidavits in which each man claimed he told deputies that his testimony that Miller was the shooter was false and deputies coerced or encouraged each man to testify in accordance with his prior false testimony/statement.   As for *Brady*, Miller argues that the alleged pretrial recantations to deputies by Darnell and Kenneth were not disclosed to the defense.  The state courts determined that Miller did not prove a *Napue* or *Brady* claims because the affidavits from Darnell and Kenneth were not reliable and all information about their changed statements was made available to the defense and the jury; hence, there was no false testimony/statement and no exculpatory evidence was suppressed.

Under *Napue*, "a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." *Napue*, 360 U.S. at 269 (citations omitted).  To establish a due process violation under *Napue*, "a petitioner must show (1) that the witness's testimony was actually false, (2) that the testimony was material, and (3) that the

prosecution knew the witness's testimony was false." *Fuller v. Johnson*, 114 F.3d 491, 496 (5th Cir. 1997).

In *Brady*, the Supreme Court made clear that the State cannot suppress evidence favorable to the accused when that evidence is material either to guilt or punishment. *Brady*, 373 U.S. at 87. Under *Brady*, clearly, a petitioner must make the threshold showing that the State actually suppressed the evidence at issue. *Giglio v. United States*, 405 U.S. 150, 154 (1972); *Megas v. Quarterman*, 281 F. App'x 330, 334 (5th Cir. 2008). Furthermore, a petitioner must prove that "(1) that the 'evidence at issue [is] favorable to the accused, either because it is exculpatory, or because it is impeaching;' (2) that the 'evidence [has] been suppressed by the State, either willfully or inadvertently;' and (3) that 'prejudice [has] ensued.'" *Summers v. Dretke*, 431 F.3d 861, 874 (5th Cir. 2005) (alterations in original) (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)). Suppressed evidence is deemed material when there is a "reasonable probability" that if the evidence had been disclosed to the defense, the outcome of the proceeding would have been different. *Reeder v. Vannoy*, 978 F.3d 272, 280 (5th Cir. 2020) (quoting *Murphy v. Davis*, 901 F.3d 578, 597 (5th Cir. 2018)), *cert. denied*, 142 S. Ct. 752 (2022). A "reasonable probability" of a different outcome occurs when the suppressed evidence "undermines confidence in the outcome of the trial." *Id*. (quoting *Turner v. United States*, 137 S. Ct. 1885, 1893 (2017)). The rule in *Brady* encompasses evidence known only to police investigators and not personally known by the prosecutor. *Strickler*, 527 U.S. at 280-81; *Kyles v. Whitley*, 514 U.S. 419, 438 (1995). "'[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police.'" *Strickler*, 527 U.S. at 281 (quoting *Kyles*, 514 U.S. at 437).

*Brady* and *Napue* claims present mixed questions of law and fact and are properly considered under § 2254(d)(1).  *Reeder*, 978 F.3d at 280 (quoting *Floyd v. Vannoy*, 894 F.3d 143, 161 (5th Cir. 2018)); *Isaac*, 588 F. App'x at 327-28.  Under Section 2254(d)(1), this Court does "not decide *de novo* whether a state prisoner has sufficiently proven a *Brady* violation."  *Dickson v. Quarterman*, 462 F.3d 470, 477 (5th Cir. 2006) (citing *Yarborough*, 541 U.S. at 665).  Instead, the Court decides whether the state court's *Brady* or *Napue* determination resulted in a decision that is contrary to, or involved an unreasonable application of, clearly established federal law.  *Id.* at 477-78 (citing *Busby v. Dretke*, 359 F.3d 708, 717 (5th Cir. 2004)).  A state court's decision is contrary to clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts."  *Megas*, 281 F. App'x at 333 (quoting *Williams*, 529 U.S. at 413).  A state-court decision is an unreasonable application of federal law "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Id.* However, "an *unreasonable* application of federal law is different from an *incorrect* or *erroneous* application of federal law."  *Williams*, 529 U.S. at 412 (emphasis in original).

It is the habeas petitioner's burden to show the state court applied the Supreme Court's holding to the facts of his case in an objectively unreasonable manner.  *Price*, 538 U.S. at 641; *Woodford*, 537 U.S. at 24-25.  A habeas petitioner must establish that the state court's decision was more than "merely wrong" or "even clear error."  *Shinn v. Kayer*, 141 S. Ct. 517, 523 (2020) (quoting *Virginia v. LeBlanc*, 137 S. Ct. 1726, 1728 (2017)).  Thus, with regard to petitioner's *Brady* and *Napue* claims, or any claim which the state habeas court addressed on the merits, the question before the federal habeas court is not whether the court agrees with the state courts'

decision but, instead, whether the state courts' decision was reasonable in light of clearly established Supreme Court precedent based on the record before the state habeas court.

