UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

COREY MILLER                                    CIVIL ACTION

VERSUS                                          NO. 21-1413

TIMOTHY HOOPER, WARDEN                          SECTION "R" (4)

## <u>**ORDER AND REASONS**</u>

Petitioner Corey Miller filed this federal petition for habeas corpus relief under 28 U.S.C. § 2254.[1]  Miller's petition was referred to Magistrate Judge Karen Wells Roby for a Report and Recommendation ("R&R").  Magistrate Judge Roby recommended that the petition be denied and dismissed with prejudice as meritless.[2]  Miller filed objections to Magistrate Judge Roby's R&R.[3]

The Court has reviewed *de novo* the petition, the record, the applicable law, the Magistrate Judge's R&R, and Miller's objections.  For the following reasons, the Court overrules the objections, and dismisses the petition.[4]

---

[1]     R. Doc. 1.
[2]     R. Doc. 24.
[3]     R. Doc. 25.
[4]     The Court reaches its decision without the need for oral argument, as requested by Miller.  R. Doc. 26-1.

## I.  DISCUSSION

The Court applies *de novo* review to the parts of the R&R to which petitioner objected.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3).  The Court is limited to plain-error review of any part of the R&R not subject to a proper objection.  *Starns v. Andrews*, 524 F.3d 612, 617 (5th Cir. 2008).

Miller does not object to the Magistrate Judge's finding that he cannot demonstrate that the state courts' rejection of his ineffective assistance of counsel claim was contrary to or an unreasonable application of the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), or any other Supreme Court precedent.[5]  As to this finding, the Court finds no clear error.  The Court therefore adopts this section of the R&R as its opinion.

The Court considers and addresses each of Miller's objections to the R&R under a *de novo* standard below.  *See Hernandez v. Estelle*, 711 F.2d 619, 620 (5th Cir. 1983) (holding that *de novo* determination requires "the district court to arrive at its own, independent conclusion about those portions of the magistrate's report to which objection is made[, which] is not satisfied by a mere review of the magistrate's report itself"); *United States v.*

---

[5]  R. Doc. 25 at 18-19.  While Miller does not object to the Magistrate Judge's findings regarding his ineffective assistance of counsel claim, he asserts that he reserves the right to argue any excuse to procedural issues based on this claim if and when it becomes relevant.  *Id.* at 19.

*Raddatz*, 447 U.S. 667, 676 (1980) (holding that *de novo* determination "permit[s] whatever reliance a district judge, in the exercise of sound judicial discretion, [chooses] to place on a magistrate's proposed findings and recommendations").

## A.    Actual Innocence

Miller's first objection to the R&R is that his claim of actual innocence is cognizable and provides a ground for relief.[6]  As an initial matter, the Court finds that Magistrate Judge Roby correctly examined Miller's actual innocence claim *de novo*.[7]  Miller first raised an actual innocence claim in his state application for post-conviction relief.[8]  The state trial court dismissed this claim as procedurally barred because an actual innocence claim not based on DNA evidence was not a cognizable ground for relief under Louisiana Code of Criminal Procedure article 930.3.[9]  The Louisiana Fifth Circuit affirmed the trial court's procedural dismissal of the actual innocence claim,[10] and Miller filed a writ application with the Louisiana Supreme Court

---

[6]    *Id.* at 4.

[7]    R. Doc. 24 at 21-22.

[8]    St. Rec. Vol. 72 of 91, Initial Application for Post-Conviction Relief, 2/19/2014.

[9]    St. Rec. Vol. 86 of 91, Trial Court Order, 8/26/2015.

[10]   *Id.*, Fifth Circuit Order, 15-KH-679, 12/29/2015.

on this claim.[11]  On October 28, 2016, the Louisiana Supreme Court declined to consider the writ, finding that it was untimely filed.  *See generally State v. Miller*, 203 So. 3d 218 (La. 2016).  The claim therefore was not exhausted or adjudicated on the merits in the state court proceedings.

It is well settled that a petitioner must exhaust state court remedies before seeking habeas corpus review in the federal courts.  *See Nobles v. Johnson*, 127 F.3d 409, 419-20 (5th Cir. 1997) (citing 28 U.S.C. § 2254(b), (c)).  When, as here, the petitioner files a "mixed petition" with both exhausted and unexhausted claims, the Court may elect to stay the proceedings or dismiss the petition without prejudice to require complete exhaustion.  *See Rhines v. Weber*, 544 U.S. 269, 278 (2005); *Pliler v. Ford*, 542 U.S. 225, 227 (2004); *Whitehead v. Johnson*, 157 F.3d 384, 387 (5th Cir. 1998).  Alternatively, the Court may deny an unexhausted or mixed petition on the merits, notwithstanding the petitioner's failure to exhaust the remedies available in state court.  28 U.S.C. § 2254(b)(2).  When reviewing the merits of claims that were unexhausted or denied by state courts on procedural grounds, the Court must review the claims *de novo*, rather than under the Antiterrorism and Effective Death Penalty Act of 1996's

---

[11]  St. Rec. Vol. 88 of 91, La. S. Ct. Writ Application, 2016-KP-0207, 1/29/2016.

("AEDPA") deferential standard of review.  *See Russell v. Denmark*, 68 F.4th 252, 271 (5th Cir. 2023) (concluding that when a state court does not evaluate a claim on the merits, "AEDPA's usual deferential standard of review would not apply; a reviewing federal court instead would 'review such claims *de novo.*'" (quoting *Carty v. Thaler*, 583 F.3d 244, 253 (5th Cir. 2009))); *Miller v. Johnson*, 200 F.3d 274, 281 n.4 (5th Cir. 2000) ("Review is *de novo* when there has been no clear adjudication on the merits."); *see also Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010) ("Courts can . . . deny writs of habeas corpus under § 2254 by engaging in *de novo* review when it is unclear whether AEDPA deference applies, because a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on *de novo* review, see § 2254(a).").  Here, Magistrate Judge Roby opted to address the merits of Miller's actual innocence claim under *de novo* review despite the procedural shortcomings of his petition.  This Court agrees, and likewise proceeds *de novo* to the merits of this claim.

In doing so, the Court finds that Miller's freestanding actual innocence claim is not cognizable in a federal habeas petition.  While the United States Supreme Court "has not resolved whether a prisoner may be entitled to habeas relief based on a freestanding actual-innocence claim," *McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013) (citation omitted), the Fifth Circuit has

held that it "does not recognize freestanding claims of actual innocence on federal habeas review."[12]  *In re Swearingen*, 556 F.3d 344, 348 (5th Cir. 2009) (per curiam) (citation omitted), *cited with approval in In re Fields*, No. 23-90016, 2023 WL 4044417, at *1 (5th Cir. June 16, 2023); *see also Graves v. Cockrell*, 351 F.3d 143, 151 (5th Cir. 2003) ("The Fifth Circuit has . . . held that claims of actual innocence are not cognizable on federal habeas review.").  Absent Fifth Circuit or Supreme Court precedent to the contrary, the Court finds that Miller's actual innocence claim is meritless.

## B.   Recantation Affidavits

### 1.   *Background*

In his last amended state court application for post-conviction relief, Miller presented two recantation affidavits from Darnell Jordan ("Darnell") and Kenneth Jordan ("Kenneth"),[13] respectively, in support of his claims

---

[12]   Although an actual innocence claim may serve as "a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits," *Schlup v. Delo*, 513 U.S. 298, 315 (1995), procedural default is not at issue here.  Miller's claim and objections pertain only to the merits of his freestanding actual innocence claim.