The petitioner has the burden of showing there was *no* reasonable basis for the state court to deny relief. *Harrington*, 562 U.S. at 98. This, of course, includes consideration of the whether the petitioner has met his burden of rebutting the presumption of correctness afforded to all underlying state court factual findings, including express and implied credibility findings, by clear and convincing evidence. *Reed v. Stephens*, 739 F.3d 753, 765 (5th Cir. 2014) ("As a federal habeas court, 'we must defer to the factual findings in the state court proceedings' and 'respect the ability of the fact-finder to evaluate the credibility of the witnesses.' "); *Avila*, 560 F.3d at 304.

Here, there is no question that the state courts applied "'the correct governing legal principle[s]'" under *Napue* and *Brady* to the facts of Miller's case. *Shinn*, 141 S. Ct. at 523 (quoting *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)). The remaining question for this federal habeas court under the AEDPA is whether the state courts' decision involved an "unreasonable application of" that Supreme Court precedent. *Id*. at 523, 526.

To prove unreasonable application, the habeas petitioner must show that the error in the state court's reasoning is "beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103. The Supreme Court has made clear that, "[u]nder § 2254(d), that is 'the only question that matters.'" *Id*. at 102 (internal quotation omitted); *Shinn*, 141 S. Ct. at 526. The Supreme Court recognizes that Congress "meant" this standard to be "difficult to meet." *Richter*, 562 U.S. at 102; *Shinn*, 141 S. Ct. at 523-24. Thus, federal habeas courts may not disturb the of state court's judgment unless "each ground supporting the state court decision is examined and found to be unreasonable." *Shinn*, 141 S. Ct. at 524 (quoting *Wetzel v. Lambert*, 565 U.S. 520, 525 (2012)); *see Trottie v. Stephens*, 720 F.3d 231, 240 (5th Cir. 2013) ("We evaluate the debatability of

Trottie's constitutional claims under AEDPA's highly deferential standard, which 'demands that state-court decisions be given the benefit of the doubt.'") (internal citation omitted)).

Miller has not shown that the state courts' decisions denying him relief under *Napue* or *Brady* were unreasonable applications of federal law. The state courts explicit and implicit factual findings clearly resolved that the affidavits of Darnell and Kenneth were not reliable or credible. As discussed above, federal habeas courts uphold such determinations where the petitioner, like Miller, has not shown those findings to be incorrect by clear and convincing evidence. *Pippin v. Dretke*, 434 F.3d 782, 788 (5th Cir. 2005) (presumption of correctness attaches to explicit findings of fact as well as "unarticulated findings which are necessary to the state court's conclusions of mixed law and fact.") (quoting *Pondexter v. Dretke*, 346 F.3d 142 (5th Cir. 2003)). Miller has not made that showing and those findings, including those of credibility, are presumed correct and reasonable in light record before the state courts.

Based on the foregoing legal standards, to recover under *Napue*, Miller was required to show that false or perjured testimony that Miller was the shooter was knowingly presented to the jury by the State. Similarly, for *Brady*, Miller had to establish that alleged pretrial recantations (mentioned for the first time in the 2018 affidavits) were actually made to state officers and withheld from the defense. Both claims were premised solely on the veracity of the affidavits from Darnell Jordan and Kenneth Jordan. However, the state courts reasonably resolved that the 2018 affidavits were suspect and not reliable.

Thus, with no credible factual support for his *Brady* or *Napue* claims, Miller did not and cannot establish that there was false testimony, much less that false or perjured testimony was fostered or presented or that known recantations were withheld from the defense. The state courts discredited Darnell's and Kenneth's affidavits and accepted the affidavits offered by the State

which denied that the recantations occurred or that there was any prompting of false testimony. The existence of false testimony and recantations are fundamental premises required to prove Miller's *Napue* and *Brady* claims.  *See In re Raby*, 925 F.3d 749, 756 (5th. Cir. 2019).

Miller had no credible evidence of perjured testimony or withheld recantations.  Miller did not prove the basic requirements for either a *Napue* or a *Brady* claim in the state courts.  Under the above Supreme Court precedent, the state courts' denial of relief was a reasonable where neither claim was factually supported.

Thus, in light of the presumed correctness of the state courts' findings that the affidavits of Darnell Jordan and Kenneth Jordan are suspect and not reliable (and the implicit finding that the affidavits presented by the State were credible), Miller has not shown that the state courts factual or legal determinations were contrary to Supreme Court precedent or that the state courts' denial of relief was an unreasonable application of Supreme Court law.  Miller is not entitled to federal habeas relief on this claim.

## VI.   <u>Recommendation</u>

For the foregoing reasons, it is **RECOMMENDED** that Corey Miller's petition for issuance of a writ of habeas corpus under 28 U.S.C. § 2254 be **DENIED** and **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation **within fourteen (14) days** after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will

result from a failure to object. *Douglass v. United Servs. Auto. Assoc.*, 79 F.3d 1415, 1430 (5th Cir. 1996).[134]

New Orleans, Louisiana, this ‾‾14th‾‾ day of April, 2022.

_____
**KAREN WELLS ROBY**
**UNITED STATES MAGISTRATE JUDGE**

---

[134]*Douglass* referenced the previously applicable ten-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.