[13]   The Court will refer to Darnell and Kenneth by their first names because of the shared last name.

under *Brady* and *Napue*.[14]  Darnell worked as a security employee at the club where the shooting took place and was on duty on the night of the incident. Several minutes after the shooting, Darnell told Detective Kevin Nichols of the Jefferson Parish Sheriff's Office ("JPSO") that Miller was the shooter. *State v. Miller*, 83 So. 3d 178, 183 (La. App. 5 Cir. 2011).  Darnell explained at trial that he knew and trusted Detective Nichols, who worked as a detail officer for the club.  *Id.*  Later that same evening, Darnell provided additional details to other investigators, but he did not name Miller as the shooter as he had done with Detective Nichols.  *Id.*  Darnell would later testify that he denied knowing who the shooter was because he feared retaliation.  *Id.* Following the shooting, Darnell allegedly received a phone call from one of the club's owners and was told something that caused him to be concerned for his life and afraid of Miller.  *Id.*  Darnell then decided to meet with investigators and provide a statement identifying Miller as the shooter.  *Id.* In an interview with Detective Donald Clogher on January 17, 2002, five days after the murder, Darnell identified Miller from a photographic lineup as the shooter.[15]  Darnell also testified at both of Miller's trials that he was about one yard away when he witnessed Miller reach his hand into a group of

---

[14]   *See generally Brady v. Maryland*, 373 U.S. 83 (1963); *Napue v. People of State of Ill.*, 360 U.S. 264 (1959).

[15]   St. Rec. Vol. 86 of 91, Darnell Jordan's Statement, 1/17/2002.

people attacking the victim and saw what he assumed to be a gun flash from the end of Miller's arm. *Id.*

Kenneth likewise testified that he was at the club on the night of the shooting, and that he observed Miller shoot the victim. *Id.* at 184. Kenneth first identified Miller as the shooter in 2003 when he was interviewed as a material witness regarding the death of his infant daughter. *Id.* At the time, Kenneth told detectives that he wanted to tell the truth because he knew how it felt to lose a child. *Id.* Kenneth then provided a statement to Detective Clogher in which he said he saw Miller shoot the victim.[16] Kenneth also identified Miller in court and testified that he was positive that Miller shot the victim. *Id.*

In 2018, almost nine years after Miller's second trial,[17] both men submitted affidavits recanting their earlier testimony. Darnell asserted in his affidavit that he was "certain that Corey Miller did not shoot [the victim]."[18] Darnell stated that he told detectives on the night of the murder

---

[16]    *Id.*, Kenneth Jordan's Statement, 1/27/2003.

[17]    The verdict in Miller's first trial was overturned after the trial court granted a motion for a new trial, which the Louisiana Supreme Court affirmed. Miller's second jury trial began on August 3, 2009, and the jury found Miller guilty as charged on August 11, 2009. On August 14, 2009, Miller was sentenced to life imprisonment, without benefit of parole, probation, or suspension of sentence.

[18]    St. Rec. Vol. 83 of 91, Darnell Jordan's Affidavit, at 1, 6/28/2018.

that Miller was not the shooter.[19]   Darnell allegedly told the detectives that he pulled Miller out of the fight and saw that Miller did not have anything in his hands or in his waistband.[20]   He also alleged that he saw the flash from the gun come from the other side of the group from where Miller stood.[21]   As for his statement to Detective Clogher identifying Miller from a photographic lineup as the shooter, Darnell claimed that he was "tricked" by the detective because he believed that he had simply been asked to identify Miller, not the shooter.[22]   Darnell also asserted that he had recanted his statement to Detective Clogher before Miller's first trial.[23]   Detective Clogher allegedly visited Darnell in his hotel room before the trial and handed Darnell a copy of his 2002 statement, at which point Darnell indicated that this was "not what [he] said."[24]  Furthermore, Darnell claimed that when he stated at trial that he "was sure," he intended to communicate that he was sure Miller was *not* the shooter.[25]

---

[19]   *Id.* at 2.

[20]   *Id.* at 3.

[21]   *Id.*

[22]   *Id.*

[23]   *Id.* at 5.

[24]   *Id.*

[25]   Darnell stated in his affidavit: "When I said on the stand that 'I was sure[,]' I meant I was sure [Miller] didn't do it."  *Id.* at 5.  The Court is unable to locate any portion of Darnell's testimony during Miller's second trial during which he stated that he "was sure."  His affidavit may be referring to his affirmative answer when asked by the State

Similarly, Kenneth's affidavit asserted that the man he saw shoot the victim was not Miller.[26]  He alleged that he was coerced to falsely identify Miller as the shooter in a "fabricated statement" following his "arrest" for the murder of his daughter in 2003.  According to Kenneth, JPSO officers offered him leniency in his criminal case if he cooperated and gave a statement identifying Miller.[27]  Kenneth alleged that he told the officers that "he saw the shooter and the shooter was not Corey Miller," but that "the officers pressured [him] to lie and say it was Corey Miller, all the while holding criminal charges over [his] head."[28]  Kenneth further alleged that he later told JPSO officers before Miller's second trial that his 2003 statement identifying Miller as the shooter was not true, but that "the officers forced him to testify anyway."[29]

Based on these affidavits, Miller urged the state court to find both *Brady* and *Napue* violations.[30]   Miller contends that the State failed to

---

whether he was "absolutely sure that the flash that [he] saw from [the] gun came from the end of [Miller's] arm," to which Darnell responded "yes."  St. Rec. Vol. 14 of 91, Darnell Jordan's Testimony, at 227, 8/5/2005.

[26]   St. Rec. Vol. 83 of 91, Kenneth Jordan's Affidavit, 6/23/2018.

[27]   *Id.*

[28]   *Id.*

[29]   *Id.*

[30]   *Id.*, Second Supplemental and Amended Memorandum in Support of Initial Application for Post-Conviction Relief, 7/2/2018.

disclose that Darnell and Kenneth had retracted their statements and testimony before his trial in violation of his rights under *Brady v. Maryland*, 373 U.S. 83 (1963).  The *Napue* violations allegedly occurred when police separately coerced Darnell and Kenneth into testifying falsely that Miller was the shooter.  *See Napue v. People of State of Ill.*, 360 U.S. 264 (1959).  In its opposition, the State submitted the affidavits of four prosecutors who tried Miller's case and of Detective Clogher to rebut the recantation affidavits of Darnell and Kenneth.[31]  The prosecutors each stated that at no time had they been told by either Darnell or Kenneth that their statements were not true or that they had ever recanted their testimony.[32]  The prosecutors also stated that they had "never threatened, pressured or coerced any witnesses into testifying."[33]  The affidavit of Detective Clogher similarly denied the allegations contained in Darnell's and Kenneth's recantation affidavits.[34] Detective Clogher asserted that he "did not intimidate, coerce or otherwise force Darnell to make any statement," and that "Darnell never told him that it was not Corey Miller who shot the victim" at the club.[35]  The detective

---

[31]   St. Rec. Vol. 86 of 91, at 601-05, Memorandum in Opposition, 9/21/2018.

[32]   *Id.* at 602-05.

[33]   *Id.*

[34]   *Id.* at 601.

[35]   *Id.*

further stated that, to the best of his knowledge, neither he nor anyone in the JPSO office had offered Kenneth leniency to implicate Miller or put any pressure on Kenneth to identify Miller as the shooter.[36]  In response, Miller requested that the state trial court hold an evidentiary hearing to weigh the credibility of the State's affidavits.[37]

### i. *State trial court determinations*

On January 23, 2019, the trial court found Miller's claims based on the recantation affidavits meritless.[38]  The court determined that Darnell's and Kenneth's affidavits were "suspect and not reliable," and did not give rise to *Brady* or *Napue* violations.  As to Darnell, the state trial court found several inconsistencies between his recantation affidavit and trial testimony.  For instance, when asked at trial "who killed [the victim]," Darnell unequivocally identified Miller.[39]  Darnell also maintained that he had no doubt that Miller was the person who shot and killed the victim, and that the flash that he saw

---

[36]   *Id.*
[37]   St. Rec. Vol. 69 of 91, Rebuttal to State's Opposition, 12/5/2018.
[38]   *Id.*, Trial Court Order, 1/23/2019.
[39]   At Miller's first trial, when asked by the State, "Who killed Steve Thomas?," Darnell responded: "Corey Miller."  St. Rec. Vol. 53 of 91, Darnell Jordan's Testimony, at 36, 9/18/2003.  When asked the same question at Miller's second trial, Darnell responded: "C-Murder," identifying Miller by his rap moniker.  St. Rec. Vol. 14 of 91, Darnell Jordan's Testimony, at 227, 8/5/2005.

from the gun came from Miller's hand.[40]   At Miller's second trial, Darnell

stated that he identified Miller from the photographic lineup in 2002

because "[h]e was the killer."[41]  Darnell reiterated that he identified Miller as

the shooter in 2002 voluntarily, and that Detective Clogher did not force him

to identify Miller or in any way threaten him.[42]   Moreover, the state court

noted that Darnell testified consistently before the grand jury and at both

trials that Miller was the shooter.[43]   Darnell also testified at both trials that

on the night of the murder he immediately identified Miller as the gunman

to Detective Nichols,[44] which Detective Nichols corroborated.[45]  As the trial

court recognized, Darnell's admission to Detective Nichols occurred before

"having had any contact with any investigators and/or prosecutors," and

thus contradicts Miller's *Napue* claim that Darnell was coerced or "tricked

into testifying as he did."[46]   And while Darnell denied to several other

---

[40]   St. Rec. Vol. 14 of 91, Darnell Jordan's Testimony, at 227, 249, 8/5/2005; St. Rec. Vol. 13 of 91, Darnell Jordan's Testimony, at 203, 8/5/2005; St. Rec. Vol. 53 of 91, Darnell Jordan's Testimony, at 34-36, 9/18/2003.

[41]   St. Rec. Vol. 14 of 91, Darnell Jordan's Testimony, at 220, 8/5/2005.

[42]   *Id.*

[43]   *Id.*

[44]   St. Rec. Vol. 53 of 91, Darnell Jordan's Testimony, at 36-37, 9/18/2003; St. Rec. Vol. 13 of 91, Darnell Jordan's Testimony, at 208, 8/5/2005.

[45]   St. Rec. Vol. 14 of 91, Darnell Jordan's Testimony, at 260, 8/5/2005.

[46]   St. Rec. Vol. 69 of 91, Trial Court Order, 1/23/2019.

investigators that Miller was the shooter, the court recognized that Darnell's inconsistent statements were "presented to the jury" at trial and refuted by Darnell's testimony.[47]   Darnell specifically testified that he failed to identify Miller as the shooter out of fear for retaliation from Miller "and his clique."[48] Darnell further stated that he was now testifying truthfully that Miller was the shooter, and that he had not been forced, pressured, or coerced to testify against Miller.[49]   Based on these inconsistencies and established testimony, the court found no evidence of a *Napue* violation.

Additionally, the court rejected Miller's assertion that the State withheld *Brady* evidence that Darnell had recanted his statement to Detective Clogher before Miller's first trial when he allegedly denied having said what was contained in his 2002 statement.[50]   The court determined that "the record refute[d] this claim, as well as the affidavits of [Detective] Clogher and the prosecutors."[51]   Darnell consistently testified at both trials that he was truthfully identifying Miller as the shooter,[52] and he denied that

---

[47]   *Id.*

[48]   St. Rec. Vol. 14 of 91, Darnell Jordan's Testimony, at 212, 8/5/2005.

[49]   *Id.* at 224, 247, 250.

[50]   St. Rec. Vol. 83 of 91, Darnell Jordan's Affidavit, at 1, 6/28/2018 (stating that when Detective Clogher handed him a copy of his 2002 statement, he told the detective, "that's not what I said.").

[51]   St. Rec. Vol. 69 of 91, Trial Court Order, 1/23/2019.

[52]   *See, e.g.*, St. Rec. Vol. 13 of 91, Darnell Jordan's Testimony, at 203, 8/5/2005 (responding that he had "no doubt" when asked whether he

Detective Clogher had forced him to tell the jury that Miller was the shooter during Miller's first trial.[53]  Darnell also testified at Miller's second trial about what he told the detectives on January 17, 2022, including that he told them that Miller murdered the victim.[54]  When asked about his statement identifying Miller from the photographic lineup, Darnell testified that he recognized the document and his signature on it, and that he had selected Miller from the lineup because Miller was the person who shot the victim.[55] Darnell never denied the content of or having made his 2002 statement during either trial; rather, his testimony substantiated what he told detectives on January 17.  Based on this testimony in the record, along with Detective Clogher's affidavit denying that Darnell ever recanted his statement before Miller's trial, the state court found no evidence of a *Brady* violation.[56]  The court therefore concluded that "[a]s to the recantation of

---

had "any doubt in [his] mind that" the flash from the gun came from Miller's hand and whether he had "any doubt in [his] mind that [Miller] shot [the victim]"); St. Rec. Vol. 13 of 91, Darnell Jordan's Testimony, at 249, 8/5/2005 (responding that he had "no doubt" when asked whether he had "[a]ny doubt in [his] mind that [Miller] was the man that shot [the victim]."); St. Rec. Vol. 53 of 91, Darnell Jordan's Testimony, at 36, 9/18/2003 (identifying "Corey Miller" when asked by the State, "Who killed Steve Thomas?").

[53]  St. Rec. Vol. 53 of 91, Darnell Jordan's Testimony, at 38, 9/18/2003.

[54]  St. Rec. Vol. 14 of 91, Darnell Jordan's Testimony, at 218, 8/5/2005.

[55]  *Id.* at 219-20.

[56]  St. Rec. Vol. 86 of 91, at 601, Memorandum in Opposition, 9/21/2018.

Darnell Jordan, in considering all evidence including the record, all transcribed trial and grand jury testimony and affidavits, [Miller] is not entitled to relief."[57]

As to Kenneth, the state court determined that his affidavit was factually erroneous because he was never arrested or facing charges for his daughter's murder.[58] This is substantiated by the record, including the investigative report for the case involving the murder of Kenneth's daughter, which does not list Kenneth as one of the three individuals arrested in the case.[59] Moreover, Kenneth himself agreed during his 2003 interview with Detective Clogher that he was making his statement after he "came to the sheriff's office *voluntarily*" as a cooperative witness in his daughter's murder case,[60] and he testified at Miller's trial that he had not been arrested in connection with that case.[61] Assistant District Attorney Tim McElroy, who was involved in the case concerning the death of Kenneth's daughter, likewise testified that on the date that Kenneth gave his statement to

---

[57] St. Rec. Vol. 69 of 91, Trial Court Order, 1/23/2019.

[58] *Id.*

[59] R. Doc. 1-3 at 44-58.

[60] St. Rec. Vol. 86 of 91, Kenneth Jordan's Statement, 1/27/2003 (emphasis added).

[61] St. Rec. Vol. 15 of 91, Kenneth Jordan's Testimony, at 181-82, 8/6/2009.

Detective Clogher in 2003, Kenneth was being "interviewed as a witness" in his daughter's case, and was not being treated as a suspect or under arrest.[62]

The court also found that McElroy's trial testimony refuted Kenneth's allegation that JPSO officers offered him leniency in his daughter's murder case in exchange for implicating Miller as the shooter.[63]  McElroy testified at Miller's second trial that Kenneth had not received any deal from the sheriff's office, and that there was no reason for him to be offered a deal.[64]  He further stated that in his review of the case involving Kenneth's daughter, he found no evidence of a deal made with Kenneth in exchange for Kenneth to testify in Miller's case.[65]  Indeed, the only offer of immunity made to Kenneth, which was filed into the trial record, was offered by the State, not the sheriff's office,[66] and related to his testimony in his daughter's murder case, not

---

[62]  *Id.*, Tim McElroy's Testimony, at 49.

[63]  St. Rec. Vol. 69 of 91, Trial Court Order, 1/23/2019.

[64]  St. Rec. Vol. 15 of 91, Tim McElroy's Testimony, at 47, 50, 8/7/2009.

[65]  *Id.* at 58.  McElroy's testimony directly refuted that of Kenneth, who agreed when asked on cross-examination that he felt as though he had to talk to detectives about the murder involving Miller if he did not want to get charged with carnal knowledge of a juvenile.  *Id.*, Kenneth Jordan's Testimony, at 209-10.

[66]  Kenneth agreed during his trial testimony that it was not an officer who offered him the deal of immunity, which further contradicts his recantation affidavit's claim that he was offered leniency by JPSO officers.  *See id.* at 193.

Miller's case.[67]   Thus, the state court concluded that Kenneth's "claim regarding immunity was presented [to the jury] at trial and refuted by . . . McElroy's testimony."[68]  This was further supported by the post-conviction affidavit of Detective Clogher, who averred that neither he nor anyone in the JPSO office had offered Kenneth leniency to implicate Miller or put any pressure on Kenneth to identify Miller as the shooter in 2003.[69]  Moreover, by the time Kenneth testified in 2009, he had no pending charges against him or offers of immunity that could have induced him to testify against

---

[67]   *Id.*, Tim McElroy's Testimony, at 52-66.   According to McElroy, Kenneth had impregnated the mother of his child when she was a minor and he was an adult, making him responsible for carnal knowledge of a juvenile, which McElroy explained is a criminal offense for "having sex with consent of the child."  *Id.* at 51.  McElroy further explained that because he found that Kenneth had committed the crime of carnal knowledge, he could not call him to the stand to testify in good faith, as this would expose Kenneth to possible criminal charges.   *Id.*   Based on this criminal exposure, the state court overseeing the infant murder case granted a motion to compel Kenneth's testimony in that case, in which Kenneth was given a grant of immunity that promised that he would not be prosecuted for the carnal knowledge charge.   *Id.* at 52-54, 60-69.   Kenneth also acknowledged this immunity deal in his testimony when he agreed that he was "offered immunity for the carnal knowledge for [his] testimony" in the case of his daughter's murder.  *Id.*, Kenneth Jordan's Testimony, at 189.

[68]   St. Rec. Vol. 69 of 91, Trial Court Order, 1/23/2019.

[69]   St. Rec. Vol. 86 of 91, at 601, Memorandum in Opposition, 9/21/2018.

Miller,[70] and he stated that he had nothing to gain from his testimony.[71] Accordingly, the trial court concluded that Miller's claim that Kenneth "was coerced into lying . . . [was] not even supported by Kenneth Jordan's affidavit" or the record, and was "purely speculative."[72]

The trial court also rejected Miller's *Brady* claim based on Kenneth's allegation that he told JPSO officers that his 2003 statement was false.[73] First, the court found this allegation to be contrary to the record. Kenneth testified at Miller's second trial that his 2003 statement was the truth. Kenneth also testified that he spoke with Greg Thurman from the sheriff's office before Miller's trial, and that he told Thurman that he "would come and testify and give [his] testimony and tell the truth."[74] He did not indicate during his testimony that he attempted to recant his 2003 statement to Thurman or anyone else in the sheriff's office. Second, the court found the allegation to be vague and conclusory because Kenneth did not indicate whom he told or when the statement was made.[75] After finding Kenneth's

---

[70]   St. Rec. Vol. 15 of 91, Kenneth Jordan's Testimony, at 220, 8/6/2009.

[71]   On re-direct by the State, Kenneth testified that he had nothing to gain from his testimony and did not have any pending charges "over [his] head" at the time of trial.  *Id.*

[72]   St. Rec. Vol. 69 of 91, Trial Court Order, 1/23/2019.

[73]   *Id.*

[74]   St. Rec. Vol. 15 of 91, Kenneth Jordan's Testimony, at 195, 8/6/2009.

[75]   St. Rec. Vol. 69 of 91, Trial Court Order, 1/23/2019.

recantation "completely unsupported and refuted by the record in this case and by the witness's testimony," the trial court concluded that the claim "must fail" when "viewed in light of the law's disdain towards recantations."[76] The court reached these determinations without holding an evidentiary hearing.

### ii. *Writ applications*

Miller's counsel then filed a writ application with the Louisiana Fifth Circuit, asserting that the trial court erred in summarily denying his post-conviction application and amended application and in denying his request for an evidentiary hearing.[77]  The Louisiana Fifth Circuit determined that Miller's writ application was untimely filed, but it nevertheless addressed the merits of Miller's arguments, finding that the trial court did not abuse its discretion in denying the claims without an evidentiary hearing.[78] Specifically, the court determined that the trial court was able to resolve the factual and legal issues presented by the recantation affidavits and determine the merits of Miller's claims without a hearing based on the "volume of

---

[76]   *Id.*

[77]   St. Rec. Vol. 85 of 91, Fifth Circuit Writ Application, 20-KH-322 (undated).

[78]   St. Rec. Vol. 84 of 91, Fifth Circuit Order, 20-KH-322, 12/11/2020.

existing information contained in the record from which the trial court could draw upon."[79]  The court further stated that the trial court did not err in its conclusion that Miller failed to sufficiently prove his *Brady* and *Napue* claims based on the recantation affidavits.[80]  The Louisiana Supreme Court denied writ, finding that Miller failed to show that the State withheld material exculpatory evidence under *Brady*.  *State ex rel. Miller v. State*, 325 So. 3d 370 (La. 2021).

### 2.    *Lack of State Court Evidentiary Hearing*

In his federal habeas petition, Miller again argues that the state trial court erred in dismissing his claims without an evidentiary hearing.[81]  But this contention is without merit as "[i]t is well-settled that 'infirmities in state habeas proceedings do not constitute grounds for federal habeas relief.'" *Henderson v. Cockrell*, 333 F.3d 592, 606 (5th Cir. 2003) (quoting *Duff-Smith v. Collins*, 973 F.2d 1175, 1182 (5th Cir. 1992)).  The Fifth Circuit has repeatedly held that a petitioner's attack on a state habeas proceeding, including the state courts' failure to hold an evidentiary hearing, does not impact the validity of the underlying state criminal conviction, which is the

---

[79]    *Id.*
[80]    *Id.*
[81]    R. Doc. 1-1 at 14, 16-17.

focus of federal habeas relief. *See Trevino v. Johnson*, 168 F.3d 173, 180 (5th Cir. 1999); *see also Rudd v. Johnson*, 256 F.3d 317, 319-20 (5th Cir. 2001) ("[A]n attack on the state habeas proceeding is an attack on a proceeding collateral to the detention and not the detention itself."); *Tercero v. Stephens*, 738 F.3d 141, 147 (5th Cir. 2013) (holding that allegation that state habeas court failed to hold an evidentiary hearing on petitioner's *Roper* claim did not furnish an independent basis for federal habeas corpus relief). Thus, the state trial court's denial of an evidentiary hearing on Miller's *Brady* and *Napue* claims is not a cognizable claim on federal review.

Moreover, although the state courts did not hold an evidentiary hearing, the state trial court entered findings of fact, conclusions of law, and a recommendation that habeas relief be denied.[82] The trial court recognized that it was able to resolve the "factual and legal issues" presented by the recantation affidavits "without further proceedings" by drawing upon the Miller's "application and answer, and supporting documents" in the record.[83] And based on those determinations, the Louisiana Fifth Circuit[84] and Louisiana Supreme Court denied Miller's writ applications. *See generally State ex rel. Miller*, 325 So. 3d 370 (La. 2021). This constitutes an

---

[82]   St. Rec. Vol. 69 of 91, Trial Court Order, 1/23/2019.

[83]   *Id.*

[84]   St. Rec. Vol. 84 of 91, Fifth Circuit Order, 20-KH-322, 12/11/2020.

adjudication on the merits and exhaustion of Miller's *Brady* and *Napue* claims, and thus the AEDPA's standard of review applies.  *See Singleton v. Johnson*, 178 F.3d 381, 384 (5th Cir. 1999); *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000).

### 3.   *Deference under § 2254(e)(1)*

AEDPA affords substantial deference to a state court's resolution of factual issues.  *See Brumfield v. Cain*, 576 U.S. 305, 313 (2015); *see also Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) ("A federal court's collateral review of a state-court decision must be consistent with the respect due state courts in our federal system.").  Claims that present questions of fact are reviewed under 28 U.S.C. §§ 2254(d)(2) and (e)(1).  This involves a "two-step approach," in which "a federal court reviewing a case [first] applies [§ 2254(e)(1)]'s rebuttable presumption of correctness to each disputed factual determination by the state court." *Neal v. Vannoy*, 78 F.4th 775, 783 (5th Cir. 2023).  Under § 2254(e)(1), a federal habeas court must presume the state court's underlying factual determinations, including credibility determinations, to be correct, unless the petitioner rebuts the presumption of correctness by clear and convincing evidence.  *Miller-El*, 537 U.S. at 340; *see also Hall v. Quarterman*, 534 F.3d 365, 371 n.22 (5th Cir. 2008) ("State

credibility determinations also receive AEDPA deference on habeas review, but not when overcome by clear and convincing evidence."); *Richards v. Quarterman*, 566 F.3d 553, 563 (5th Cir. 2009) (holding that state court credibility determinations are entitled to presumption of correctness under § 2254(e)(1)). This presumption of correctness "is especially strong when, as here, the state habeas court and the trial court are one and the same." *Murphy v. Johnson*, 205 F.3d 809, 813 (5th Cir. 2000). It extends not only to express factual findings, but also to implicit or unarticulated findings that are necessary to the state court's conclusions of mixed law and fact. *Murphy v. Davis*, 901 F.3d 578, 597 (5th Cir. 2018).

"Then, in reviewing the state court's decision, the [federal habeas] court considers the entire factual basis and utilizes the reasonableness standard from [§ 2254(d)(2)] to assess, ultimately, whether the second exception to AEDPA's relitigation bar has been satisfied." *Neal*, 78 F.4th at 783. Section 2254(d)(2) provides that "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. at 340; *see also Neal*, 78 F.4th at 783 ("Ultimately, to clear the required threshold, the petitioner must show 'a reasonable factfinder must conclude' the state

court's determination of the facts was unreasonable." (quoting *Rice v. Collins*, 546 U.S. 333, 335 (2006))).

Here, Magistrate Judge Roby applied this deferential standard and presumption of correctness to the state trial court's factual determinations concerning the recantation affidavits.  Miller objects to the Magistrate Judge's application of the presumption of correctness to the state court's credibility findings under 28 U.S.C. § 2254(e)(1), arguing that because the trial court did not hold an evidentiary hearing on his *Brady* and *Napue* claims, it, in effect, did not make findings of fact concerning the recantation affidavits.[85]

The Fifth Circuit has recognized that a state court's reliance on a paper record without live testimony does not preclude the application of AEDPA deference and the presumption of correctness attached to its factual findings. *See, e.g.*, *Morrow v. Dretke*, 367 F.3d 309, 315 (5th Cir. 2004) (holding that AEDPA requires courts "to presume correct the state court's findings of fact . . . even if the hearing was a 'paper' hearing and may not have been full and fair," unless petitioner rebuts presumption of correctness by clear and convincing evidence (citation and internal quotation marks omitted)); *Valdez v. Cockrell*, 274 F.3d 941, 951 (5th Cir. 2001) (holding that

---

[85]    R. Doc. 25 at 8.

presumption of correctness and deferential standard of review apply to state court's findings of fact even when reached without "full and fair" evidentiary hearing).   And it is not the province of a federal court to reevaluate the credibility of affidavits, even if the state court reached its credibility determinations without a hearing.  *See Avila v. Quarterman*, 560 F.3d 299, 307 (5th Cir. 2009) (holding that federal district court improperly re-evaluated state court's credibility determination based on an evaluation of conflicting affidavits); *Morales v. Thaler*, 714 F.3d 295, 303 (5th Cir. 2013) ("AEDPA does not allow federal habeas courts to gainsay state courts' assessments of credibility on a cold paper record.").  Here, the state court made findings of fact and determinations of credibility that the recantation affidavits were "suspect and not reliable," based on inconsistencies and established falsities,[86] and thus failed to support Miller's *Brady* and *Napue* claims.[87]  These determinations are entitled to a rebuttable presumption of correctness under § 2254(e)(1), regardless of the state court's decision not to hold an evidentiary hearing.  *See Valdez*, 274 F.3d at 951.  The presumption applies to all of the state court's factual findings, including its credibility determinations on Darnell's and Kenneth's affidavits.

---

[86]   *See supra* Section I.B.1.i.
[87]   St. Rec. Vol. 69 of 91, Trial Court Order, at 3, 1/23/2019.

Accordingly, this Court will apply the rebuttable presumption of correctness under § 2254(e)(1) in evaluating the state trial court's determinations of the credibility of the recantation affidavits. Because this Court is not entitled to supplant the factual determinations of the state court, which were reached based on "the volume of existing information contained in the record,"[88] it will evaluate Miller's claim without holding an evidentiary hearing.[89]  *See Avila*, 560 F.3d at 307; *Morales*, 714 F.3d at 303; *see also Cullen v. Pinholster*, 563 U.S. 170, 183 (2011) ("[W]hen the state-court record 'precludes habeas relief' under the limitations of § 2254(d), a district

---

[88]   St. Rec. Vol. 84 of 91, Fifth Circuit Order, 20-KH-322, 12/11/2020.

[89]   A district court may hold an evidentiary hearing only when the petitioner shows that either the claim relies on a new, retroactive rule of constitutional law that was previously unavailable, 28 U.S.C. § 2254(e)(2)(A)(i), or the claim relies on a factual basis that could not have been previously discovered by exercise of due diligence, *id.* § 2254(e)(2)(A)(ii); *and* that the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner.  *Id.* § 2254(e)(2)(B).  Miller contends that the record reveals a genuine dispute as to the alleged facts in the recantation affidavits, thus warranting a federal evidentiary hearing to reach credibility determinations not previously reached by the state trial court.  As discussed, the state court made credibility and factual determinations based on the extensive record and adjudicated Miller's *Brady* and *Napue* claims on the merits despite not holding an evidentiary hearing; thus, an evidentiary hearing will not aid this Court in its review.  *See Sandoval Mendoza v. Lumpkin*, 81 F.4th 461, 472 (5th Cir. 2023).

court is 'not required to hold an evidentiary hearing.'" (quoting *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007))).

### 4.   *Miller's Failure to Overcome Presumption*

As noted, Miller must overcome the presumption of correctness afforded under § 2254(e)(1) by clear and convincing evidence that the state court's factual findings, including its credibility determinations, were incorrect.  *See Miller-El*, 537 U.S. at 330-31.  Miller attempts to do so by objecting to the state trial court's treatment of the recantation affidavits with suspicion, arguing that this skepticism is an unreasonable and fundamentally unfair approach to making factual determinations.[90]

Magistrate Judge Roby correctly noted that both federal and Louisiana law recognize a long-standing view that "recantations are highly suspicious."[91]  *Isaac v. Cain*, 588 F. App'x 318, 326 (5th Cir. 2014) (citations omitted); *see also Spence v. Johnson*, 80 F.3d 989, 1003 (5th Cir. 1996) ("[R]ecanting affidavits and witnesses are viewed with extreme suspicion by the courts."); *Neal*, 78 F.4th at 788-89 (affirming *Spence* and noting that "recantation is viewed with suspicion because it is tantamount to an

---

[90]     R. Doc. 25 at 10-11.
[91]     R. Doc. 24 at 64.

admission of perjury"); *State v. Prudholm*, 446 So. 2d 729, 736 (La. 1984) ("[R]ecantations are highly suspicious and, except in rare circumstances, a motion for new trial should not be grated on the basis of a recantation since that disclaimer is tantamount to admission of perjury so as to discredit the witness at a later trial."). That the state trial court treated the affidavits with suspicion, without more, does not amount to clear and convincing evidence that the court's findings were incorrect. This objection is therefore overruled.

Further, Magistrate Judge Roby was correct in finding no clear and convincing evidence that the state court's discrediting of the affidavits as unreliable was wrong on the facts or the law. The state trial court found contradictions and falsities in both Darnell's and Kenneth's affidavits,[92] which led the court to conclude that the affidavits were not credible and unreliable to serve as proof that *Brady* and *Napue* violations occurred.[93] For example, the state trial court found Darnell's affidavit not credible in light of his consistent identification of Miller as the shooter, first when he volunteered this information to Detective Nichols on the night of the murder, and again before the grand jury and at both trials. As the trial court

---

[92]    *See supra* Section I.B.1.i.

[93]    St. Rec. Vol. 69 of 91, Trial Court Order, at 3, 1/23/2019.

recognized, Darnell's statement to Detective Nichols, which Nichols corroborated at trial, occurred before Darnell "had any contact with other investigators and/or prosecutors," and thus rebutted Miller's "claim that Darnell Jordan was tricked into testifying as he did."[94]  The court also relied on a number of inconsistencies between Darnell's trial testimony and recantation affidavit.  For instance, while Darnell alleged in his affidavit that he was tricked into identifying Miller as the killer from the photographic lineup when he thought he was simply identifying Miller in a picture, the trial court pointed out that he testified at trial that he "picked [Miller] from the line-up and identified him as the shooter."[95]  Indeed, when asked by the State at Miller's second trial why he had selected the photo of Miller from the lineup, Darnell responded: "He was the killer."[96]  Darnell also alleged in his affidavit that the flash from the gun came from the other side of the pile surrounding the victim, but at trial he testified that he saw the flash from the gun come from Miller's hand.[97]  And while Darnell alleged in his affidavit

---

[94]  *Id.*

[95]  *Id.*

[96]  St. Rec. Vol. 14 of 91, Darnell Jordan's Testimony, at 220, 8/5/2005.

[97]  *Id.* at 227, 249; St. Rec. Vol. 13 of 91, Darnell Jordan's Testimony, at 203, 8/5/2005; St. Rec. Vol. 53 of 91, Darnell Jordan's Testimony, at 34-36, 9/18/2003.

that he meant to say at trial that he "was sure" Miller was *not* the shooter,[98] this was refuted by his testimony at both trials during which he unequivocally named Miller when asked who shot the victim.[99]   Further, the court found Darnell's claim that he had recanted his 2002 statement to Detective Clogher before Miller's trial to be refuted by Darnell's trial testimony and Detective Clogher's post-conviction affidavit.   Based on the inconsistencies between Darnell's affidavit and the record evidence, the court concluded that the affidavit was not credible, and was "suspect and not reliable" as *Brady* or *Napue* evidence.[100]

Moreover, the court found Kenneth's affidavit not credible because it contained established falsities and contradictions with his trial testimony and 2003 statement.   First, although Kenneth claimed to have been "arrested for the murder of [his] infant daughter,"[101] this was refuted by both Kenneth's

---

[98]   Darnell stated: "When I said on the stand that 'I was sure' I meant I was sure [Miller] didn't do it."   St. Rec. Vol. 83 of 91, Darnell Jordan's Affidavit, 6/28/2018.

[99]   St. Rec. Vol. 53 of 91, Darnell Jordan's Testimony, at 36, 9/18/2003; St. Rec. Vol. 14 of 91, Darnell Jordan's Testimony, at 227, 8/5/2005.

[100]   St. Rec. Vol. 69 of 91, Trial Court Order, 1/23/2019.

[101]   St. Rec. Vol. 83 of 91, Kenneth Jordan's Affidavit, 6/23/2018.

and McElroy's trial testimony,[102] as well as other evidence in the record.[103]
Second, Kenneth claimed that JPSO officers offered him "leniency in [his] criminal case if [he] agreed to cooperate and give [ ] a statement implicating Corey Miller in the shooting."[104]  This issue was raised during Miller's second trial and rebutted by McElroy's testimony that no such offer had been made.[105]  It was further rebutted by the post-conviction affidavit of Detective Coghler, who stated that neither he nor "anyone in the Sheriff's Office to his knowledge offered [Kenneth] any kind of leniency to cooperate and give a statement implicating" Miller.[106]  The court also found that the record, which included Kenneth's testimony that he had not been coerced or otherwise induced to testify against Miller and that his 2003 statement was true, as well as the post-conviction affidavits from Detective Clogher and the prosecutors, made the claims in his recantation affidavit not credible.  The court further

---

[102]   St. Rec. Vol. 15 of 91, Kenneth Jordan's Testimony, at 181-82, 8/6/2009 (testifying that he was interviewed as a witness in his daughter's murder case and was not arrested on that charge); *id.*, Tim McElroy's Testimony, at 49 (testifying that the JPSO "interviewed [Kenneth] as a witness" in his daughter's case, and Kenneth was not being treated as a suspect or under arrest).

[103]   *See, e.g.*, R. Doc. 1-3 at 44-58 (Investigative report of JPSO Criminal Investigations Bureau Homicide Division).

[104]   St. Rec. Vol. 83 of 91, Kenneth Jordan's Affidavit, 6/23/2018.

[105]   St. Rec. Vol. 15 of 91, Tim McElroy's Testimony, at 47, 50, 58, 8/7/2009.

[106]   St. Rec. Vol. 86 of 91, Donald Clogher's Affidavit, at 601, 9/19/2018.

determined that Kenneth's allegation regarding his purported pre-trial recantation to Detective Clogher to be both vague and conclusory because Kenneth did not indicate whom he told or when the statement was made.[107] These falsities, discrepancies, and conclusory allegations led the court to find Kenneth's recantation both suspect and unreliable.[108]  As the recantation affidavits were the only proof offered in support of Miller's *Brady* and *Napue* violations, the court accordingly found that Miller had not proved his *Brady* or *Napue* claims.

Now, in support of his federal habeas claim based on *Brady* and *Napue*, Miller again has presented no other evidence beyond the two recantation affidavits of Darnell and Kenneth, which he contends warrants a reevaluation of the state courts' credibility determinations.  But the trial court's factual and credibility findings resolved that these affidavits were suspect and not reliable and, thus, provided no basis to credit the recantations, to establish that the affiants' trial testimony was false, or to establish impropriety by state officials in inducing their respective trial testimony.  And as previously discussed, it is not the province of this federal habeas court to make credibility determinations when previously reached by

---

[107]   St. Rec. Vol. 69 of 91, Trial Court Order, 1/23/2019.

[108]   *Id.*

the state trial court.  Rather, it is Miller's burden to put forth clear and convincing evidence of error in the state courts' findings of fact, which he has failed to do.  Without meeting this high burden, the factual and credibility determinations are entitled to the presumption of correctness under § 2254(e)(1) in assessing the reasonableness of the denial of relief on Miller's *Brady* and *Napue* claims.  Accordingly, the Court finds that Miller's objection based on the state courts' treatment of the recantation affidavits with suspicion and the application of the AEDPA's presumption of correctness to the credibility determinations is without merit.

After finding the presumption of correctness applicable to the state court's factual and credibility determinations, the Magistrate Judge applied AEDPA's standard of review under § 2254(d)(1) to evaluate the merits of Miller's *Brady* and *Napue* claims.  This standard requires the Court to decide whether the state court's *Brady* or *Napue* determination resulted in a decision that is contrary to, or involved an unreasonable application of, clearly established federal law.  *Miller-El*, 537 U.S. at 340; *Neal*, 78 F.4th at 783.  The Magistrate Judge concluded that it had not, and thus that the state courts' denial of relief was not unreasonable as neither claim was factually supported.[109]  Miller did not object to this portion of the R&R.  Having

---

[109]    *See* R. Doc. 24 at 66-71.

reviewed this portion of the R&R, the Court finds no clear error. The Court therefore adopts this section of the R&R as its opinion. Miller is not entitled to federal habeas relief on this claim.

### 5.    *Miller's Suspension Clause Objection*

Miller also argues, without citation to authority, that this federal habeas court's denial of an evidentiary hearing out of deference to the state courts' credibility determinations, made without an evidentiary hearing, implicates the Suspension Clause, U.S. Const. art. I, § 9, cl. 2.[110]  At least one federal court has considered, and rejected, the argument Miller seemingly makes here.  In *Crater v. Galaza*, 491 F.3d 1119 (9th Cir. 2007), the Ninth Circuit addressed whether the deference due a state court under § 2254(d)(1) constituted a suspension of the writ of habeas corpus.  Noting that a suspension of the writ occurs only when Congress "clearly and unambiguously" removes all federal habeas corpus jurisdiction, the court concluded that the plain text of the AEDPA "defeats any suggestion that § 2254(d)(1) eliminates habeas jurisdiction entirely." *Id.* at 1124.  The Ninth Circuit further concluded that the deference afforded under § 2254(d)(1) does not "constrain[] relief so dramatically that it *effectively* suspends the

---

[110]    R. Doc. 25 at 13.

writ;" rather, relief under § 2254(d)(1) "remains available, but is reserved for cases where a state adjudication 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'" *Id.* at 1124-25; *see also Miller-El*, 537 U.S. at 340 (holding that a habeas court's deferential standard of review "does not imply abandonment or abdication of judicial review" or "by definition preclude relief"). This Court finds this authority persuasive and concludes that Miller's Suspension Clause argument is without merit. Accordingly, no evidentiary hearing is warranted on his *Brady* and *Napue* claims.

### C.   Juror Misconduct

Finally, Miller argues that he is entitled to relief or an evidentiary hearing based on alleged juror misconduct. Miller contends that his Sixth and Fourteenth Amendment rights were violated when at least one juror in the majority of his ten-to-two verdict voted to convict because she wished to end deliberations, not because she believed Miller was guilty.[111]

---

[111]    *Id.* at 14.

1.  *Background*

On the second day of deliberations during Miller's second trial, the jury notified the trial judge that juror Geralneigh Bazile, a young African American female,[112] refused to participate or cooperate in deliberations.[113] The judge then met with the jury, instructing them to evaluate their convictions and informing them that each juror "must participate in the [deliberation] process" and consider each other's views.[114]  He also spoke individually with Bazile, who indicated that she believed Miller was not guilty and felt pressure from her fellow jurors to change her vote.[115]  The judge informed Bazile that her vote mattered and that she did not have to change her view, but she could change it if she believed her position was wrong.[116]

Less than two hours after the jury returned to deliberations, the judge was advised that the jury had reached a verdict.[117]  The court was also advised that Bazile did not want to leave the jury room and was throwing up.[118]  The jury eventually appeared together and announced its ten-to-two verdict of

---

[112]  St. Rec. Vol. 17 of 91, Sentencing Transcript, at 10, 8/11/2009.
[113]  *Id.* at 2.
[114]  *Id.* at 5, 8.
[115]  *Id.* at 11-13.
[116]  *Id.* at 12-14.
[117]  *Id.* at 23.
[118]  *Id.*

guilty.[119]   During polling, it was determined that another juror, Edith M. Jacob, qualified her guilty vote as being "under duress to get out of here."[120] The judge declared the verdict invalid and sent the jury back to deliberate, reminding the jurors that they should not vote "for the mere purpose of returning a verdict."[121]   That same day, the jury returned with a second ten-to-two verdict, which the court accepted.   The ten votes to convict came from one African American juror and nine white jurors, including Jacob,[122] while the two not guilty votes both came from African American jurors, including Bazile.[123]   When polled, Jacob did not qualify her vote of guilty.

Days later, Jacob spoke with a reporter at the Times-Picayune, stating that she "changed her vote to guilty to end deliberations to protect a young juror who felt [Miller] was innocent but who crumbled under 'brutal' pressure from other jurors."[124]   Jacob also signed an affidavit in which she maintained that the other jurors were "very abusive" to Bazile, calling her names and using racial slurs.[125]   Both the article and affidavit were stricken

---

[119]   *Id.*

[120]   *Id.* at 26.

[121]   *Id.* at 27-28.

[122]   Jacob is described in the state trial record as a "white lady" and "white woman."  *Id.* at 29-30.

[123]   *Id.* at 15 (defense counsel providing statistics of the verdict vote).

[124]   R. Doc. 1-2 at 105.

[125]   R. Doc. 1-3 at 97.

and not considered by the state courts on direct appeal or post-conviction review as they impermissibly comprised materials outside of the evidence under Louisiana Code of Evidence article 606.  Now, in this federal habeas proceeding, Miller again relies on Jacob's statements to claim that juror intimidation and racial harassment improperly influenced the guilty verdict.

### 2.   *Merits of Jury Misconduct Claim*

As an initial matter, the "abuse" described by Jacob and relied upon by Miller constitutes "internal," rather than "external," influence during the deliberation process.[126]  *See United States v. Straach*, 987 F.2d 232, 241 (5th Cir. 1993) (distinguishing between external influences, such as newspapers or statements by court personnel, and internal influences surrounding the jury's internal deliberations).  Absent a showing of external influence, courts, as a rule, may not inquire into the jury's deliberative process based on allegations of internal influence alone.  *See Greer v. Thaler*, 380 F. App'x 373, 382 (5th Cir. 2010) (citing *Tanner v. United States*, 483 U.S. 107, 120-21 (1987)).  Nor may courts consider post-verdict affidavits or testimony from a juror regarding the internal deliberation process and no such affidavit

---

[126]   R. Doc. 24 at 27-29.

or testimony can form the basis of a mistrial.[127]  *See Straach*, 987 F.2d at 241

("[J]ury's internal deliberations cannot result in a mistrial."); *Oliver v.*

*Quarterman*, 541 F.3d 329, 336 (5th Cir. 2008) ("[I]nternal influences . . .

provide no basis for relief."); *see also United States v. Black*, 843 F.2d 1456,

1464 n.7 (D.C. Cir. 1988) ("[A] juror's affidavit is incompetent to impeach the

verdict for internal error; juror affidavits may only be used for the narrow

purpose of showing 'extraneous influence,' such as prejudicial publicity.").

This bar against using juror testimony about internal processes to impeach a

verdict is known as the "no-impeachment rule."  *See Pena-Rodriguez v.*

*Colorado*, 580 U.S. 206, 211 (2017) ("A general rule has evolved to give

substantial protection to verdict finality and to assure jurors that, once their

verdict has been entered, it will not later be called into question based on the

comments or conclusions they expressed during deliberations.   This

principle, itself centuries old, is often referred to as the no-impeachment

rule.").

     Miller contends that an exception to the no-impeachment rule should

be made under *Pena-Rodriguez v. Colorado*, 580 U.S. 206 (2017), because

the evidence shows that Jacob's vote was motivated in part by racial

harassment directed at another juror.   Miller's reliance on this case is

---

[127]    *Id.* at 29.

misplaced.  In *Pena-Rodriguez*, the Supreme Court examined "whether there is an exception to the no-impeachment rule when, after the jury is discharged, a juror comes forward with compelling evidence that another juror made clear and explicit statements indicating that racial animus was a significant motivating factor in his or her vote to convict."  *Id.* at 211.  There, one juror said during deliberations that the defendant was guilty of sexual misconduct "because [he was] Mexican and Mexican men take whatever they want" and also because the defendant's alibi witness was "an illegal."  *Id.* at 213.  The Court held that when "a juror makes a clear statement that indicates he or she relied on racial stereotypes or animus to convict a criminal defendant," the rule barring evidence of internal influence must "give way in order to permit the trial court to consider the evidence of the juror's statement and any resulting denial of the jury trial guarantee."  *Id.* at 225.  But unlike *Pena-Rodriguez*, which concerned the jury's use of racial animus or stereotypes against the defendant when voting to convict, Miller's claim is solely based upon alleged racial harassment directed at Bazile by other members of the jury.  Miller does not contend that the verdict was motivated by racial bias or animus against him.  And Miller points to no Supreme Court or Fifth Circuit precedent extending the *Pena-Rodriguez* exception to cases involving juror harassment directed at another juror.

41

To the contrary, courts are generally in agreement that intra-jury intimidation or harassment constitutes internal influence covered under the no-impeachment rule. *See, e.g.*, *United States v. Brown*, 934 F.3d 1278, 1302-04 (11th Cir. 2019) (holding that allegations of racial bias against police officers did not satisfy the narrow exception under *Pena-Rodriguez*, that allegations of intra-jury bullying were "nothing more than a typical feature of jury deliberations . . . that [ ] fall[] squarely within the no-impeachment rule," and that allegations of gender bias by one juror against another did not fall within an exception because the court has "never held that bias of one juror *against another juror* constitutes an exceptional circumstances to the no-impeachment rule." (emphasis in original)); *United States v. Bailey*, Nos. 19-2280/2281/2354 & 20-1235, 2022 WL 2444930, at *9 (6th Cir. July 5, 2022) ("[C]laims that a juror 'pressured' and 'berated' other jurors to reach a guilty verdict concern matters internal to the jury."); *United States v. Lakhani*, 480 F.3d 171, 184-85 (3d Cir. 2007) ("[E]vidence of discussions among jurors, intimidation or harassment of one juror by another, and other intra-jury influences on the verdict is within the rule, rather than the exception, and is not competent to impeach a verdict."); *United States v. Briggs*, 291 F.3d 958, 963 (7th Cir. 2002) (affirming district court's denial of post-verdict motion based on a juror's allegations that jurors and the jury

foreman exerted "extreme and excessive pressure on individuals to change votes"); *United States v. Moses*, 15 F.3d 774, 778 (8th Cir. 1994) (holding that hostility among jurors during deliberations may not be shown); *Gov't of V.I. v. Gereau*, 523 F.2d 140, 149-50 (3d Cir. 1975) ("[E]vidence of discussions among jurors, intimidation or harassment of one juror by another, and other intra-jury influences on the verdict is within the rule, rather than the exception." (emphasis omitted) (footnotes omitted)); *Martinez v. Food City, Inc.*, 658 F.2d 369, 373 (5th Cir. 1981) ("[J]uror testimony regarding the possible subjective prejudices or improper motives of individual jurors has been held to be within the rule, rather than within the exception for 'extraneous influences.'" (citations omitted)).  Without binding precedent to the contrary, the Court rejects Miller's objection.

Even if there were circumstances under which a claim of intra-jury racial harassment would be cognizable, this case would not qualify.  This is not a case where any juror contends that his or her vote to convict was significantly motivated by racial antagonism or intimidation directed at him or her by other jurors.  Indeed, Bazile herself, who bore the brunt of the alleged racism and bullying, maintained her position that Miller was not guilty throughout deliberations and ultimately voted not to convict.  And there is also no allegation that the two other African American jurors,

including one who voted not guilty, were subject to any racial animus or harassment. *See Robinson*, 872 F.3d at 771 (holding that *Pena-Rodriguez* does not overcome the no-impeachment rule when the racial animus of another juror "appeared not to influence [other juror's] votes"). Rather, Jacob, who is white, was the only juror whose vote was allegedly influenced, albeit indirectly, by the racial harassment aimed at another juror. As Magistrate Judge Roby discussed, there is no showing of any racial slurs or other race-based harassment or intimidation directed at Jacob *herself* with the purpose of influencing her vote of guilty.[128] Jacob at most vaguely alleges the use of non-specific "racial slurs" toward Bazile, which allegedly influenced Jacob's guilty vote because she wished to end deliberations and allow the jury to return home.[129] This is insufficient to impeach Miller's guilty verdict. *See Brown*, 934 F.3d at 1302 (holding that the no-impeachment rule prohibits evidence that a juror "was overcome by

---

[128]    *Id.* at 30-31.

[129]    While unnecessary to the Court's decision, the Court notes that Jacob's assertion that she voted to convict Miller in part out of a desire to end the bullying and racial abuse of this young African American juror is inherently self-contradictory. This is because her actions had the certain result of convicting Miller, a young African American man, of second-degree murder, based on evidence Jacob now says she considered insufficient to convict. Thus, Jacob oddly contends that her disapproval of racial harassment of an African American woman motivated her to vote to *convict* an African American man of second-degree murder.

weariness or unsound arguments of other jurors, or by a desire to return home").

The Court further notes that, although Jacob qualified her first vote as guilty under duress to end deliberations, her second polling contained no such qualifier.  Before sending the jury back in to deliberate, the trial judge clearly instructed that no juror should vote a certain way "for the mere purpose of returning a verdict."[130]  Even with this cautionary instruction, Jacob did not reconsider and alter her vote to convict Miller.  Jacob also took no action, beyond the qualification of her initial vote, to alert the state court of any of the harassment, coercion, or intimidation allegedly occurring in the jury room towards Bazile.

Accordingly, Miller's claim based on vague, non-specific allegations of intra-jury racial harassment, without evidence of outside influence, does not give rise to a post-verdict inquiry.  The Court therefore accepts Magistrate Judge Roby's conclusion that Miller's jury misconduct claim is meritless, and no evidentiary hearing is warranted on this claim.

In sum, the Court, having reviewed *de novo* the petition, the record, the applicable law, the Magistrate Judge's R&R, and Miller's objections, adopts the Magistrate Judge's R&R as its opinion.  Miller's objections are

---

[130]    R. Doc. 24 at 27-28.

overruled, and his petition is dismissed for the reasons stated in the Magistrate Judge's R&R and in this Order.


## II.   CERTIFICATE OF APPEALABILITY

Rule 11 of the Rules Governing Section 2254 Proceedings provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  A court may issue a certificate of appealability only if the petitioner makes "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The "controlling standard" for a certificate of appealability requires the petitioner to show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented [are] 'adequate to deserve encouragement to proceed further.'"  *Miller-El*, 537 U.S. at 336 (quoting *Slack v. McDaniel*, 529 U.S. 473, 475 (2000)).

Miller's petition does not satisfy these standards.  For the reasons stated in this Court's Order and in the R&R, the Court finds that Miller has not demonstrated that he is entitled to federal habeas relief under § 2254 or that his claims would engender debate among reasonable jurists or deserve encouragement to proceed further.  Thus, the Court will not issue a COA.

## III.   CONCLUSION

IT IS ORDERED that Miller's petition is DISMISSED WITH PREJUDICE.  The Court will not issue a certificate of appealability.

New Orleans, Louisiana, this  13th   day of November, 2023.

*Sarah Vance*

SARAH S. VANCE
UNITED STATES DISTRICT JUDGE